**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DENISE ARCHER, Individually and on behalf of all others similarly situated; J.W., a minor, by and through their next friend, JAHLIA HERNANDEZ, individually and on behalf of all others similarly situated; J.A., a minor, by and through their next friend, JAHLIA HERNANDEZ, individually and on behalf of all others similarly situated; D.A., a minor, by and through their next friend, JAHLIA HERNANDEZ, individually and on behalf of all others similarly situated; DANIELLE LORIMER, Individually and on behalf of all others similarly situated; Z.L., a minor, by and through their next friend, JEANNETTE BOCANEGRA, individually and on behalf of all others similarly situated; Y.L., a minor, by and through their next friend, JEANNETTE BOCANEGRA, individually and on behalf of all others similarly situated; X.L., a minor, by and through their next friend, JEANNETTE BOCANEGRA, individually and on behalf of all others similarly situated; W.L., a minor, by and through their next friend, JEANNETTE BOCANEGRA, individually and on behalf of all others similarly situated; K.L., a minor, by and through their next friend, JEANNETTE BOCANEGRA, individually and on behalf of all others similarly situated, | Case No. 1:26-cv-4426 <br><br> **COMPLAINT** <br><br> **PLAINTIFFS DEMAND TRIAL BY JURY** |
| Plaintiffs, | |
| v. | |
| CITY OF NEW YORK, | |
| Defendant. | |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

PARTIES ....................................................................................................................7

 A. Plaintiffs ...............................................................................................7

 B. Defendant ..............................................................................................8

JURISDICTION AND VENUE .................................................................................9

DEMAND FOR JURY TRIAL ..................................................................................9

FACTS ......................................................................................................................10

 I. THE LAW AND MECHANICS OF FAMILY SEPARATION ..........................10

  A. Reporting and Investigation Stage.............................................10

  B. Child Removals .........................................................................11

 II. ACS MAINTAINS AN UNLAWFUL POLICY OF UNILATERALLY SEIZING CHILDREN IN NON-EMERGENT CIRCUMSTANCES WHERE THERE IS TIME TO SEEK A COURT ORDER ..................................................16

  A. ACS Conducts Emergency Removals with Alarming Regularity and in a Manner That Undermines the Claim of Bona Fide Emergencies ..............18

  B. ACS's Own Statements and Internal Reports Reveal That the Agency Incentivizes and Condones the Unconstitutional Abuse of Its Emergency Removal Powers .....................................................................................24

 III. ACS DEPLOYS ITS UNLAWFUL EMERGENCY REMOVAL POLICY AGAINST PLAINTIFFS AND CLASS MEMBERS ..........................................25

  A. Plaintiffs ....................................................................................25

   The Archer Family.....................................................................25

   The Lorimer Family...................................................................34

  B. Witnesses ...................................................................................41

   The Richardson Family..............................................................42

   The Trainor Family....................................................................47

   The E. Family.............................................................................50

 IV. ACS'S EMERGENCY REMOVAL POLICY REFLECTS A SYSTEMIC, DISCRIMINATORY PRACTICE THAT TARGETS BLACK AND LATINO FAMILIES .............................................................................................51

  A. Historical Legacy of Racialized Family Separation...................51

  B. Data Overwhelmingly Demonstrate Profound Racial Disparities in ACS Emergency Removal Practices That Are Highly Probative of Racial Animus.......................................................................................54

  C. ACS's Use of Subjective and Discriminatory Risk Assessment Factors...59

V.      ACS'S EMERGENCY REMOVAL POLICY CAUSES SEVERE, IRREPARABLE HARM TO CHILDREN AND THEIR FAMILIES ..................61

     A.      ACS's Emergency Removal Policy Causes Irreparable Harm to Children ..........................................................................................61

     B.      ACS's Emergency Removal Policy Causes Irreparable Harm to Parents and Families ..................................................................................67

VI.     ACS HAS LONG KNOWN THAT ITS EMERGENCY REMOVAL POLICY IS UNLAWFUL AND REFLECTS DISCRIMINATORY ANIMUS AGAINST BLACK AND LATINO FAMILIES ...................................................................70

VII.    ACS FAILS TO ADEQUATELY TRAIN, SUPERVISE, MONITOR, AND DISCIPLINE ITS STAFF TO ENSURE EMERGENCY REMOVALS COMPLY WITH THE LAW ............................................................................76

CLASS ACTION ALLEGATIONS ..................................................................................79

CAUSES OF ACTION ......................................................................................................82

COUNT ONE.....................................................................................................................82

COUNT TWO.....................................................................................................................84

COUNT THREE.................................................................................................................85

COUNT FOUR ...................................................................................................................87

PRAYER FOR RELIEF .....................................................................................................88

Plaintiffs, who include parents and minor children, by and through their next friends Jahlia Hernandez and Jeannette Bocanegra, on behalf of themselves ("Plaintiffs") and others similarly situated, by and through their counsel, in their Complaint against defendant City of New York (the "City"), allege as follows:

## PRELIMINARY STATEMENT

1.      No family forgets the moment it is torn apart.  When agents of the Administration for Children's Services ("ACS") barge into a New York City family's home, claiming that an emergency requires them to forcibly take a child from their parents, the agency inflicts indelible trauma on children and parents.  These seizures—which predominantly and disproportionally target the City's Black and Latino families—frequently occur in the middle of the night, involve armed police officers, and result in ACS caseworkers pulling terrified children out of their beds.  ACS's own documents describe how "[m]any" caseworkers "have experienced the toddler whose little fingers have to be pried off of her mother" during a removal.  Children have characterized the experience as "like being kidnapped."  After seizing children, ACS regularly fails to provide information to frightened parents about where their children will be taken, who will take care of them, or when they will see them again.  Even when families are reunited within days, the distress, trauma, and psychological damage far outlast the terrifying moments of a child's seizure and resulting period of family separation.

2.      ACS is an agency of the City that is authorized to conduct child removals under limited circumstances.  Before ACS can remove a child from their parents, the law ordinarily requires the agency to demonstrate to a judge that the child faces an imminent risk of harm that necessitates removal.  The basic due process principles are designed to promote fairer and more accurate outcomes, while giving children and parents the opportunity to challenge ACS's allegations and fight for their fundamental right to maintain the integrity of their families.

1

3.      The law permits a narrow exception to this requirement of judicial review prior to removal; this exception is known as an "emergency removal."  To ensure that ACS executes these extrajudicial family separations only when necessary, constitutional and statutory law limit emergency removals to circumstances where there is insufficient time to seek a court order without endangering the child.  This "emergency" power is designed to be a tool of last resort, reserved for only the most urgent and dangerous circumstances.  Nonetheless, ACS systematically removes children without prior judicial review and without justification.

4.      ACS has adopted a policy, practice, and/or custom—an unwritten "Emergency Removal Policy"—whereby ACS staff routinely execute extrajudicial removals in circumstances that do not present a risk to the child's life or health so grave and immediate that there is insufficient time to seek a court order.  By removing first and seeking judicial approval only after the family has been torn apart, ACS bypasses fundamental constitutional protections, exploits well-documented decision-making biases favoring family separation, and inflicts lasting harm on children and families.  ACS has implemented and continues to use its unconstitutional Emergency Removal Policy with deliberate indifference to children's and parents' constitutional rights.

5.      ACS invokes an emergency rationale for extrajudicial removals at a shockingly high rate.  ACS's own reports show that year after year, ACS conducts around 50% of all removals without a court order.  In each of the years from 2021 to 2025, ACS removed roughly 1,400-1,500 children from their families annually on a purported "emergency" basis.

6.      A significant percentage of these "emergency" removals fail to withstand judicial scrutiny.  The Constitution and New York State law require prompt judicial review after an emergency removal of a child.  In over 25% of such cases, at the post-removal initial hearing, a

judge does not find a legal justification for the child to remain in state custody. But that 25% figure significantly understates the frequency of illegal emergency removals.

7.    Data additionally show that there is no bona fide justification for ACS's overreliance on this extraordinary power, because the Emergency Removal Policy does not make children safer. For example, when COVID-19 restrictions effectively forced ACS to suspend its Emergency Removal Policy and decrease the number of removals, there was no increase in harm to children. Even the then-Commissioner of ACS acknowledged in testimony to the New York City Council that although there were dramatically fewer child removals, ACS had not seen any indicators of a larger bolus of undetected child abuse during the pandemic. Yet, after the pandemic, ACS reverted to its Emergency Removal Policy with full force.

8.    Rather than making children safer, ACS's Emergency Removal Policy harms them. As detailed in numerous studies, family separation can cause significant harm to children. Disruption of family relationships can result in post-traumatic stress disorder and toxic stress, leading to damaged bodily systems and brain architecture with lifelong repercussions, "including subsequent cognitive delays, impairments in executive functioning, and disruptions of the body's stress response." The trauma from unexpected and forced family separation can occur even when the separation is brief. Reunification does not undo the effects of removal.

9.    Once removed, many children (including infants) are sent to ACS's pre-placement shelter—the Nicholas Scoppetta Children's Center ("Children's Center")—which is known for overcrowding, unsanitary conditions, and frequent violence. Children have experienced bullying, assault, theft, inadequate staff supervision, and sexual exploitation when held at the Children's Center.

10.     ACS's Emergency Removal Policy targets and harms Black and Latino families almost exclusively.  The numbers are shocking.  Over 90% of the children ACS seizes from their families on an emergency basis are Black or Hispanic.  Hispanic families in New York City are five times more likely, and Black families ten times more likely, to have their children seized than white families.  In 2025, ACS removed 1,397 children on a purported emergency basis, 1,131 of whom were Black or Hispanic.  This overwhelming statistical evidence, itself likely unexplainable but for race, is significantly bolstered by qualitative evidence of endemic race discrimination in ACS's assessment of risk, as well as public reporting and ACS admissions of race discrimination. Indeed, ACS staff have described the agency as "predatory" and one "that specifically targets Black and Brown parents" and applies "a different level of scrutiny to them throughout their engagement with ACS."

11.     Despite well-publicized and amply documented criticisms from affected families, advocates, the media, oversight organizations, and its own staff, ACS has demonstrated indifference to the harms that its Emergency Removal Policy predictably inflicts on parents and children.  ACS has failed to sufficiently change its supervision, monitoring, discipline, or training to ensure that the agency complies with the law.

12.     This case is not about the rare, extreme situations where the law allows state actors to extrajudicially separate families.  Such outlier cases, which dominate media narratives and drive much of the decision making in the child-protection system, are distinct from the disturbingly high number of removals conducted reflexively—and unlawfully—under ACS's Emergency Removal Policy.

13.     Like far too many families, the Archer and Lorimer families—the Plaintiffs in this action—were subjected to ACS's Emergency Removal Policy and suffered grave harm as a

4

result—harm that could have been avoided had ACS complied with the law. And like the overwhelming majority of families impacted by ACS's Emergency Removal Policy, the Archer and Lorimer families are Black and/or Latino.

14. The Archer and Lorimer families live in fear of being unlawfully separated again by ACS. Therefore, these families bring this civil rights suit, pursuant to 42 U.S.C. § 1983, on behalf of themselves, two putative classes, and two putative subclasses who are subject to ACS's Emergency Removal Policy.

15. First, the Children's Class is composed of all children who have been, are, or will be seized by ACS without a court order, parental consent, or the threat of such immediate harm to the child's health or safety that there is insufficient time to secure a court order.

16. Second, the Parents' Class is composed of all parents whose children have been, are, or will be seized by ACS without a court order, parental consent, or the threat of such immediate harm to the child's health or safety that there is insufficient time to secure a court order.

17. The Children's Equal Protection Subclass is composed of all members of the Children's Class who are Black or Latino. The Parents' Equal Protection Subclass is composed of all members of the Parents' Class who are Black or Latino.

18. Together, Plaintiffs and the Classes seek declaratory and injunctive relief to end ACS's Emergency Removal Policy, as it violates children's rights to be free from unreasonable seizures under the Fourth Amendment, parents' and children's rights to procedural due process, parents' rights to substantive due process, and parents' and children's rights to be free from discrimination guaranteed by the Equal Protection Clause.

19. The government exercises profound power when it unilaterally separates a family. ACS routinely—multiple times each day—deploys such power, notwithstanding the law's

5

prescription that it be reserved for only the rarest, most urgent circumstances.  Thus, with the City's knowing acquiescence and deliberate indifference, ACS has claimed the dangerous power to transform extraordinary "emergency" removals into a routine government practice of extrajudicial family separation.

20.    The remedial power of this Court is desperately needed to redress these constitutional violations.  As one New York City family court judge recently emphasized, although ACS's actions in extrajudicially separating a newborn from her parents were "outrageous" and "unacceptable," there is "nothing that … this particular [family] court can do to redress that problem, but it is a problem."[1]  Another New York City family court judge in a published opinion has recognized that family courts, when confronting "inherently inequitable system[s]," lack the "equitable powers to enter system-wide relief when the other branches' actions or inactions violate the constitutional rights of entire classes of people."[2]  The federal courts are charged with ensuring that local officials comply with the United States Constitution, which in this case prohibits ACS from wielding its profound power of family separation without rigorous judicial oversight, compliance with legal protections, and respect for family integrity.

---

[1] Hr'g Tr. 21, 20–21, 22:10–11, 20:23–25, *Matter of K.R.* (on file with Plaintiffs' counsel).

[2] *Matter of Jeremi C.*, 175 N.Y.S.3d 181, 183–84 (N.Y. Fam. Ct. 2022).

**PARTIES**

**A.    Plaintiffs**

21.    Plaintiff Denise Archer is a resident of Bronx, New York.[3]  She is the mother of three children: Jasmine, a twelve-year-old girl who is diagnosed with autism and ADHD; Jeremiah, a seven-year-old boy; and Daevon, a five-year-old boy.  Ms. Archer is Black.

22.    Plaintiff Danielle Lorimer is a resident of Bronx, New York.[4]  She is the mother of five children: Zoe, a fourteen-year-old girl; Yolanda, a ten-year-old girl; Xena, an eight-year-old girl; Willow, a five-year-old girl; and Kayden, a two-year-old boy.  Ms. Lorimer is Black and Latina.

23.    Pursuant to Rule 17(c)(1)(A) of the Federal Rules of Civil Procedure, Jasmine, Jeremiah, and Daevon, minors, appear by their next friend, Jahlia Hernandez.  All three children are Black and reside in Bronx, New York.  Ms. Hernandez is entering her second year of law school at New York Law School, was involved in family court proceedings as a child, and has advocated for youth involved in the family court system.  Ms. Hernandez is sufficiently familiar with the facts of each child's situation and dedicated to their best interests to fairly and adequately represent each child's interests in this litigation.

24.    Pursuant to Rule 17(c)(1)(A) of the Federal Rules of Civil Procedure, Zoe, Yolanda, Xena, Willow, and Kayden, minors, appear by their next friend, Jeannette Bocanegra.  All five

---

[3] Denise Archer is a pseudonym of Plaintiff mother D.A. and is used throughout the Complaint.  Jasmine is a pseudonym of minor Plaintiff J.W., Jeremiah is a pseudonym of minor Plaintiff J.A., and Daevon is a pseudonym of minor Plaintiff D.A.  *See* Fed. R. Civ. P. 5.2(a); N.Y. Soc. Serv. Law § 372(3)-(4).  Plaintiffs will share identifying information with the City after entering into a protective order.

[4] Danielle Lorimer is a pseudonym of Plaintiff mother D.L. and is used throughout the Complaint.  Zoe is a pseudonym of minor Plaintiff Z.L., Yolanda is a pseudonym of minor Plaintiff Y.L., Xena is a pseudonym of minor Plaintiff X.L., Willow is a pseudonym of minor Plaintiff W.L., and Kayden is a pseudonym of minor Plaintiff K.L.  *See* Fed. R. Civ. P. 5.2(a); N.Y. Soc. Serv. Law § 372(3)-(4).  Plaintiffs will share identifying information with the City after entering into a protective order.

7

children are Black and Latino and reside in Bronx, New York.  Ms. Bocanegra is the Executive Director of Justice for Families, a non-profit organization that helps families in New York and other states navigate local agencies and systems.  Ms. Bocanegra is sufficiently familiar with the facts of each child's situation and dedicated to their best interests to fairly and adequately represent each child's interests in this litigation.

**B.      Defendant**

25.      The City is a municipal corporation, incorporated pursuant to the laws of the State of New York.

26.      The City is charged with certain duties and responsibilities, including under the New York Social Services Law and the New York Family Court Act.  These duties and responsibilities include, but are not limited to, investigating allegations of child abuse and neglect and administering the foster care system in New York City.  The City carries out these responsibilities by and through its agency, ACS.

27.      At all relevant times, ACS is and has been authorized by New York law to investigate allegations of child abuse and neglect, to offer rehabilitative and preventive services to both children and parents, and to separate children from their parents only when necessary to prevent imminent risk to the child that cannot be ameliorated by other means.

28.      The City is authorized by law to maintain ACS and is responsible for its policies and practices, as well as the appointment, training, supervision, promotion, and discipline of officials, supervisors, managers, caseworkers, agents, and employees of ACS.

29.      As the acts and omissions complained of herein are those of ACS, references in this Complaint to Defendant or the City shall refer specifically to and include the acts and omissions of ACS.

8

30.     At all relevant times, the officials, supervisors, managers, caseworkers, agents, and employees of ACS were acting under the color of New York state law in the course and scope of their duties and functions as officials, supervisors, managers, caseworkers, agents, and employees of ACS and otherwise performed and engaged in conduct incidental to the performance of their lawful duties.  The officials, supervisors, managers, caseworkers, agents, and employees acted for and on behalf of ACS with the power and authority vested in them as officials, supervisors, managers, caseworkers, agents, and employees of ACS and the City.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and 1988, and under 28 U.S.C. §§ 1331 and 1343(a), which provide for jurisdiction over all cases brought pursuant to the Constitution and laws of the United States, as this action seeks redress for the violations of Plaintiffs' constitutional and civil rights.

32.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.  This Court has authority to award attorneys' fees and costs under 42 U.S.C. § 1988.

33.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 (b) and (c), as a substantial part of the acts and omissions complained of occurred in this district, and Plaintiffs reside in this district.  Although ACS is responsible for children from all five boroughs of New York City, including those in the Eastern District of New York, the majority of ACS's administrative and managerial functions operate out of its headquarters located in the Southern District of New York.  In addition, New York City Hall is in the Southern District of New York.

## DEMAND FOR JURY TRIAL

34.     Plaintiffs demand a trial by jury in this action.

9

**FACTS**

I.    **THE LAW AND MECHANICS OF FAMILY SEPARATION**

A.    **Reporting and Investigation Stage**

35.    A family's involvement with ACS begins with a call to the New York Statewide Central Register of Child Abuse and Maltreatment (the "SCR"), a centralized hotline operated by the New York State Office of Children and Family Services ("OCFS") that screens calls concerning the welfare of children in New York State.[5]  These calls come from mandated reporters—who are required to report suspicions of child abuse or neglect such as school employees and medical staff—as well as from members of the public.[6]

36.    Allegations made to the hotline that pertain to families in New York City are forwarded to ACS for investigation.[7]  A call to the SCR does not necessarily mean that a child is being harmed; the report could be inaccurate or a product of personal grievance or retaliation, such as by perpetrators of domestic violence or abusive landlords.  Former ACS Commissioner Jess Dannhauser has acknowledged that the "weaponizing" of the SCR through malicious reporting is a "real problem."[8]

37.    ACS is responsible for investigating reports of child abuse and neglect.[9]  Once ACS begins an investigation, it has sixty days to administratively classify the allegations in the report as either "indicated" or "unfounded."[10]  An allegation is "indicated" if ACS determines it is more

---

[5] N.Y. Soc. Serv. Law § 422(2)(a).

[6] *Id.*

[7] *Id.*; *see also* N.Y. Soc. Serv. Law § 422(b).

[8] The Imprint Weekly Podcast, *America's Most High Profile Child Welfare Job: Jess Dannhauser's Plan for New York City*, at 37:10–37:32 (Apple Podcasts, Feb. 21, 2022), https://podcasts.apple.com/us/podcast/americas-most-high-profile-child-welfare-job-jessdannhausers/id1533882487?i=1000551742596 [https://perma.cc/8S7C-CJ66].

[9] N.Y. Soc. Serv. Law § 424.

[10] N.Y. Soc. Serv. Law § 424(7).

likely than not that a child was maltreated or abused; otherwise, an allegation is considered "unfounded," and the case is closed.[11]

38.    As part of an ACS investigation, an assigned ACS caseworker[12] is typically required to contact the person who made the report, visit the home of the child, and speak with all of the adults and children who live in the home.[13]  ACS also requires caseworkers to conduct home searches, which often occur in the middle of the night.  These searches typically include entering every room in the family's home, opening the cabinets and refrigerators, inspecting the medicine cabinets, and, in many cases, strip-searching children,[14] even when the searches have no relation to the allegations.

39.    If the case is indicated, ACS is not required to remove the child from the home or even to file a petition in family court.[15]  Instead, ACS may offer the family services and support. If ACS does file a petition in family court, it can seek protective court orders as well as agency and court supervision over the family without removing the child.

**B.    Child Removals**

40.    ACS has legal authority to remove a child from their family in only three circumstances: (1) with parental consent; (2) through a court order; and (3) by an emergency

---

[11] N.Y. Soc. Serv. Law § 412(6), (7)(ii).

[12] Caseworkers are sometimes referred to as Child Protective Specialists.  In addition to the assigned caseworker, other ACS employees work on, direct, manage, or assist in responses to reports of child abuse and maltreatment, including Emergency Children's Services Workers, Child Protective Supervisors, Child Protective Managers, and other child protective and diagnostic staff.  As used in this Complaint, "caseworker" can refer to Emergency Children's Services Workers as well as Child Protective Specialists.

[13] N.Y. Soc. Serv. Law § 424(6); N.Y.C. Admin. for Child.'s Servs., Division of Child Protection Casework Practice Requirements Manual at 19–64 (Dec. 2013) ("Casework Manual").

[14] *See* Casework Manual, *supra* note 13, at 2021; Jonah E. Bromwich & Andy Newman, *Child Abuse Investigators Traumatize Families, Lawsuit Charges*, N.Y. Times (Feb. 20, 2024), https://www.nytimes.com/2024/02/20/nyregion/acs-nyc-family-trauma-lawsuit.html [https://perma.cc/X64R-SJBC].

[15] As used in this Complaint, "petition" refers to the accusatory instrument used to initiate an Article 10 abuse or neglect case in New York Family Court.

removal, in the rare instance when a threat to the child's health or safety is so immediate that there is insufficient time to secure a court order.[16]

41.    ***Parental Consent:*** ACS may temporarily remove a child with their parent's written consent. N.Y. Fam. Ct. Act § 1021. Following a consent removal, ACS has three days to either return the child or file a petition in family court alleging abuse or neglect. *Id.* Filing a petition in family court triggers a hearing where continued removal is authorized only if the family court finds it "necessary to avoid imminent risk to the child's life or health." N.Y. Fam. Ct. Act § 1027(b)(i). Based on its response to a Freedom of Information Law Request, ACS does not appear to conduct removals with parental written consent in New York City.

42.    ***Court Order:*** ACS may seek authorization from the family court after filing a petition pursuant to Family Court Act § 1031 and making an application to remove a child pursuant to Family Court Act § 1027(a)(iii) (through a "§ 1027 hearing"). Alternatively, if ACS believes there is insufficient time to file a full petition, it may file a pre-petition application seeking an order, often *ex parte*, pursuant to Family Court Act § 1022 (through a "§ 1022 *ex parte* order"). For ACS to obtain a court order authorizing a seizure of the child to state custody under § 1027 or § 1022, the family court must determine that removal is necessary to avoid imminent risk to the

---

[16] ACS defines a "removal" as "any interference with the parent's right to custody of the child[.]" N.Y.C. Admin. for Child.'s Servs., *Child Safety Alert No. 30*: *Conducting Emergency Removals of Children* at 123 (Nov. 18, 2010), https://mightyunionfunds.org/wp-content/uploads/2023/05/Child-Safety-Alerts_35.pdf    [https://perma.cc/AFE2-WZTG]. This includes instances where ACS physically removes a child from their parent's care; the seizure of the child may occur at the home, school, hospital, or other location. N.Y.C. Admin. for Child.'s Servs., *FCLS Removal Training* at 9 (2023). A "removal" also includes, *inter alia*, instances where: (1) ACS tells a parent to move a child to a non-custodial parent, other relative, or friend; (2) ACS instructs a hospital, school, or other caretaker not to release the child to the parent (also known as a "social hold"); (3) ACS requires as a condition of the children remaining in the home that a parent leave the residence and/or limits the parent's contact with the child; and (4) ACS takes a child from home, school, or daycare to the Children's Center or a facility for an evaluation without consent of the parent. N.Y.C. Admin. for Child.'s Servs., *FCLS Removal Training* at 9-19 (2023); N.Y.C. Admin. for Child.'s Servs., *Child Safety Alert No. 30: Conducting Emergency Removals of Children* at 123. As ACS acknowledges, the "general question to ask" concerning when its actions and show of authority "becom[e] a removal" is whether the agency is "affecting the parent's ability to freely parent the child." N.Y.C. Admin. for Child.'s Servs., *FCLS Removal Training*, at 5. Plaintiffs agree that all of these actions, among others, constitute a removal.

12

child's life or health, that the risk cannot be mitigated by other means (such as an order for services or an order excluding a non-parent from the home), and that the risk of harm to a child remaining with their parents outweighs the harm of removal. The family court must consider whether ACS has complied with its obligation to make reasonable efforts to prevent the need for the removal, including through the provision of services.

43.     A § 1027 hearing must commence within one day of the filing of the removal application. The petition provides notice to parents and children of the allegations, and the hearing provides parents and children, both of whom have the right to be represented by counsel, an opportunity to be heard. During the hearing, ACS must justify the removal by presenting evidence, and parents and children can respond.

44.     A § 1022 *ex parte* order requires ACS to provide enough information to the court to demonstrate that an immediate removal short of the full-petition process—i.e., without notice to or participation by parents or children—is necessary. In some instances, parents and children do appear and are represented by legal counsel.

45.     Requests for a court order authorizing removal pursuant to § 1027 and § 1022 afford due process to varying degrees, but they each ensure that there is judicial review of ACS's decision to remove a child *prior* to the family separation. This framework "ensures that in most urgent situations, there will be judicial oversight in order to prevent well-meaning but misguided removals that may harm the child more than help." *Nicholson v. Scoppetta*, 820 N.E.2d 840, 853 (N.Y. 2004).

46.     ***Emergency Removal:*** The final—and most extreme—option allows ACS to remove a child unilaterally, without pre-deprivation due process or a court order. N.Y. Fam. Ct. Act § 1024. Emergency removals are strictly limited to exigent circumstances where (1) the child's

life and/or health is in imminent danger; and (2) there is not sufficient time to seek a court order. The New York Court of Appeals has made clear as a matter of statutory law that this standard is a "stringent one": ACS cannot rely on its emergency removal powers simply because it believes removal would be a "safer course." *Nicholson*, 820 N.E.2d at 853. Only when "the very grave circumstance of danger" is "so immediate, so urgent that the child's life or safety will be at risk before an ex parte order can be obtained" is an emergency removal justified. *Id.* at 853–54. Simply put, if there is time to obtain a court order, ACS is prohibited from using its emergency removal power.

47. ACS can typically obtain a removal order within just a few hours or less. Family court is open five days a week and routinely rules on ACS removal petitions the same day they are filed, providing ACS ample opportunity to seek expedited judicial approval where it believes the need for removal is urgent.

48. Judicial review is a necessary and practical safeguard against the dangers of unchecked or arbitrary state power to separate families. To meet its burden before a neutral fact finder, ACS must demonstrate that there is sufficient evidence to warrant taking custody of a child and that it has taken all reasonable steps to avoid family separation.

49. ACS is legally mandated to explore any less-invasive alternatives to keep the child safe, including by providing basic resources and social services support and, where necessary, seeking protective orders on behalf of the child. Indeed, ACS is required to provide a wide range of services to the parent and/or the child to alleviate existing concerns—including mental health services, substance abuse programs, parenting and homemaking classes for parents with cognitive and developmental impairments, domestic violence counseling, and live-in service professionals who can support families around the clock.

14

50.     Judicial review of ACS's efforts to avoid the need for removal and the court's authority to deny removal orders where ACS has not met its burden guard against unconstitutional executive branch overreach into the protected realm of family life by ensuring that family separation is a last resort.

51.     Indeed, when ACS goes to court to seek a judicial order prior to removing a child, family courts have the obligation and authority to issue a broad range of orders to mitigate any imminent risk to prevent family separation. *See, e.g.*, *Nicholson*, 820 N.E.2d at 852–53; N.Y. Fam. Ct. Act § 1015-a.  For example, family courts can order ACS to arrange (and pay for) a wide range of services and support and can issue temporary orders of protection on behalf of children and parents.  Moreover, family courts may order parents to engage in services, submit to ACS supervision, submit to drug testing, or follow a temporary order of protection to keep the child safely at home.  N.Y. Fam. Ct. Act §§ 1015-a, 1027(c), 1029.

52.     Even when removal is necessary, prior judicial review increases the likelihood children will be placed with loved ones or family friends rather than at the Children's Center or with strangers.  The family court can minimize the harm of removals by issuing orders to place children with family or friends and directing that children have access to necessary medications and other items to ease the transition away from their parents.  Obtaining prior judicial approval also ensures parents know where their children are being taken.  Although ACS is required by law to make "every reasonable effort" to inform parents about their child's whereabouts after an emergency removal, N.Y. Fam. Ct. Act § 1024(b)(ii), the agency regularly fails to do so.

53.     After conducting an emergency removal, ACS is legally required to file a petition in family court by the next business day.  This tight statutory timeframe is supposed to afford families notice and an opportunity to be heard at the earliest available time after a removal has

15

occurred.  However, there are instances where ACS removes and then returns a child, sometimes days or weeks later, without ever filing a petition in court.

54.    ACS does not publicly report on how many families it secretly separates, and subsequently reunites, without ever seeking judicial review.

55.    The removal mechanisms available to ACS reflect a continuum of constitutional protections, oversight, and urgency.  Even when ACS believes removal to be justified, the agency must afford families meaningful constitutional protection by filing a petition in family court and seeking a § 1027 hearing before a judge prior to infringing upon parents' and children's reciprocal constitutional rights to be free from undue state intrusion.  Where the perceived danger is so urgent that ACS does not have time to file a petition, ACS is still required to seek judicial approval prior to the removal through a § 1022 application, which may be granted *ex parte*.  Emergency removals—which are effectuated without approval from a judge—are a tool of last resort reserved only for the most imminent and dangerous situations where there is insufficient time to seek a court order.

## II.    ACS MAINTAINS AN UNLAWFUL POLICY OF UNILATERALLY SEIZING CHILDREN IN NON-EMERGENT CIRCUMSTANCES WHERE THERE IS TIME TO SEEK A COURT ORDER

56.    For ACS to remove a child from their family without parental consent or a court order, the Fourth and Fourteenth Amendments, as well as Family Court Act § 1024, require that the danger to the child be so imminent that there is not sufficient time to seek a court order, even using available *ex parte* procedures.  *K.W. ex rel. K.A. v. City of New York*, -- F.4th --, No. 24-3042, 2026 WL 1391967, at *7–8 (2d Cir. May 19, 2026); *Tenenbaum v. Williams*, 193 F.3d 581, 594 (2d Cir. 1999); *see also Nicholson*, 820 N.E.2d at 852–53.

57.    In stark violation of these constitutional requirements, ACS has adopted an unwritten Emergency Removal Policy whereby ACS staff routinely execute extrajudicial removals

16

in circumstances that do not present a risk to the child's life or health so grave and immediate that there is insufficient time to seek a court order.  Under the Emergency Removal Policy, ACS disregards whether there is sufficient time to seek court authorization and thus regularly bypasses the elementary protections of due process and pre-deprivation judicial review.

58.    The Emergency Removal Policy violates children's Fourth Amendment right to be free from unreasonable seizures and parents' and children's Fourteenth Amendment rights to due process as well as the equal protection guarantees afforded to Black and Latino[17] families.

59.    ACS's Emergency Removal Policy is reflected in the staggering rate at which ACS seizes children on a purported emergency basis, as well as by the high rate of cases in which the family court declines to keep children in state custody once there is judicial review and an opportunity for families to be heard.  It is also reflected in ACS's own statements and internal reports revealing how the agency incentivizes caseworkers and their supervisors to overuse emergency removals and fails to properly discipline or retrain staff when they separate families in violation of the law.[18]  Finally, the experience of the Plaintiffs and other families who have been subjected to ACS emergency removals where there was time to seek a court order further establishes that ACS's Emergency Removal Policy violates the Fourth and Fourteenth Amendments.

---

[17] This Complaint uses the term "Latino" to refer to people of Latin American origin or descent, except where citing statistical data or studies that specifically use the term "Hispanic," in which case the Complaint preserves the original terminology used in the source for accuracy.

[18] As used in this Complaint, "supervisor" includes Child Protective Managers and other supervisory and managerial staff that are involved in and/or have the power to authorize emergency removals.

A.     **ACS Conducts Emergency Removals with Alarming Regularity and in a Manner That Undermines the Claim of Bona Fide Emergencies**

60.     The City's own data show that consistently over at least eight years, ACS has conducted about 50% of its removals of children using its emergency removal power, an average of well over 1,000 removals per year.

61.     In just the first three months of 2026, when removing children at the outset of a case, ACS used its emergency removal power in at least 59.3% of cases, separating at least 428 children from their families without due process or a court order.[19]

62.     In 2025, when removing children at the outset of a case, ACS used its emergency removal power in at least 53.7% of cases,[20] separating at least 1,397 children from their families without due process or a court order.[21]

63.     In 2024, when removing children at the outset of a case, ACS used its emergency removal power in at least 53.5% of cases,[22] separating at least 1,428 children from their families without due process or a court order.[23]

---

[19] N.Y.C. Child., *Flash Report: Monthly Indicators* at 13 (Apr. 2026), https://www.nyc.gov/assets/acs/pdf/data-analysis/flashReports/2026/04.pdf [https://perma.cc/9X58-GUP2].

[20] N.Y.C. Child., *Flash Report: Monthly Indicators* at 13 (Jan. 2026), https://www.nyc.gov/assets/acs/pdf/data-analysis/flashReports/2026/01.pdf [https://perma.cc/V4CN-8JLL].

[21] N.Y.C. Admin. for Child.'s Servs., *Child Welfare Indicators Annual Report CY 2025*, at 17 (2025), https://www.nyc.gov/assets/acs/pdf/data-analysis/2025/CityCouncilReportCY2025.pdf [https://perma.cc/6D8P-BPP4].

[22] N.Y.C. Child., *Flash Report: Monthly Indicators* at 13 (Jan. 2025), https://www.nyc.gov/assets/acs/pdf/data-analysis/flashReports/2025/01.pdf [https://perma.cc/6XZP-7XV3].

[23] N.Y.C. Admin. for Child.'s Servs., *Child Welfare Indicators Annual Report CY 2024*, at 17 (2024), https://www.nyc.gov/assets/acs/pdf/data-analysis/2024/CityCouncilReportCY2024.pdf [https://perma.cc/HV2S-6ZUE].

64.     In 2023, when removing children at the outset of a case, ACS used its emergency removal power in at least 51.2% of cases,[24] separating at least 1,500 children from their families without due process or a court order.[25]

65.     In 2022, when removing children at the outset of a case, ACS used its emergency removal power in at least 50.3% of cases,[26] separating at least 1,369 children from their families without due process or a court order.[27]

66.     In 2021, when removing children at the outset of a case, ACS used its emergency removal power in at least 48.9% of cases, separating at least 858 children from their families without due process or a court order.[28]

67.     In 2020, when removing children at the outset of a case, ACS used its emergency removal power in at least 45.1% of cases, separating at least 812 children from their families without due process or a court order.[29]

---

[24] N.Y.C. Child., *Flash Report: Monthly Indicators* at 13 (Jan. 2024), https://www.nyc.gov/assets/acs/pdf/data-analysis/flashReports/2024/01.pdf [https://perma.cc/6KM3-WXCZ].

[25] N.Y.C. Admin. for Child.'s Servs., *Child Welfare Indicators Annual Report CY 2023*, at 17 (2023), https://www.nyc.gov/assets/acs/pdf/data-analysis/2023/CityCouncilReportCY2023.pdf    [https://perma.cc/ZK5J-PLMY].

[26] N.Y.C. Child., *Flash Report: Monthly Indicators* at 10 (Jan. 2023), https://www.nyc.gov/assets/acs/pdf/data-analysis/flashReports/2023/01.pdf [https://perma.cc/6EQF-YUF6]. In 2022, after being required to do so by the New York City Council, ACS began reporting the "total emergency removals" per year. *Id.*; N.Y.C., N.Y., Local Law No. 132 (2021) (codified at N.Y.C., N.Y., Code § 21-919).

[27] N.Y.C. Admin. for Child.'s Servs., *Child Welfare Indicators Annual Report CY 2022*, at 17 (2022), https://www.nyc.gov/assets/acs/pdf/data-analysis/2022/CityCouncilReportCY2022.pdf    [https://perma.cc/37U4-WBCT].

[28] N.Y.C. Child., *Flash Report: Monthly Indicators* at 10 (Jan. 2022), https://www.nyc.gov/assets/acs/pdf/data-analysis/flashReports/2022/01.pdf [https://perma.cc/3K9B-Z7NS].

[29] N.Y.C. Child., *Flash Report: Monthly Indicators* at 10 (Jan. 2021), https://www.nyc.gov/assets/acs/pdf/data-analysis/flashReports/2021/01.pdf [https://perma.cc/XZQ7-HCK9].

68.     In 2019, when removing children at the outset of a case, ACS used its emergency removal power in at least 49% of cases, separating at least 1,209 children from their families without due process or a court order.[30]

69.     In 2018, when removing children at the outset of a case, ACS used its emergency removal power in at least 47.1% of cases, separating at least 1,194 children from their families without due process or a court order.[31]

70.     In 2017, when removing children at the outset of a case, ACS used its emergency removal power in at least 48.2% of cases, separating at least 1,453 children from their families without due process or a court order.[32]

71.     The data confirm that over at least eight consecutive years, ACS has consistently abused its removal authority through its Emergency Removal Policy.

72.     ACS has done nothing to meaningfully remediate—through policy, supervision, discipline, or training—these abuses, demonstrating deliberate indifference to these constitutional violations.  Instead, ACS has increasingly defaulted to emergency removals over time—from at least 48.2% of removals in 2017 to at least 59.3% of removals in the first three months of 2026.

---

[30] N.Y.C. Child., *Flash Report: Monthly Indicators* at 10 (Jan. 2020), https://www.nyc.gov/assets/acs/pdf/data-analysis/flashReports/2020/01.pdf [https://perma.cc/KH24-7EQ7].

[31] N.Y.C. Child., *Flash Report: Monthly Indicators* at 9 (Jan. 2019), https://www.nyc.gov/assets/acs/pdf/data-analysis/flashReports/2019/01.pdf [https://perma.cc/R243-CJDL].  Other ACS statements suggest that their own reporting understates the true number of emergency removals, with former ACS Commissioner Hansell stating that there were 1,854 children removed using the agency's emergency removal power in 2018.  *See* Hearing Before N.Y.C. Council Comm. on Just. Sys. & N.Y.C. Council Comm. on Gen. Welfare, Sess. 2018-2019, at 37:6-37:11 (Nov. 27, 2018) ("Nov. 27, 2018 Hr'g Tr.") (statement of David Hansell, Comm'r, Admin. for Child.'s Servs.), https://legistar.council.nyc.gov/View.ashx?M=F&ID=6875606&GUID=F963A4DD-5F99-446F-9BB1-9F7E83B2BBBA [https://perma.cc/UAY5-BYGB].

[32] N.Y.C. Child., *Flash Report: Monthly Indicators* at 9 (Jan. 2018), https://www.nyc.gov/assets/acs/pdf/data-analysis/flashReports/2018/01.pdf [https://perma.cc/6BWX-VEH9].

73.    These numbers, taken from ACS's own reporting, likely underrepresent the frequency with which the agency wields its emergency removal power to bypass judicial review and separate children from their families.[33]

74.    ACS's public reporting on emergency removals fails to capture the number of families subjected to emergency removals where the agency seizes children and subsequently returns them without ever seeking judicial review—like the first time ACS extrajudicially removed Ms. Archer's three children from her care.    These secret removals are sanctioned by ACS's Emergency Removal Policy.

75.    ACS's reporting also fails to capture instances where the agency claims it never conducted an emergency removal, but in reality it did—like when ACS extrajudicially removed Mr. Richardson's[34] newborn daughter from his care, yet asserted in family court that its actions did not amount to an emergency removal, a contention the judge rejected and described as "outrageous."    These unreported removals are hidden from public view in ACS's data, which understate the reach of its Emergency Removal Policy.

76.    In cases that ACS ultimately brings to court after an emergency removal, at over 25% of the initial hearings, family court judges do not find justification for children to remain in

---

[33] *See supra* note 31; *see also* Ctr. for N.Y.C. Fam. Affs., *Watching the Numbers 2023: Covid-19's Effects on Child Welfare System* (Mar. 2023), https://static1.squarespace.com/static/53ee4f0be4b015b9c3690d84/t/642212d0fe 002f702c5eae79/1679954640524/WTN+SUMMARY+2023.pdf [https://perma.cc/3LPG-W22T] (reporting higher numbers of total emergency removals between 2017-2022 than ACS reported); Ctr. for N.Y.C. Fam. Affs., *Watching the Numbers 2025* (Apr. 2025), https://www.centernyc.org/reports-briefs/watching-the-numbers-2025 [https://perma.cc/G3XF-FMXR] (reporting higher numbers of total emergency removals between 2018-2023 than ACS reported).

[34] *See infra* Section III.B.

state custody.[35]  This strongly suggests that, in hundreds of cases each year, ACS unjustifiably conducts emergency removals.

77.    As a proxy, this 25% rate likely undercounts illegal extrajudicial removals for several reasons.  First, a post-removal judicial order is not a stamp of approval for the legality of an emergency removal, because the family court does not consider whether an imminent risk was present at the earlier time of the emergency removal or whether there was time for ACS to obtain a court order.[36]  When the family court decides whether to continue a removal, it considers only whether returning the child to the parent would pose a risk to the child's life or health at the time of its determination (i.e., the time when the agency comes to court), when circumstances might be materially different.[37]

78.    Second, the data on cases where the family court maintains a child in state custody at the initial appearance include a significant number of cases in which family courts subsequently order the return of the child after parents and children have been able to compile evidence to challenge these removal orders.[38]

---

[35] The City Council of New York, *Report of the Finance Division on the Fiscal 2021 Preliminary Financial Plan, Fiscal 2021 Preliminary Capital Budget, Fiscal 2021 Preliminary Capital Commitment Plan, and the Fiscal 2020 Preliminary Mayor's Management Report for the Administration for Children's Services* at 41 (Mar. 23, 2020) https://council.nyc.gov/budget/wp-content/uploads/sites/54/2020/04/068-ACS.pdf [https://perma.cc/VR6W-MRP7].

[36] *See* N.Y. Fam. Ct. Act § 1027(b)(i); *see also K.W.*, 2026 WL 1391967, at *9 ("[T]here is no reason to conclude that the family court's subsequent order continuing [the child's] removal bears on the constitutionality of the initial warrantless seizure.").

[37] For example, a child may have been safely in a third-party's control at the time ACS conducted the emergency removal but may be unsafe in the parent's custody at a later period of time, thus requiring the family court to issue a removal order but not requiring the court to determine that the underlying removal needed to be conducted on an emergency basis.

[38] ACS's own data show that between 2014 and 2019, nearly 26% of the approximately 18,000 hearings challenging removal orders resulted in the family court ordering a child returned to a parent.  *See* Administration for Children's Services Response to Request for Public Information Re: ACS Policies and Procedures, Tables 3a.-b. (Oct. 22, 2020) (on file with Plaintiffs' counsel)*.*

79.    Third, extrajudicial custodial decisions distort later decision-making.  When a child is removed on an emergency basis without an initial hearing, research suggests that judges are likely to maintain the status quo (i.e., keeping the family separated) even if they would not have issued a pre-removal order.[39]  This is the result of well-documented cognitive bias toward the status quo:  Decisionmakers will often maintain the existing state of affairs, believing that path has already been legitimately paved, especially where change requires action rather than passive acquiescence.[40]  Reversing a removal carries perceived risk, while letting a child stay in foster care is a course that feels safer, even though foster care can cause significant harm.[41]  Research suggests that this phenomenon is driven by decisionmakers' aversion to feeling or appearing responsible for a negative outcome.[42]  As a result, judges tend to be more likely to keep children in government custody to avoid the perceived risk associated with affirmatively returning a child, thus passively continuing the harm of separation that was initiated by ACS.  In Ms. Archer's case, for instance, after ACS conducted an emergency removal, the family court maintained the status quo and continued the separation.  Three years later, an appellate court unanimously reversed the family

---

[39] *See* Peggy Cooper Davis & Guatam Barua, *Custodial Choices for Children at Risk: Bias, Sequentiality, and the Law*, 2 U. Chi. L. Sch. Roundtable 139, 148–150 (1995); Paul Chill, *Burden of Proof Begone: The Pernicious Effect of Emergency Removal in Child Protective Proceedings*, 41 Fam. Ct. Rev. 457, 460–61 (2003); Sara Tiano, *Despite Federal Law and Due Process Rights, Most Children Taken Into Foster Care on an "Emergency" Basis Before Parents Get a Hearing*, The Imprint (Dec. 11, 2025), https://imprintnews.org/top-stories/despite-federal-law-and-due-process-rights-most-children-taken-into-foster-care-on-an-emergency-basis-before-parents-get-a-hearing/269291 [https://perma.cc/L7E8-A7R8].

[40] Davis & Barua, *supra* note 39 at 149; Chill, *supra* note 39, at 460–61.

[41] Chill, *supra* note 39, at 460–61.

[42] Chill, *supra* note 39, at 461 (explaining that "although judges are supposed to operate as a check on CPS actions, they exhibit the same defensive outlook as many CPS caseworkers" and are fearful that a decision "to return a child home who has been unilaterally seized by CPS[] is much more likely to come back to haunt them than is a decision to uphold the status quo"); New York City Special Child Welfare Advisory Panel, *Report On Front Line And Supervisory Practice* 48 (2000), https://files.eric.ed.gov/fulltext/ED439189.pdf [https://perma.cc/GY7M-7U5P] (last visited May 14, 2026).  Judges interviewed for this report "spoke of the withering media attention to decisions that turn out badly" and actually nodded their heads at the suggestion that "the *weaker* the case ACS presented, the more likely it would be to prevail (because judges would be especially afraid that something bad was going on in a home when they couldn't get clear information)[.]" *Id.*

23

court's neglect finding, ruling that the children had not been at imminent risk of harm in their mother's care.

80.    As a result, by seeking judicial approval only after separating a family, ACS increases the chances that its application to separate the family will be approved by the judge, even in cases where the evidence does not demonstrate a risk of harm that warrants separation. And, accordingly, the already high 25% figure significantly undercounts the true rate of emergency removals that violate the law.

**B.    ACS's Own Statements and Internal Reports Reveal That the Agency Incentivizes and Condones the Unconstitutional Abuse of Its Emergency Removal Powers**

81.    In 2020, ACS commissioned an internal audit on racial inequity, which included interviews with more than fifty caseworkers as well as ACS leadership across its divisions (the "ACS Audit"). The ACS Audit reveals an underlying cause of the Emergency Removal Policy, concluding that "internal and external pressures drive staff to seek removal as a first course of action, to cover the reputation of staff, internally, and ACS, externally."[43]

82.    The ACS Audit exposed ACS's "internal culture that operates on fear and intimidation" and "incentivize[s] the removal of children," making caseworkers feel pressure to "err on the side of safety for themselves, by seeking removal and thereby ensuring that they won't be liable in the case of abuse."[44]  ACS staff reported that the agency's leadership situates caseworkers as "detectives looking for reasons to remove children, rather than as social workers

---

[43] Antwuan Wallace, Abigail Fradkin, Marshall Buxton & Sydney Henriques-Payne, *New York City Administration for Children's Services Racial Equity Participatory Action Research & System Audit: Findings and Opportunities*, Nat'l Innovation Serv., at 22 (Dec. 2020), https://www.bronxdefenders.org/wp-content/uploads/2022/11/DRAFT_NIS_ACS_Final_Report_12.28.20.pdf [https://perma.cc/5S52-NLKW].

[44] Wallace, et al., *supra* note 43, at 21.

aiming to support families."[45]  As a result, according to ACS staff, "many removals result from mundane non-compliance with court orders for services, not neglect or abuse."[46]  Families who are under court-ordered ACS supervision, like the Lorimer family, thus face a significantly higher risk of being subjected to ACS's Emergency Removal Policy.  By incentivizing removals, ACS has chosen to sanction and promote bypassing due process and judicial review when seizing children.

83.    Moreover, while ACS incentivizes caseworkers and their supervisors to separate children from their families, the ACS Audit reveals that the agency fails to discipline staff who do not "conduct a full investigation" or "fully understand and support family needs"[47] prior to conducting a removal.

84.    ACS has created an environment where its staff violate families' constitutional rights with impunity.  Indeed, ACS caseworkers have publicly stated that the Fourth Amendment's protections—the Second Circuit's holdings notwithstanding[48]—do not apply to them.[49]

## III.    ACS DEPLOYS ITS UNLAWFUL EMERGENCY REMOVAL POLICY AGAINST PLAINTIFFS AND CLASS MEMBERS

### A.    Plaintiffs

### *The Archer Family*

85.    Denise Archer is a 36-year-old Black resident of Bronx, New York.  She is the single mother of three children: Jasmine, a twelve-year-old girl who is diagnosed with autism and

---

[45] *Id.*

[46] Nat'l Innovation Serv., Digest of Data from ACS Audit Interviews (on file with Plaintiffs' counsel).

[47] Wallace et al., *supra* note 43, at 18.

[48] *Southerland v. City of New York*, 680 F.3d 127, 143–49 (2d Cir. 2012) (holding that Fourth Amendment search and seizure protections apply to ACS actions); *Tenenbaum*, 193 F.3d at 602 n.14 (same).

[49] Eli Hager, *Police Need Warrants to Search Homes. Child Welfare Agents Almost Never Get One*, ProPublica (Oct. 13, 2022), https://www.propublica.org/article/child-welfare-search-seizure-without-warrants [https://perma.cc/G86Y-X5S6].

ADHD; Jeremiah, a seven-year-old-boy; and Daevon, a five-year-old boy. All her children are Black.

86.    Ms. Archer, who spent over three years in foster care as a teenager, is involved in community advocacy, and supports other parents who grew up in the foster system.

87.    Ms. Archer describes her children as "her life." The Archer family is tight-knit and, until 2023, had always lived together.

88.    In 2023, in the span of just four months, ACS removed Ms. Archer's children twice without prior court authorization. The second of these emergency removals resulted in the Archer family being separated for nearly three years—a harrowing experience that has had lasting psychological effects on Ms. Archer and her children.

89.    In March 2023, Ms. Archer brought nine-year-old Jasmine to the hospital to treat an accidental injury that occurred during a meltdown Jasmine was having. Ms. Archer also brought Jeremiah and Daevon with them.

90.    Although Ms. Archer and Jasmine both explained that the injury was from an accident, the hospital called ACS.

91.    The treating doctor informed ACS that the explanation provided by Ms. Archer was consistent with the injury. Nevertheless, ACS conducted an emergency removal of Jasmine and her siblings.

92.    After removing Ms. Archer's three children from her care without a court order, ACS was required under Family Court Act § 1026(c) to file an Article 10 petition the next business day to seek the family court's review.

93.    Instead, ACS kept the family separated without filing an Article 10 petition, only to change course and return the children to Ms. Archer's care two days later.

26

94.     ACS conducted a forensic interview with Jasmine.  At the conclusion of the interview, the forensic team determined that the injury was a "freak accident," and not the result of any wrongdoing by Ms. Archer.

95.     During the investigation, Ms. Archer asked ACS for help restarting services for Jasmine that she had previously received through the Office for People with Developmental Disabilities ("OPWDD") based on Jasmine's diagnosed high-support needs.

96.     Up until 2020, Ms. Archer had received fifteen to twenty hours a week of respite care for Jasmine through OPWDD[50] to address Jasmine's needs and allow Ms. Archer more time and energy to care for herself and her children.  Unfortunately, OPWDD suspended respite services due to the COVID-19 pandemic and did not resume respite care thereafter, nor did it provide any other supportive services instead.  As a single mother managing Jasmine's significant support needs while caring for her two younger boys, Ms. Archer recognized the utility of the OPWDD services and needed ACS's help to get reenrolled.

97.     Although ACS agreed with Ms. Archer that the family could benefit from OPWDD services, and the caseworker was instructed by her supervisor to help Ms. Archer with this issue, ACS failed to help Ms. Archer reenroll her family in critical OPWDD services.

98.     ACS closed its investigation without this service in place.

99.     A few months later, in June 2023, Ms. Archer's children's daycare made a malicious, false report to the SCR that the children were unclean and improperly dressed.  The report was retaliatory; about a week prior, Ms. Archer had reported the daycare to the Department of Health for unprofessional conduct.

---

[50] Respite care "is an 'indirect' service that provides relief to people who are responsible for the primary care and support of a person with a developmental disability" by providing "temporary relief from the demands of care giving." *See* Office for People with Developmental Disabilities, *Respite Services: Getting a Break*, https://opwdd.ny.gov/types-services/respite-services [https://perma.cc/MPP6-PBPP] (accessed Apr. 30, 2026).

27

100. The daycare's report also referenced Jasmine's prior accidental injury—the same injury for which ACS had already determined, after investigating, that no Article 10 petition should be filed. ACS commenced a new investigation.

101. ACS interviewed Ms. Archer's children and observed that they had no injuries, were healthy, were closely attached to their mother, and were safe in her care.

102. During the investigation, Ms. Archer again asked ACS for help with childcare and other supportive services. The ACS caseworker offered to refer Ms. Archer to respite services and explained that these services could be helpful for single mothers who need some assistance.

103. About two weeks later, on the morning of July 2, 2023, Ms. Archer tried to contact the ACS caseworker to follow up about the respite services ACS had offered.

104. Unable to get in touch with the caseworker, Ms. Archer called the SCR hotline, hoping to be connected to her caseworker for assistance.

105. Ms. Archer was seeking the very same service she had received before the pandemic (and that ACS had offered her just two weeks prior)—respite care for her children.

106. Instead of providing the service, which was designed exactly for situations like the one Ms. Archer was facing, ACS commenced a new investigation based on her call to the SCR seeking assistance.

107. A new ACS caseworker arrived at Ms. Archer's home that day around noon.

108. In consultation with ACS, Ms. Archer made a family arrangement to have her aunt, Diane, take care of Jasmine and Jeremiah for a week, as a form of support and respite, so that she could focus on caring for her toddler Daevon.

109. Ms. Archer got her two older children ready, and they were brought to her aunt's home that afternoon.

28

110.    The next day, on the morning of Monday July 3, 2023, the ACS caseworker who had initially suggested respite care called Ms. Archer.

111.    Ms. Archer told the caseworker that she wanted to explore respite care for when Jasmine and Jeremiah returned home from their aunt's.  The ACS caseworker sent Ms. Archer information for a respite care provider, but the provider no longer offered respite care.

112.    That afternoon, a different ACS caseworker came to Ms. Archer's home, where she noticed a burn on Daevon's arm.

113.    Ms. Archer explained that Daevon accidentally burned his arm a few days prior while she was ironing Jeremiah's shirt for school, that she had previously brought Daevon to urgent care for treatment, and that she had a follow-up appointment scheduled.

114.    Even though Ms. Archer had already sought and obtained medical care for Daevon, the caseworker took him to the hospital for further medical evaluation.  Medical staff assessed that, consistent with Ms. Archer's explanation, the burn was several days old, healing, and did not require further treatment.

115.    There was no indication that Daevon's burn was anything other than accidental.  In fact, as the Appellate Division, First Department later found, "uncontroverted testimonial and documentary evidence establish that [Daevon's burn] was accidental" and that Ms. Archer appropriately sought treatment for her son.[51]

116.    Yet when Daevon was discharged from the hospital later that day, ACS did not return him to Ms. Archer.  Instead, in accordance with its Emergency Removal Policy, ACS conducted an emergency removal of all three of Ms. Archer's children.  ACS relied on Ms. Archer's request for respite care and Daevon's accidental burn as the reasons for the removal.

---

[51] *Matter of Ja. W.*, 247 A.D.3d 599, 600 (N.Y. App. Div. 2026).

29

ACS transported Daevon to the home of Ms. Archer's aunt Diane, where his siblings were staying. ACS further informed Ms. Archer that it had also emergency removed Jasmine and Jeremiah, meaning they could not come back to her home later that week as planned. ACS told Ms. Archer that she could not have contact with any of her children.

117. Because there were no bona fide emergency circumstances and because ACS had time to seek a court order prior to the removal, the emergency removal was unlawful.

118. ACS did not permit Ms. Archer to see or speak with her three young children for four days after ACS removed them from her care.

119. ACS did not attempt to set up any visits for the family.

120. On July 7, 2023, four days after the removal, ACS finally filed an Article 10 petition in Bronx County Family Court. The petition alleged that Ms. Archer's children were at imminent risk in her care based on her request for respite care and Daevon's accidental burn. ACS also alleged that Ms. Archer was not in mental health treatment for her depression and anxiety.

121. In its Article 10 neglect petition, ACS did not provide any reason for why an emergency removal was justified—even though it was legally obligated to do so, *see* N.Y. Fam. Ct. Act § 1031(e). ACS did not provide any reason because the emergency removal was not justified.

122. During the first court appearance, the family court noted that ACS had violated the law by waiting more than twenty-four hours to file a petition after the emergency removal. Nevertheless, the family court decided to maintain the status quo and, in deference to the removal ACS had already carried out, granted the agency's request to place the children in foster care. The family court cited only one reason for continuing the removal: Ms. Archer's request for respite care.

123.    For the nearly three years that followed, Ms. Archer's children moved through multiple foster care placements while Ms. Archer continued to battle ACS in court for their return.

124.    After almost three years of separation, the family was finally reunited when an appellate court unanimously reversed the family court's neglect findings and dismissed the Article 10 case in 2026.[52]  The appellate court ruled that Ms. Archer's request for respite care was "not a proper basis for finding imminent risk."[53]  The appellate court further ruled that "the mother was at all relevant times under the care of a psychiatrist and was compliant with the psychiatrist's prescribed medications," and, therefore, the "[family] court erroneously found that the mother" was not compliant with her "recommended treatment."[54]  The family was immediately reunited following the appellate court's decision.

125.    Ms. Archer and her children remain deeply traumatized by the two emergency removals they endured and the family separations that followed.

126.    While in foster care, Jasmine, Jeremiah, and Daevon were physically attacked and forcibly medicated.  As a result of their experiences in foster care, they have developed lasting psychological and behavioral problems.

127.    During the Archer family's three-year separation, Jasmine, Jeremiah, and Daevon cycled through several placements.  ACS initially left the children in a foster placement with Ms. Archer's aunt, Diane.  Just a few days later, Jasmine, who was nine at the time, found Diane unconscious in her home due to her medical condition.  Diane was hospitalized, and ACS temporarily moved the children to their adult cousin's home.

---

[52] *Id.*

[53] *Id*. at 601.

[54] *Id.* at 600.

128. Although the children's cousin informed ACS that she had to work and could not keep the children after the weekend, ACS failed to make an alternate plan. On Monday morning, without any alternate plan from ACS, the children's cousin walked all three of them to the local ACS office and left them there.

129. ACS housed all three children at the Children's Center. ACS then moved the kids to a different pre-placement shelter, where they remained for nearly two months.

130. While Jasmine was at the pre-placement shelter, she was attacked and punched in the face by a male resident.

131. After ACS placed Jasmine, Jeremiah, and Daevon in a foster home with strangers, the children struggled to adjust.

132. The harm to Jasmine was particularly acute. Before ACS removed her from her mother, Jasmine had been thriving in school. After ACS removed her, she began to struggle academically.

133. Before ACS placed Ms. Archer's children in foster care, they had been a close and peaceful sibling group. After being placed in foster care, Jasmine more frequently became dysregulated, physically fought with her siblings, and self-isolated.

134. Four months after ACS placed Jasmine in foster care with strangers, her foster parents called 911. Jasmine was involuntarily hospitalized and forcibly medicated.

135. Following Jasmine's involuntary hospitalization, ACS separated her from her siblings and moved her to a different foster home with strangers.

136. Over the three years that Jasmine was in foster care, ACS moved her through four different foster homes. Her foster parents regularly called 911 when she struggled to regulate.

137. Jasmine was involuntarily hospitalized and forcibly medicated approximately ten times in the almost three years she was in foster care. According to Jasmine, ACS made her "want to die."

138. Jasmine has never been psychiatrically hospitalized while being cared for by Ms. Archer.

139. The two younger boys also suffered emotional harm in ACS's care. Jeremiah developed anxiety and began pulling out his eyebrows and wetting the bed, even though he had previously outgrown bed wetting. Daevon frequently became dysregulated and began physically fighting with his siblings.

140. Ms. Archer, who had developed depression and anxiety after being placed in the foster system as a teenager, was destabilized by ACS's sudden and terrifying removal of her children.

141. Although Ms. Archer is overjoyed to have her children back home, she is still working to rebuild her children's sense of stability and heal their relationships after almost three years apart.

142. Beyond having already been subjected by ACS to two extrajudicial removals, the Archer family has routine contact with mandated reporters through the children's public schools, public hospitals, and the family's receipt of public assistance and other public services.

143. Because both Jasmine and Daevon have high-support needs, they are more likely to be subjects of another SCR report.

144. Jasmine continues to struggle with significant behavioral challenges because of her disability, and after years in foster care, Daevon has developed behavioral challenges as well.

These behavioral challenges put both children at increased risk of future accidental injuries like the one that resulted in their first emergency removal.

145.    The family's South Bronx neighborhood, Melrose, has one of the highest numbers of removals into foster care, with ACS removing children at more than twice the citywide rate.[55]

146.    The Archer family lives in constant fear of another traumatizing, illegal emergency removal.

### *The Lorimer Family*

147.    Danielle Lorimer is a 37-year-old Black and Latina resident of Bronx, New York. She is the single mother of five children:  Zoe, a fourteen-year-old girl; Yolanda, a ten-year-old girl; Xena, an eight-year-old girl; Willow, a five-year-old girl; and Kayden, a two-year-old boy. All her children are Black and Latino.  The Lorimer family is extremely close.  The children have a wonderful relationship with their mother, and the siblings share a close bond.

148.    Ms. Lorimer receives public assistance to help support her family.

149.    ACS has removed Ms. Lorimer's children twice pursuant to its Emergency Removal Policy—most recently in the fall of 2025.

150.    On October 14, 2025, Yolanda and Willow's school placed a call to the SCR alleging that Yolanda and Willow had poor hygiene, that their clothes did not fit, and that they were late to school.  ACS opened an investigation.

---

[55] *See* N.Y.C.L.U. *Racism at Every Stage: Data Shows How NYC's Administration for Children's Services Discriminates Against Black and Brown Families* (June 20, 2023), https://www.nyclu.org/en/campaigns/racism-every-stage-data-shows-how-nycs-administration-childrens-services-discriminates  [https://perma.cc/6HT5-FVRV]; Neighborhood Data, *New York City Family Policy Project*, https://familypolicynyc.org/community-overview/# [https://perma.cc/MY5N-G3UG] (accessed May 21, 2026).

151.    On October 15, 2025, ACS spoke with Yolanda and Willow at their school.  The girls told ACS that they felt safe with their mother, and ACS did not observe any marks or bruises on the children.  Yolanda said she was late because the family was staying far from the school.

152.    ACS also spoke with the school.  The school repeated the concerns about poor hygiene, inadequate clothing, and that Yolanda and Willow were late to school.

153.    On October 16, 2025, at ACS's request, Ms. Lorimer brought all her children to ACS's office.  ACS met with Ms. Lorimer and her children.  Ms. Lorimer explained her housing concerns to ACS:  After having been violently assaulted by an ex-partner, Kayden and Willow's father, Ms. Lorimer sought and obtained an order of protection to shield herself and her children from her abuser.  Even though Ms. Lorimer obtained an order of protection, her ex-partner would sometimes show up to the home and harass the family.  Ms. Lorimer called the police on several occasions, but the ex-partner was never arrested.

154.    To avoid conflict and seek safety, Ms. Lorimer and her children would frequently stay with the children's godmother and her kids.  The Lorimer family referred to this home as their "safe house."  The safe house was far from Yolanda and Willow's school.

155.    While at the ACS office, Ms. Lorimer asked ACS to provide her with childcare vouchers and additional clothing.  She also asked ACS for assistance with getting a new apartment.

156.    ACS promised to help but then failed to provide the family with any of the support Ms. Lorimer requested.  At the ACS office, Ms. Lorimer also agreed to engage in numerous services, including preventive services designed to keep the family intact and cleaning services for the home.

157.    At the end of the meeting, after seeing Ms. Lorimer's children and speaking with the family, ACS determined that the children were safe in their mother's care and permitted the family to return home together.

158.    An ACS caseworker met with the family in their home just over ten days later, on October 27, 2025.  The caseworker criticized the condition of the home, and asked Ms. Lorimer for the address where she and her family were staying.  Ms. Lorimer was concerned about getting ACS involved with her children's godmother's family, so she declined to provide the address.

159.    ACS told Ms. Lorimer that she and her children must enter the NYC homeless shelter system through the Prevention Assistance and Temporary Housing ("PATH") intake center.

160.    Although there were no physical injuries to the children, ACS took Ms. Lorimer and the children to the hospital to be evaluated.  On the way to the hospital, Ms. Lorimer's fourteen-year-old daughter Zoe overheard the ACS caseworker say that if Ms. Lorimer did not enter a homeless shelter, ACS would take her children.

161.    Zoe was frightened and asked her mom if ACS was going to take her away. Ms. Lorimer asked the ACS caseworker if what Zoe overheard was true.  The ACS caseworker said yes:  If Ms. Lorimer did not enter a homeless shelter, ACS would separate her family.

162.    Because her children had previously been removed by ACS, Ms. Lorimer was terrified ACS would separate the family again, so she immediately left the hospital to take the kids to the PATH intake center.  Once at PATH, Ms. Lorimer and her kids began the hours-long process of seeking shelter placement.

163. On the morning of October 28, 2025, ACS filed an Article 10 neglect petition against Ms. Lorimer in Bronx County Family Court, alleging inadequate guardianship, clothing, and shelter.

164. Ms. Lorimer appeared virtually from the Bronx PATH intake center and informed the Court and ACS that she was waiting with her children to be placed in a shelter. After receiving more information about the family's location during this court appearance, ACS stated that they were not seeking a court order to remove the children.

165. Had ACS sought a court order authorizing a removal, the agency would have had to demonstrate an imminent risk to the children; Ms. Lorimer and her children, all of whom were represented by counsel, would have had an opportunity to be heard and contest any allegations.

166. Instead, ACS stated that the agency was satisfied with an order from the family court that Ms. Lorimer produce the children the next day at the ACS field office by 4:00 p.m.

167. The family court, Ms. Lorimer, and the children's attorney agreed with this plan, and the court ordered Ms. Lorimer to bring the children to the ACS office the next day. Ms. Lorimer stated that she understood the Court's order and would comply.

168. Around 6:00 p.m. that night—just about an hour and a half after the court appearance ended—Ms. Lorimer and her five children were on a parked bus outside of PATH, waiting to be transferred to the shelter placement. A PATH employee took Ms. Lorimer and her children off the bus and led them all to a small, windowless room inside the PATH intake center.

169. Ms. Lorimer felt like she was in a jail cell.

170. An ACS caseworker, accompanied by multiple armed police officers and a PATH employee, entered the room. Ms. Lorimer was told that ACS was conducting an emergency removal of her children. Ms. Lorimer began crying and pleading with ACS not to take her children.

171. ACS had not received any new information about the Lorimer family since it had declined—just an hour and a half earlier—to request that the family court issue a removal order.

172. Nevertheless, even though Ms. Lorimer was awaiting shelter placement, ACS removed all five children without a court order, pursuant to its Emergency Removal Policy.

173. ACS conducted this emergency removal notwithstanding the fact that Ms. Lorimer was taking the exact step—entering PATH—that ACS had previously indicated would alleviate its concerns about the family.

174. Because there were no emergency circumstances and because ACS had, less than two hours earlier, declined to seek a court order authorizing the removal, the emergency removal was unlawful.

175. That night, after the children were medically cleared, ACS placed them in the Children's Center. At the Children's Center, the children were separated from each other. Zoe described it as a prison.

176. The children were subject to unsanitary conditions and did not see their mother for three days.

177. The day after the removal, Ms. Lorimer's fourteen-year-old daughter Zoe texted her mom in a panic because ACS had forgotten to pick her up from school. She had been waiting outside in the rain for hours and told her mom that she wanted to run away to be with her. Because of the removal, Ms. Lorimer was not permitted to pick up her daughter. She told Zoe to be strong so they could be reunited soon.

178. Ms. Lorimer was devastated that ACS was preventing her from caring for her distressed daughter.

179.    On Wednesday, October 29, 2025, at around 4:00 p.m., about thirty minutes before family court was scheduled to close, ACS filed a motion seeking a court order to remand the children into foster care.  Because of how late in the day ACS filed the motion, the family court did not hear the case until the next day.

180.    The ACS caseworker's affidavit attached to the motion contained no new information; it merely affirmed the same facts as the day before when ACS had appeared in family court and declined to request a removal order.

181.    On Thursday, October 30, 2025, the family court began a § 1027 hearing but adjourned without making a determination.

182.    The next day, Friday, October 31, 2025, ACS agreed to return Ms. Lorimer's children on the condition that she and the children return to PATH, the very place they had been when ACS conducted the illegal emergency removal.

183.    When Ms. Lorimer was reunified with her children at Bronx County Family Court, all five of her children ran up to hug her.  That night, to try to forget the horrors of the week, Ms. Lorimer took her children trick-or-treating in their neighborhood.

184.    Because ACS had separated Ms. Lorimer and her children before they could finish going through the intake process, the family had to begin the lengthy and burdensome process of entering the shelter system all over again.

185.    Ms. Lorimer's children have been safely in her care ever since.

186.    Despite the family's resilience, Ms. Lorimer and her children still feel the harmful effects of the emergency removal more than six months later.

187.    Since the emergency removal, all five children suffer from severe anxiety whenever they are separated from their mother—including when they go to school—fearful that they will be

39

separated again.  Two-year-old Kayden, who had been an outgoing boy, has been timid and shy since the removal.  Whenever Ms. Lorimer leaves him with his godmother, he cries and yells for his mom to come back, which he did not do before the removal.

188.    During the emergency removal, ACS confiscated Zoe's art book because it had a spiral binding and was not allowed in the Children's Center.  The art book had years of her cherished drawings in it.  ACS never returned Zoe's art book.  Zoe is devastated by this loss.

189.    On March 2, 2026, the family court ordered that Ms. Lorimer's case be adjourned in contemplation of dismissal ("ACD") until June 1, 2026.  The terms of the ACD impose ACS supervision over Ms. Lorimer and her children.  As part of the supervision, ACS caseworkers enter and inspect Ms. Lorimer's home—much like the monitoring that resulted in the family's prior two emergency removals.

190.    On top of being subject to ACS supervision, which appreciably increases the chances of an emergency removal, the Lorimer family continues to have constant contact with mandated reporters through the children's public schools, public hospitals, and the family's receipt of public assistance and other public services.

191.    Additionally, the Lorimer family has been subjected to numerous malicious, false reports to the SCR.

192.    In the family's Bronx neighborhood, Laconia, the rate of removals into foster care is almost twice what it is citywide.[56]

193.    Unfortunately, the fear of repeat emergency removals is not speculative for the Lorimer family.

---

[56] *See* Neighborhood Data, *New York City Family Policy Project*, available at https://familypolicynyc.org/ community-overview/# [https://perma.cc/MY5N-G3UG] (accessed May 14, 2026).

194.    Five and a half years earlier, in April of 2019, pursuant to its Emergency Removal Policy, ACS removed Ms. Lorimer's children from her home in the middle of a Thursday afternoon without a court order, after monitoring the family for months.  The family court was open the day the children were removed.

195.    The family was living in the shelter system at the time, and Ms. Lorimer had been struggling with post-partum depression since giving birth to Xena.

196.    ACS's investigation of the family focused on housing conditions, Ms. Lorimer's occasional use of marijuana, and her mental health.

197.    After conducting the emergency removal, ACS filed an Article 10 petition the next day in Bronx County Family Court.  In its Article 10 neglect petition, ACS did not provide any reason for why an emergency removal was justified—even though it was legally obligated to do so, *see* N.Y. Fam. Ct. Act § 1031(e).

198.    ACS did not provide any reason because the emergency removal was not justified.

199.    The family court maintained the status quo, deferred to ACS's removal decision, and placed the children with Ms. Lorimer's father.

200.    The family court ultimately dismissed the petition and sent the children back to Ms. Lorimer's care.

201.    The Lorimer family lives in constant fear of another traumatizing, illegal emergency removal.

### B.    Witnesses

202.    The Richardson, Trainor, and E. families have each been subject to ACS's Emergency Removal Policy.  Their experiences, detailed below, are emblematic of the ways families suffer from ACS's policy of abusing its emergency removal power.

### *The Richardson Family*

203.     Kendrick Richardson is a Black, 30-year-old father who lives in Allentown, Pennsylvania and regularly visits his daughter and partner in Bronx, New York.[57]  He has four children.  His two oldest children live in Pennsylvania with their mother, and Mr. Richardson has been a committed father in their lives.  Mr. Richardson's son, Kevin, a three-year-old boy, lives in Florida in foster care.  His youngest, Kiara, an infant girl, lives in the Bronx with Mr. Richardson's partner, Johana Pavon.  All of his children are Black.

204.     Mr. Richardson works as a manager at a delivery company in Pennsylvania.

205.     In October 2025, ACS emergency removed Mr. Richardson's newborn daughter, Kiara, at the New York City hospital where she was born, and where, by all accounts, her parents were taking appropriate, loving care of her.  The extrajudicial removal was based on a pre-existing case in Florida where Mr. Richardson and his partner's parental rights to their son, Kevin, had been terminated.

206.     The Florida case began in May 2024 when Mr. Richardson, Ms. Pavon, and Kevin were there on vacation.  On their way to church, Kevin, then almost one year old, had a seizure.  His parents immediately took him to the hospital.  Upon evaluation, hospital staff determined that he had low electrolytes and called Florida child protective services ("Florida CPS"), who removed Kevin and placed him in foster care.  Kevin's mother and other family members have epilepsy and have suffered from seizures as a result.  Florida CPS asked the parents to take drug tests.  While the mother's drug test was positive, Mr. Richardson tested negative for all illicit substances other than marijuana.

---

[57] Kendrick Richardson is a pseudonym of father K.R., and Johana Pavon is a pseudonym of K.R.'s partner J.P., and both pseudonyms are used throughout the Complaint.  Kevin is a pseudonym of minor K.R., and Kiara is a pseudonym of minor K.R.  *See* Fed. R. Civ. P. 5.2(a); N.Y. Soc. Serv. Law § 372(3)-(4).

207.    The New York family court later said that "[t]he symptoms of the seizure were the catalyst for a lot of what happened" in the Florida case and noted that Kevin went on to have two more seizures while in foster care.[58]

208.    For five months, Mr. Richardson and Ms. Pavon rented a room in a hotel as they sought Kevin's return.

209.    Florida CPS instituted a safety plan that required the family to maintain housing and employment in Florida—even though they were there on vacation.  The New York family court later described the parents as having been "left completely on their own, told to take a bus two hours away to see their child, not provided with information that they needed, not even provided with a safety plan that made any sense."[59]  The New York family court found Florida CPS's treatment of Mr. Richardson and his partner "inexplicable" and observed that the Florida caseworker had described Kevin as "an unsmiling baby" who "lit up like a Christmas tree" when he saw his parents.[60]

210.    Tragically, after five months of trying to get Kevin returned to their care, Mr. Richardson and Ms. Pavon eventually ran out of money and could no longer afford to stay in Florida.  Moreover, Mr. Richardson had to return to his other children in Pennsylvania.  Mr. Richardson was heartbroken and pleaded with Florida CPS for help.  Florida CPS said it would try to transfer the case to Pennsylvania, but the case was never transferred.

211.    Mr. Richardson's and Ms. Pavon's parental rights to their young son were terminated on default.

---

[58] Hr'g Tr. 15:7–8, *Matter of K.R.* (on file with Plaintiffs' counsel).

[59] *Id*. at 21:6–10.

[60] *Id*. at 21:10, 15:1–3.

212.    Mr. Richardson was completely devastated by losing his son.   Despite Mr. Richardson's efforts to reunify with his young son, he feels that Florida CPS set him up to fail.

213.    In reviewing the Florida termination of parental rights proceedings, the New York family court ultimately determined that Mr. Richardson's belief that he "had been set up to fail" by Florida CPS was "not an unreasonable assessment of the situation," and noted that, during the Florida termination hearing, "[m]ore time on the record was spent discussing the health of one of the attorneys . . . than was spent on any substantive proof supporting a termination of parental rights."[61]

214.    After returning to New York, Ms. Pavon gave birth to her second child with Mr. Richardson on October 20, 2025: a daughter, Kiara.  Mr. Richardson was by Ms. Pavon's side throughout the birth and was an attentive father to Kiara from the start.  He lovingly held his baby daughter, soothed her, and fed her.

215.    Although both Mr. Richardson and Ms. Pavon were acting appropriately with their newborn daughter and had obtained the necessary provisions to safely care for her, the hospital called in a report based solely on the family's experience with Florida CPS.  The New York hospital had no first-hand concerns about Kiara or her parents.

216.    The day after Kiara's birth, ACS came to the hospital to discuss the Florida case with the parents.  ACS then left.

217.    Ms. Pavon and Kiara had to remain in the hospital for a few days because the birth had been by c-section, and Mr. Richardson remained by Ms. Pavon's and Kiara's side during their hospital stay.  For the next three days, Ms. Pavon, Mr. Richardson, and Kiara bonded at the hospital.  Mr. Richardson described his time with his baby in the hospital as establishing a bond

---

[61] *Id*. at 15:19–20, 16:7–11.

44

and "a different kind of love ... a father's love." He wanted to make sure that his daughter knew he was there for her and that "she [could] always come and rely on her father for everything."

218.    On Friday, October 24, 2025, ACS again visited the hospital. Again, ACS observed Mr. Richardson safely caring for Kiara, who was happy and healthy in her parents' care.

219.    That day, Ms. Pavon was discharged and Kiara was medically cleared for discharge. However, pursuant to its Emergency Removal Policy, ACS extrajudicially removed Kiara by instructing the hospital not to allow Mr. Richardson and Ms. Pavon to take their baby home from the hospital.[62]

220.    The basis for the extrajudicial removal was the case concerning Kevin in Florida. ACS made no other allegations concerning Mr. Richardson or his interactions with Kiara.

221.    ACS informed Mr. Richardson that he could not bring Kiara home or visit her in the hospital until after the agency had held a conference. For the next five days, Mr. Richardson could not see his newborn daughter, which disrupted important early bonding moments. He was devastated.

222.    On Monday, October 27, 2025, ACS held a conference with the parents. ACS told them that they could not visit Kiara until they all went before a judge. Yet ACS did not bring the case to court that day, or the next.

223.    On Wednesday, October 29, 2025, ACS filed a petition in Bronx County Family Court. ACS alleged that Kiara was at risk in Mr. Richardson's and his partner's care due to their

---

[62] For Fourth Amendment and due process purposes, an emergency removal occurs when a child is medically cleared but held at the hospital under a social hold. *See Kia P. v. McIntyre*, 235 F.3d 749, 762 (2d Cir. 2000) (holding that a child is "'seized' within the meaning of the Fourth Amendment" once the child is "medically cleared but not released from the Hospital's custody"); *see also K.W.*, 2026 WL 1391967, at *13 (explaining that "the standard for analyzing a procedural-due-process claim challenging the unconstitutional removal of a child is for present purposes similar to that employed for a Fourth Amendment unreasonable-seizure claim") (quotation marks and citations omitted). ACS acknowledges that a social hold is an emergency removal. *See supra* note 16 (analyzing a procedural-due-process claim challenging the unconstitutional removal of a child is for present purposes similar to that employed for a Fourth Amendment unreasonable-seizure claim).

45

case in Florida. ACS did not give any reasons why there was insufficient time to seek a court order prior to conducting an emergency removal. Instead, ACS claimed that the agency had not conducted an emergency removal.

224. At this initial hearing, the New York family court judge excoriated ACS for its "unacceptable" conduct in delaying coming to court and for claiming that it had not conducted an emergency removal. The judge stressed that when ACS creates a situation such that the parents could not see their newborn child, "that is a removal."[63] The judge continued, "[K]eep[ing] a child who's medically cleared [at a hospital] is a removal. Let's just call it what it is. You can call it a social hold. You can call it a removal. . . . The parents deserve to know what's going on."[64] The court also stated, "this is outrageous the way that this happened. This should never happen."[65] The court specifically noted the harm to the child of being unable to be held by and have skin-to-skin contact with her parents.[66]

225. For the next 26 days, the court held a § 1027 hearing to determine whether Kiara should remain in state custody, as ACS was requesting. Because Mr. Richardson is employed in Pennsylvania, he had to travel between Pennsylvania and New York to attend court appearances and visit Kiara in the hospital, where she remained for the entirety of the § 1027 hearing. The extended hearing strained Mr. Richardson's relationship with his employer. The hospital staff, who watched as Mr. Richardson doted on Kiara during visits, were rooting for him to be reunited and asked Mr. Richardson when he could bring his daughter home.

---

[63] Hr'g Tr. 11:23–12–1, *Matter of K.R.* (on file with Plaintiffs' counsel).

[64] *Id*. at 16:2–15.

[65] *Id*. at 21:16–21.

[66] *Id*. at 22:2–5.

226.    At the conclusion of the hearing, the family court found that there was no imminent risk to Kiara in her parents' care and ordered that she be returned to them.

227.    The family court further noted that it appeared that ACS removed Kiara "without legal authority to do so," yet there was "nothing that this court can do, this particular court can do to redress that problem, but it is a problem."[67]

228.    The harms of the separation have stayed with Mr. Richardson and his family. Mr. Richardson struggled to eat and sleep while he was separated from his daughter. Kiara was unable to nurse as planned due to the separation. Mr. Richardson was devastated not to be able to introduce his newborn to her siblings.

229.    Kiara remains safely in her parents' care, and ACS has offered to resolve the case with an ACD.

### *The Trainor Family*

230.    In December 2023, the Trainor family lived in Queens, New York. Meredith Trainor is a 34-year-old hospital social worker and mother of two minor children, S.P. and L.P.[68]

231.    On December 31, 2023, Ms. Trainor was at work while her ex-fiancé was watching their 11-month-old daughter, S.P.

232.    That morning, he called Ms. Trainor to tell her that S.P.'s face was turning red. Ms. Trainor told him to go to the hospital immediately and left work to meet them there.

---

[67] Hr'g Tr. 20:21–24, *Matter of K.R.* (on file with Plaintiffs' counsel).

[68] Ms. Trainor recently filed a civil rights lawsuit against ACS, alleging that the agency conducted an illegal emergency removal of her baby. *See* Compl., Dkt. No. 1, *Trainor v. City of New York*, No. 1:26-cv-1566 (E.D.N.Y. March 17, 2026); *see also* Samantha Max, *Queens Mother Sues New York City Over Removal of Baby Without Court Order*, Gothamist (Mar. 18, 2026), https://gothamist.com/news/queens-mother-sues-new-york-city-over-removal-of-baby-without-court-order [https://perma.cc/LP4G-6M3A]. Consistent with Ms. Trainor's federal lawsuit, this Complaint refers to her children using initials for their protection.

233.    When Ms. Trainor arrived at the hospital, the nurse said S.P. had been exposed to narcotics.  The nurse reassured Ms. Trainor that S.P. was safe but informed her that the hospital had placed a call to ACS.  Ms. Trainor was shocked.  She had no idea how this could have happened to her daughter.  S.P. was ready for discharge in a few hours, and Ms. Trainor took her home.

234.    That night, an ACS caseworker arrived at Ms. Trainor's home with the police.  The police arrested Ms. Trainor's ex-fiancé.  ACS allowed S.P. to stay with Ms. Trainor in her home.

235.    Over the next four days, Ms. Trainor did everything ACS requested.  ACS caseworkers told her they did not have any safety concerns about keeping her daughter in her care.  ACS did not go to family court to attempt to obtain a court order to permit them to remove the child.

236.    On Thursday, January 4, 2024, four days after S.P. was discharged to her mother from the hospital, an ACS caseworker called Ms. Trainor and said that she had to return to her apartment immediately.  Ms. Trainor, who had been in Westchester at her mother's, returned to her home in Queens.

237.    When Ms. Trainor arrived back home that night, she found two ACS caseworkers outside her door alongside multiple police officers.  ACS caseworkers told her that they were conducting an immediate emergency removal of S.P.  Even though four days had passed since the initial incident that triggered ACS involvement, ACS did not obtain—or even seek—a court order authorizing the seizure of Ms. Trainor's baby.  Instead, pursuant to its Emergency Removal Policy, ACS removed S.P. from her mother's care.  Because there were no emergency circumstances and because ACS had time to seek a court order prior to the removal, the emergency removal was unlawful.

238.    Ms. Trainor begged ACS not to take her baby.  While being forcibly torn from her mother's arms, S.P. began crying and screaming.  Ms. Trainor asked the caseworker if she could breastfeed her daughter before they took her.  The caseworker refused.

239.    Ms. Trainor asked the caseworker where ACS was taking her baby and what they would feed her.  The caseworker did not answer.  ACS took S.P. to a temporary placement shelter in the Bronx, where she spent the night.

240.    On January 5, 2024, the day after seizing S.P., ACS filed a petition in family court against both parents.  The family court held a § 1027 hearing.  Both Ms. Trainor and S.P., through their counsel, objected to the family separation and asked the family court to let S.P. come home to her mother's care.  At the conclusion of the hearing, on January 9, 2024, the family court sent S.P. home to Ms. Trainor.

241.    At that time, Ms. Trainor was pregnant.  During the pendency of the family court case, an ACS caseworker threatened Ms. Trainor by telling her that if she did not do what ACS demanded, the agency could take her new baby away when he was born.

242.    On July 12, 2024, Ms. Trainor gave birth to her son, L.P.  After L.P. was born, the nurse took him out of Ms. Trainor's room to run routine tests.  Haunted by the removal of her daughter, Ms. Trainor was so afraid that ACS was going to remove her newborn son that her whole body started shaking.

243.    Ms. Trainor continues to live in fear of ACS taking her young children.

49

***The E. Family***

244.    In July 2024, the E. family lived in Queens, New York.  M.E. is a 31-year-old mother.[69]  Ms. E.'s mother used drugs during Ms. E.'s childhood.  When Ms. E. was a child, ACS removed her from her mother and placed her into foster care.  After this traumatic childhood, Ms. E. developed a substance use disorder.

245.    In the spring of 2024, while incarcerated, Ms. E. learned she was pregnant.  Ms. E. considered this pregnancy to be a chance for a fresh start.  She got clean, and, in June 2024, was released from incarceration through a residential program that provides an alternative to pretrial detention for mothers.

246.    After she entered the program, Ms. E. thrived.  She maintained her sobriety, participated in regular check-ins with her counselor, attended prenatal appointments, participated in employment courses, and engaged in therapy.  She prepared eagerly for the birth of her child and planned to remain at the program after giving birth, where she would continue to be surrounded by supportive staff.

247.    In July 2024, Ms. E. gave birth to her son, L.E.  Ms. E. tested negative for all illicit substances one day after her son was born.  However, because Ms. E. had prior history with ACS, the hospital staff notified ACS about the birth.

248.    Three days after L.E. was born, Ms. E. and L.E. were discharged from the hospital and returned to the residential program.  Ms. E. was overjoyed to bring him home.

249.    But just a few hours after Ms. E. and L.E. arrived home together, several ACS caseworkers and multiple police officers came to Ms. E.'s program at night.  ACS told her that

---

[69] Ms. E. recently filed a civil rights lawsuit against ACS, alleging that the agency conducted an illegal emergency removal of her baby.  *See* Compl. and Jury Trial Demand, Dkt. No. 1, *M.E. v. City of New York*, No. 26 CV 02914 (CBA) (E.D.N.Y. May 15, 2026), Dkt. No. 1.  Consistent with Ms. E.'s federal lawsuit, initials are used for the family's protection.

they were conducting an immediate emergency removal of L.E.  Even though L.E. had been born three days earlier, ACS staff did not seek a court order authorizing the seizure of the newborn. Instead, pursuant to its Emergency Removal Policy, ACS removed L.E. from his mother's care. Because there were no emergency circumstances and because ACS had time to seek a court order prior to the removal, the emergency removal was unlawful.

250.    Ms. E. begged ACS not to take her baby.  The director of the program told ACS that a removal was not necessary, and that program staff would help support Ms. E. and her baby. ACS nevertheless removed L.E. and took him to a temporary placement shelter in Manhattan, where he spent the night.

251.    The next day, ACS filed a petition against Ms. E. in family court.  The family court held a § 1027 hearing.

252.    At the conclusion of the hearing, the family court sent L.E. home to his mother.

253.    The Article 10 case was ultimately dismissed, and L.E. remains safely in Ms. E.'s care.

## IV.    ACS'S EMERGENCY REMOVAL POLICY REFLECTS A SYSTEMIC, DISCRIMINATORY PRACTICE THAT TARGETS BLACK AND LATINO FAMILIES

### A.    Historical Legacy of Racialized Family Separation

254.    Unjust separations of Black and Latino families have a deeply rooted historical legacy grounded in discriminatory assumptions and pretextual rationales regarding the "best interests" of children.[70]  In fact, the Reconstruction Amendments, including the Fourteenth Amendment, were motivated in significant part by outrage over the forced separation of enslaved

---

[70] *See* Shanta Trivedi, *The Harm of Child Removal*, 43 NYU Rev. L. & Soc. Change 523 (2019); Dorothy Roberts, *Torn Apart: How the Child Welfare System Destroys Black Families—And How Abolition Can Build a Safer World* at 88-102, 113-18 (2022).

families and were intended to establish that Black families have the fundamental, constitutionally protected right to raise their children.[71]

255.   Following the abolition of slavery, throughout which Black children had been considered property with no legal connection to their parents, Reconstruction lawmakers "shared a passionate commitment to the stability of family life as a badge of freedom."[72]   Reconstruction Congressmen were explicit that the Thirteenth and Fourteenth Amendments were intended to ensure the constitutional right to family integrity for all.[73]

256.   The practice of legally sanctioned family separation along racial lines continued. The Black Codes, enacted in Southern States in 1865 and 1866, allowed Black children to be "bound out" to work (including for the children's former owners) without their parents' approval when a judge deemed such separation to be in the children's best interests.[74]

257.   In the early 20th century, legislatures enacted government-funded welfare programs to provide aid to husbandless mothers considered "deserving"—primarily white widowed or unmarried women with children—with the goal of encouraging women to stay home

---

[71] *See* Peggy Cooper Davis, *Neglected Stories: The Constitution and Family Values* 38-40, 112-17 (1998); *see also, e.g.*, Cong. Globe, 39th Cong., 1st Sess. at 504 (1866) (remarks of Michigan Sen. Howard, observing that the Civil Rights Act of 1866 simply confirmed rights of Black freedmen obtained under "the intention of the advocates of the [Thirteenth] amendment," which includes "the right of having a family, a wife, children [and a] home").

[72] Eric Foner, *Reconstruction: America's Unfinished Revolution 1863-1877*, at 87 (1988).

[73] Cong. Globe, 38th Cong., 1st Sess. at 1324 (1864) (remarks of Massachusetts Sen. Wilson, "[W]hen this amendment to the Constitution be consummated . . . . Then the sacred rights of human nature, the hallowed family relations of husband and wife, parent and child will be protected by the guardian spirit of that law"); Cong. Globe, 38th Cong., 2d Sess. at 193 (1865) (remarks of Iowa Rep. Kasson, explaining the Thirteenth Amendment would protect "the right of the father to his child—the parental relation"); Cong. Globe, 38th Cong. 1st Sess. at 2990 (1864) (remarks of Illinois Rep. Ingersoll, explaining that the Thirteenth Amendment would ensure the inalienable right of the Black man "to the endearments and enjoyment of family ties; and no white man has any right to rob him of or infringe upon any of these blessings"); *see also Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977) ("[T]he Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition.").

[74] Roberts, *supra* note 70, at 97.

with their children and keeping children in the care of their mothers.[75]  In 1931, 96% of recipients of state welfare were white, while only 3% were Black.[76]  In New York City, child welfare investigators were instructed to maintain a sympathetic attitude and avoid using the cash aid to discipline mothers.[77]

258.    By mid-century, as a result of the gains of the Civil Rights Movement, expressly discriminatory state laws diminished, and more Black families began to receive welfare benefits. In response to increased outlays to Black families, state welfare policies became more punitive and began to shift towards increased monitoring, surveillance, and separation of aid recipients.[78] Federal and state welfare programs adopted new eligibility rules based on the perceived "suitability" of homes and racialized tropes of mothers, to cut off Black women's access to welfare programs by rendering them ineligible.[79]  Discriminatory suitability rules, which predominantly applied to Black mothers, denied benefits when families reached a certain size, reduced aid for unmarried women, and required drug testing.[80]  In addition, mandatory reporting laws and federal law introduced "neglect" as a basis for reporting child maltreatment, leading to soaring numbers

---

[75] Roberts, *supra* note 70, at 115 (citing a 1931 national survey); *see also* Board of Child Welfare of the City of New York, *First Annual Report of the Board of Child Welfare of the City of New York* (1916).

[76] Roberts, *supra* note 70, at 115.

[77] Board of Child Welfare of the City of New York, *Third Annual Report of the Board of Child Welfare of the City of New York: January 1, 1918-December 31, 1918*, at 16 (1918).

[78] Laura Briggs, *Taking Children: A History of American Terror* 38 (2020).

[79] Roberts, *supra* note 70, at 116–17; *see also* Laura Meyer, Ife Floyd & LaDonna Pavetti, *Ending Behavioral Requirements and Reproductive Control Measures Would Move TANF in an Antiracist Direction*, Ctr. on Budget & Pol'y Priorities (Feb. 23, 2022), https://www.cbpp.org/research/income-security/ending-behavioral-requirements-and-reproductive-control-measures-would [https://perma.cc/3ZAM-J2GP].

[80] Roberts, *supra* note 70, at 116.

of child welfare investigations.[81]  These changes led to a dramatic overrepresentation of families of color in investigations and foster care that carries through to this day.[82]

259.    ACS's Emergency Removal Policy operates within this context of historical disregard for the parental rights and familial integrity of people of color, perpetuating invidious racial discrimination that pervades the agency's practices.

**B.    Data Overwhelmingly Demonstrate Profound Racial Disparities in ACS Emergency Removal Practices That Are Highly Probative of Racial Animus**

260.    The data regarding ACS's contemporary practice are revealing and damning. Racial discrimination is present at every stage of ACS involvement, and the stunning disparities increase at every juncture and decision point within the child welfare system, reflecting systematic racial bias.  Roughly half of all Black children in New York City are subjected to an ACS investigation during their childhood—a significantly higher percentage than white children.[83] ACS reports that it is 8.3 times more likely to investigate Black children, and 6.7 times more likely to investigate Hispanic children, than white children.[84]  ACS is 10.5 times more likely to indicate cases involving Black children, and 9.2 times more likely to indicate cases involving Hispanic

---

[81] New York State Bar Ass'n, Comm. on Families and the Law, Report and Recommendations on Racial Justice and Child Welfare, at 9 (April 2022), https://nysba.org/wp-content/uploads/2022/03/Committee-on-Families-and-the-Law-April-2022-approved.pdf?srsltid=AfmBOorZEKAK-bCPT1NG5lbbbOhBl8ueJDZ_reFdd7ujBZojf4lv7Iji [https://perma.cc/5QTK-M533].

[82] *Id.* at 24 (stating that "[s]ystemic racism resulting from the history of slavery in the United States exists within the NYS child welfare system, impacting Black families disparately"); A.B.A. Resolution 606 (2022) (stating that anti-Black systemic racism within the child welfare system "stemming from the history of slavery in the United States … is pervasive, ongoing, and a root cause of the disproportionate involvement of Black parents and children within the system").

[83] As the City acknowledges, "1 out of every 2 Black children in New York City has been the subject of an investigation by the time they reach the age of 18[.]" Press Release, N.Y.C. Admin. for Child.'s Servs., *NYC Public Schools & New York State Office of Children and Family Services Announce Strategies to Address Racial Disproportionality in the Child Welfare System* at 2 (Oct. 19, 2023), https://www.nyc.gov/assets/acs/pdf/PressReleases/2023/address-racial-disproportionality.pdf [https://perma.cc/DQ2M-8N23].

[84] State Off. of Child. & Fam. Servs., *Black Disparity Rate: Unique Children in CPS Reports CY 2024* (2024), https://ocfs.ny.gov/reports/sppd/dmr/Disparity-Rate-Packet-2024-County-Comparison.pdf [https://perma.cc/59E3-3V25].

54

children, than white children.[85]  Black and Hispanic children are then admitted to foster care at rates of 15.6 and 8.4 times higher than white children, respectively.[86]  As former Commissioner Dannhauser testified in a hearing before New York City Council in February 2026, "These ratios have been stubbornly similar over many years."[87]

261.    The racial disparities with respect to emergency removals are especially stark. ACS's own data indicate that across the last several years at least, roughly 90% of emergency removals in New York City have been executed against Black and Hispanic children, even though only approximately 56% of children in New York City are Black or Hispanic.[88]  Of the 6,663 children who were in foster care for 2024, 6,171—or 92%—were Black or Hispanic.[89]

---

[85] *Id*.

[86] *Id.*

[87] Testimony of Jess Dannhauser, Comm'r, N.Y.C. Admin. for Child.'s Servs., Before the N.Y.C. Council Children & Youth Comm. at 2, https://www.nyc.gov/assets/acs/pdf/testimony/2026/examining-racial-disparities.pdf [https://perma.cc/9TGK-TU46].

[88] *Id*.; New York State Office of Children and Family Services, *Disproportionate Minority Representation (DMR) in Child Welfare Services Dashboard*, https://ocfs.ny.gov/reports/sppd/dmr/Disparity-Rate-Packet-2024-Dashboard.xlsx.

[89] *Disproportionate Minority Representation (DMR) in Child Welfare Services Dashboard, supra* note 83.



New York State Office of Children and Family Services, *Disproportionate Minority Representation (DMR) in Child Welfare Services Dashboard 2024 & Five Year Trends; Demographics of Children and Parents at Steps in the Child Welfare System*, FY 2025, 1.

262.    In 2022, in majority-non-white neighborhoods like Highbridge in the Bronx, Jamaica in Queens, and East New York in Brooklyn, ACS conducted thousands of investigations, leading to hundreds of children being seized from their homes.[90]  In stark contrast, in the whiter Manhattan neighborhoods of Soho, Greenwich Village, and the Upper East Side, ACS did not remove a single child into foster care.

---

[90] N.Y.C.L.U. *Racism at Every Stage: Data Shows How NYC's Administration for Children's Services Discriminates Against Black and Brown Families* (June 20, 2023), https://www.nyclu.org/en/campaigns/racism-every-stage-data-shows-how-nycs-administration-childrens-services-discriminates [https://perma.cc/6HT5-FVRV].  *See also* Council of the City of New York, Committee on Children & Youth, Oversight: Examining Racial Disparities in the Child Welfare System (Feb. 26, 2026) (concluding that majority-Black and/or Latino neighborhoods have disproportionately high rates of ACS investigations and foster care entries compared to majority white and/or Asian neighborhoods, and that while poverty is strongly correlated with system involvement, poverty rates by neighborhood do not account for the magnitude of racial disparities in ACS investigations).

263.    Under its Emergency Removal Policy, ACS overwhelmingly—indeed, almost *exclusively*—separates Black and Latino families.

264.    In 2025, 88% of children subjected to ACS emergency removals were Black or Hispanic.[91]

265.    In 2024, over 90% of children subjected to ACS emergency removals were Black or Hispanic.[92]

266.    In 2023, 89% of children subjected to ACS emergency removals were Black or Hispanic.[93]

267.    In 2022, over 90% of children subjected to ACS emergency removals were Black or Hispanic.[94]

---

[91] Black children and parents constituted approximately 42% and 41% of those subjected to an ACS emergency removal in 2025, respectively.  Hispanic children and parents constituted approximately 45% and 42% of those subjected to an ACS emergency removal in 2025, respectively. *Demographics of Children and Parents at Steps in the Child Welfare System, FY 2025*, N.Y.C. Admin. for Child.'s Servs. at 1–2, https://www.nyc.gov/assets/acs/pdf/data-analysis/2025/demographics-of-children-and-parents-at-steps-in-the-child-welfare-system-fy2025.pdf [https://perma.cc/LW8L-9W6R].

[92] Black children and parents constituted approximately 44% and 42% of those subjected to an ACS emergency removal in 2024, respectively.  Hispanic children and parents constituted approximately 47% and 41% those subjected to an ACS emergency removal, respectively. *Demographics of Children and Parents at Steps in the Child Welfare System, FY 2024*, *supra* note 88.

[93] Black children and parents constituted approximately 46% and 43% of those subjected to an ACS emergency removal in 2023, respectively.  Hispanic children and parents constituted approximately 42% and 39% of those subjected to an ACS emergency removal, respectively. *Demographics of Children and Parents at Steps in the Child Welfare System, FY 2023*, N.Y.C. Admin. for Child.'s Servs. at 1–2, https://www.nyc.gov/assets/acs/pdf/data-analysis/2023/demographics-children-fy-2023.pdf, [https://perma.cc/E9UP-C7QS].

[94] Black children and parents constituted 52% and 51% of those subjected to an ACS emergency removal in 2022, respectively.  Hispanic children and parents constituted 38% and 34% of those subjected to an ACS emergency removal in 2022, respectively. Demographics of Children and Parents at Steps in the Child Welfare System, FY 2022, N.Y.C. Admin. for Child.'s Servs. at 1–2, https://www.nyc.gov/assets/acs/pdf/data-analysis/2022/demographics-children-fy-2022.pdf, [https://perma.cc/5R9M-AAVW].

268.    Comparatively, ACS rarely separates white families on an emergency basis: In 2025 and 2024, 3.4% of children subject to emergency removals were white.[95]  In 2023, 3.9% of children subject to emergency removals were white.[96]  In 2022, 2.9% of children subject to emergency removals were white.[97]



269.    Notably, even when ACS determines a white parent abused or neglected their child, the agency is less likely to remove the child on an emergency basis as compared with Black and Hispanic parents.  For instance, in 2025, when ACS indicated reports against white parents, they

---

[95] Black children and parents constituted approximately 42% and 41% of those subjected to an ACS emergency removal in 2025, respectively.  Hispanic children and parents constituted approximately 45% and 42% of those subjected to an ACS emergency removal in 2025, respectively. *Demographics of Children and Parents at Steps in the Child Welfare System, FY 2025*, at 1–2, *supra* note 69.

[96] *Supra* note 62.

[97] *Supra* note 94.

emergency removed the children 5.2% of the time; when ACS indicated reports against Hispanic parents, they emergency removed the children 8.7% of the time; and when ACS indicated reports against Black parents, they removed the children 10.4% of the time—twice as often as for white parents with indicated reports.[98]  In every year ACS has reported race data regarding emergency removals,[99] their data have consistently shown that when there is evidence of child abuse or neglect involving Black, Hispanic, and white parents, ACS emergency removes Black children at the highest rates, white children at the lowest rates, and Hispanic children at a rate in between.[100]

### C.    ACS's Use of Subjective and Discriminatory Risk Assessment Factors

270.    The subjective nature of risk assessment drastically increases the likelihood that explicit or implicit racial bias infects an emergency removal decision.  According to participants in the ACS Audit, "race operates as an indicator of risk."[101]  "Black and Brown parents are generally presumed to be a risk to their children," while "white parents are presumed to be innocent and are repeatedly given opportunities to fail and try again."[102]

---

[98] *Demographics of Children and Parents at Steps in the Child Welfare System, FY 2025*, N.Y.C. Admin. for Child.'s Servs. at 2, https://www.nyc.gov/assets/acs/pdf/data-analysis/2025/demographics-of-children-and-parents-at-steps-in-the-child-welfare-system-fy2025.pdf [https://perma.cc/LW8L-9W6R].

[99] ACS began reporting the demographic information of parents and children subjected to emergency removals per year in 2022, after being required to do so by the New York City Council.  N.Y.C. Child., *Flash Report: Monthly Indicators* at 10 (Jan. 2023), https://www.nyc.gov/assets/acs/pdf/data-analysis/flashReports/2023/12.pdf [https://perma.cc/J3G5-XMJU]; N.Y.C., N.Y., Local Law No. 132 (2021).

[100] The respective rates of emergency removals from parents with indicated reports in 2022 were 10.6% for Black parents, 6.8% for Hispanic parents, and 3.9% for white parents; in 2023, they were 9.9% for Black parents, 7.7% for Hispanic parents, and 4.4% for white parents; and in 2024, they were 10.7% for Black parents, 7.9% for Hispanic parents, and 6.4% for white parents. *Demographics of Children and Parents at Steps in the Child Welfare System, FY 2022*, N.Y.C. Admin. for Child.'s Servs. at 2, https://www.nyc.gov/assets/acs/pdf/data-analysis/2022/demographics-children-fy-2022.pdf [https://perma.cc/5R9M-AAVW]; *Demographics of Children and Parents at Steps in the Child Welfare System, FY 2023*, N.Y.C. Admin. for Child.'s Servs. at 2, https://www.nyc.gov/assets/acs/pdf/data-analysis/2023/demographics-children-fy-2023.pdf [https://perma.cc/E9UP-C7QS]; *Demographics of Children and Parents at Steps in the Child Welfare System, FY 2024*, N.Y.C. Admin. for Child.'s Servs. at 2, https://www.nyc.gov/assets/acs/pdf/data-analysis/2024/demographics-children-fy-2024.pdf [https://perma.cc/9KUC-AQJN].

[101] Wallace et al., *supra* note 43, at 15.

[102] *Id.*

271.    When investigating reports about Black and Latino families, ACS evaluates risk based on pre-existing stereotypes—such as relying on the racist "welfare queen" trope when evaluating a Black mother's request for financial assistance—rather than objective safety assessments.[103]  This racial animus is reflected in ACS's use of language when describing Black and Latino families.  For instance, ACS frequently uses stereotypical descriptions of Black hair which reflect the "widespread and fundamentally racist belief that Black hairstyles are not suited for formal settings, and may be unhygienic, messy, disruptive, or unkempt."[104]

272.    Racial animus is also reflected in ACS's treatment of cases involving child medical conditions.  As Ms. Archer's family painfully experienced, ACS more often separates Black and Latino families when they seek medical care for their children, ignoring parents' explanations of accidental injuries and disregarding medical evidence consistent with innocence.[105]

273.    ACS's reliance on the stereotype of Black and Latino parents as drug users provides an especially stark suggestion of racial animus.  As detailed in a recent report by The Bronx Defenders, ACS is quick to scrutinize expressions of emotion, personal appearance, cleanliness of family homes, or parents' speech patterns as indications of substance abuse necessitating emergency removal when investigating Black or Latino parents—even when drug tests are negative.[106]  ACS's reliance on this stereotype is so pervasive that it is acknowledged by the agency; former Commissioner Dannhauser testified that "[s]ubstance abuse is treated differently

---

[103] *"This Wound is Still Fresh": Stories of Family Survival in the Face of the Administration for Children's Services Racism* at 14, Bronx Defenders (June 2025), https://www.bronxdefenders.org/wp-content/uploads/2025/06/ACS-racism-report-FINAL.pdf [https://perma.cc/SJD3-FKW3].

[104] New York City Comm'n on Human Rights, *Legal Enforcement Guidance on Race Discrimination on the Basis of Hair* at 4 (Feb. 2019), https://www.nyc.gov/assets/cchr/downloads/pdf/Hair-Guidance.pdf [https://perma.cc/M6VW-WEKG].

[105] *This Wound is Still Fresh*, supra note 103, at 9.

[106] *Id.* at 14-16.

…. by race."[107]   Exemplifying this disparate treatment, ACS relied in part on Ms. Lorimer's occasional marijuana use when it unlawfully removed her children in 2019—despite lacking any evidence that Ms. Lorimer's marijuana use was dangerous to her children.   Ms. Lorimer's experience was not an isolated incident.[108]

274.   Despite being aware year after year that its Emergency Removal Policy almost exclusively targets Black and Latino families, ACS has not taken meaningful corrective actions and has thereby entrenched discrimination into its routine practice.

275.   ACS's written policies may appear neutral on their face, but its actual Emergency Removal Policy targets Black and Latino families and is applied with discriminatory animus.

## V.   ACS'S EMERGENCY REMOVAL POLICY CAUSES SEVERE, IRREPARABLE HARM TO CHILDREN AND THEIR FAMILIES

276.   ACS's Emergency Removal Policy undermines ACS's stated mission of protecting "the safety and well-being of children, youth and families through child welfare and juvenile justice services and community supports."[109]

277.   The Emergency Removal Policy is especially egregious given ACS's mandate to use less severe alternatives to separation and to provide social service support to families.

### A.   ACS's Emergency Removal Policy Causes Irreparable Harm to Children

278.   When ACS removes a child from their parents on an emergency basis, it causes irreparable harm to that child.   Social scientists have found that "the moment when a child is taken

---

[107]   Jess   Dannhauser,   Testimony   to   New   York   State   Assembly   (Sep.   27,   2023), https://nystateassembly.granicus.com/player/clip/7735?view_id=8&meta_id=215687&redirect=true [https://perma.cc/3Z2N-WG8P]..

[108] *See, e.g.*, Order of J. Pursuant to Rule 68, *Rivers v. City of New York*, CV 4084 (JGLC) (S.D.N.Y. Aug. 30, 2023), Dkt. No. 32 (plaintiff, a Black mother, accepted an offer of judgment from the City of approximately $75,000 after alleging that ACS illegally removed her newborn baby without a court order based solely on positive marijuana tests despite the fact that New York law legalized marijuana).

[109] *See Mission & Organization*, N.Y.C. Admin. for Child.'s Servs., https://www.nyc.gov/site/acs/about/about.page [https://perma.cc/QK2J-2XJJ].

from [their] parents is the source of lifelong trauma, regardless of how long the separation lasts."[110] When ACS separates children from their families, the children often interpret the removal "as a threat to their well-being."[111]  Indeed, some children describe the experience as "like being kidnapped."[112]  The harm that children experience is far-reaching, negatively affecting their psychology and compromising their sense of personal safety and interpersonal well-being.[113]  And the effects of removal can be long lasting;[114] for a child, it is a "significant turning point … that many children will relive over and over again in their minds."[115]  Removals also affect a child's biology, "result[ing] in a monsoon of stress hormones flooding the brain and body,"[116] that can

---

[110] Eli Hager, *The Hidden Trauma of "Short Stays" in Foster Care*, Marshall Project (Feb. 11, 2020), https://www.themarshallproject.org/2020/02/11/the-hidden-trauma-of-short-stays-in-foster-care [https://perma.cc/SGV3-RXVP]; *see also* Vivek Sankaran, Christopher Church & Monique Mitchell, *A Cure Worse than the Disease? The Impact of Removal on Children and Their Families*, 102 Marq. L. Rev. 1161, 1168 (2019); Kimberly Howard et al., *Early Mother-Child Separation, Parenting, and Child Well-Being in Early Head Start Families*, 13 Attachment & Hum. Dev. 5 (2009), https://pmc.ncbi.nlm.nih.gov/articles/PMC3115616/ [https://perma.cc/Q3SQ-HVCN]; Vivek Sankaran & Christopher Church, *Easy Come, Easy Go: The Plight of Children Who Spend Less Than 30 Days in Foster Care*, U. Pa. J. L. & Soc. Change 19 (2016) (describing the lasting trauma children experience when being removed from a parent, even if the removal lasts for a short period of time).

[111] Sankaran, Church & Mitchell, *supra* note 110, at 1168.

[112] Hager, *Hidden Trauma*, *supra* note 110; Sankaran, Church & Mitchell, *supra* note 110, at 1168; *see also* Miriam Jordan, *A Migrant Boy Rejoins His Mother, but He's Not the Same*, N.Y. Times (July 31, 2018), https://www.nytimes.com/2018/07/31/us/migrant-children-separation-anxiety.html    [https://perma.cc/JZ9U-LJW7] ("In some cases, children were torn from their parents' arms amid tears and pleas.").

[113] Sankaran, Church & Mitchell, *supra* note 110, at 1166-67.

[114] Trivedi, *supra* note 41, at 528, 531.

[115] *Id.* at 531 (citation omitted).

[116] Sankaran, Church & Mitchell, *supra* note 110, at 1166–67 (cleaned up) (quoting Allison Eck, *Psychological Damage Inflicted by Parent-Child Separation Is Deep, Long-Lasting*, NOVA Next (June 20, 2018), https://www.pbs.org/wgbh/nova/article/psychological-damage-inflicted-by-parent-child-separation-is-deep-long-lasting/ [https://perma.cc/XZK8-D5TQ]).

change the architecture of a child's brain.[117]  Among children separated from their families, PTSD rates are nearly twice that of veterans returning from combat.[118]

279.    These children also face a heightened risk of developing emotional and behavioral issues that persist after reunification with their parents, including overreaction to perceived threats,[119] attachment issues,[120] "bed wetting, loss of language, return to thumb sucking, and inability to control bowel movements and urination."[121]  For example, even after being reunited with their mother, Ms. Lorimer's children are deeply anxious when they leave her to go to school. And Ms. Archer's son Jeremiah continues to wet the bed—something he had outgrown before being separated from his mother.

280.    One study showed that separations of only *one week* within a child's first two years of life can "result in distress for a young child who lacks the cognitive abilities to understand the continuity of maternal availability."[122]  As a result of being separated from their parents, young children can develop an "[i]nability to trust, soothe themselves, or develop foundations for meaningful relationships due to the disruption in the single most important relationship they

---

[117] Sara Goudarzi, *Separating Families May Cause Lifelong Health Damage*, Sci. Am. (June 20, 2018), https://www.scientificamerican.com/article/separating-families-may-cause-lifelong-health-damage [https://perma.cc/TH4K-7KUP] (stating that the younger the child is at the moment of separation, the more likely they will suffer from "negative health outcomes caused by dysregulation of stress response"); Jordan, *supra* note 112 ("Decades of research have concluded that children traumatically separated from their parents have a high likelihood of developing emotional problems, cognitive delays and long-term trauma.  More recent studies have found that separation can impair memory and normal production of cortisol, a hormone produced in response to stress.").

[118] Peter J. Pecora et al., *Improving Family Foster Care: Findings from the Northwest Foster Care Alumni Study* at 1 (2005), https://www.casey.org/media/AlumniStudies_NW_Report_FR.pdf [https://perma.cc/29RW-7MT3].

[119] Hajar Habbach et al., *"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation* at 20, Physicians for Hum. Rts. (Feb. 2020), https://phr.org/wp-content/uploads/2020/02/PHR-Report-2020-Family-Separation-Full-Report.pdf [https://perma.cc/G4TW-5V8U].

[120] *Key Points: Traumatic Separation and Refugee & Immigrant Children*, Nat'l Child Traumatic Stress Network, https://www.nctsn.org/sites/default/files/resources/tip-sheet/key_points_traumatic_separation_and_refugee_immigrant_children.pdf [https://perma.cc/6YPN-W7HE].

[121] Habbach et al., *supra* note 119, at 20 (describing symptoms not resolving even after reunification).

[122] Howard et al., *supra* note 110.

have."[123]   Disruptions of parental attachment can cause children to blame themselves for the separation.[124]  As newly-appointed ACS Commissioner Rebecca Jones Gaston has acknowledged, "Even when it's necessary, there is a trauma involved in that experience of separating children from their families."[125]

281.    Emergency removals exacerbate the trauma of separation because they deprive families of any opportunity to prepare children for the dramatic disruption of all aspects of their lives.  Without reassurance or information, children are less able to cope and experience greater confusion, apprehension, and shock.[126]  Children are frequently not told where they will be going, why they are being separated from their family, or when they will see their parents again.  They are deprived of the chance to be comforted by their primary caretaker or other relatives.  The absence of preplanning or forethought often leaves children without critical medications, favorite stuffed animals or other comfort objects, clothing, homework, or even breast milk for breastfeeding newborns.  For example, Ms. Lorimer's fourteen-year-old daughter Zoe lost years of cherished drawings because of ACS's lack of planning and its resulting haphazard care of her belongings while she was at the Children's Center.  ACS's lack of preparation threatens the safety of children with medical needs, mental health issues, allergies, or dietary restrictions.

---

[123] Nat'l Child Traumatic Stress Network, *supra* note 120.

[124] *Id.*

[125] Hannah Albarazi, *Outgoing HHS Official On The Thorny Issues Of Child Welfare*, Law360 (Jan. 21, 2025), https://www.law360.com/healthcare-authority/articles/2284054/outgoing-hhs-official-on-the-thorny-issues-of-child-welfare [https://perma.cc/6SLR-LFTM].

[126] *See* Rosalind D. Folman, *"I Was Tooken": How Children Experience Removal from Their Parents Preliminary to Placement into Foster Care*, 2 Adoption Q. 7, 19, 23, 29 (1998) (noting that an unanticipated removal may "undermine[] the children's ability to adapt to their loss … [T]he traumatic impact on the children of emergency removals may be long lasting."), https://www.tandfonline.com/doi/epdf/10.1300/J145v02n02_02 [https://perma.cc/Q446-8CB8]; Sankaran, Church & Mitchell, *supra* note 110, at 1168 ("When children are removed from their families—often suddenly and without warning— . . . children have a harmful physiological response, rooted in stress, and far too often are traumatized.").

282.    Emergency removals of infants disrupt critical mother-infant bonding,[127] and at times stop mothers from breastfeeding their own children.  The physical and emotional benefits of breastfeeding are well documented;[128] disruption or involuntary cessation of breastfeeding can have significant adverse consequences for both infant and mother, including heightened risk of postpartum depression, anxiety, and feelings of loss or grief in the mother, and greater risks of disease for babies.[129]  Even so, ACS abruptly removed Ms. Trainor's infant child while she was attempting to breastfeed.

283.    Once removed, many children end up at ACS's Children's Center, a facility that has been described as "overcrowded," "unsafe," and "unsanitary," with multiple reports noting the presence of mold and rodents.[130]  The facility is chaotic, with children living alongside teenagers and even young adults who have been traumatized and struggle with serious mental illness.[131]  Employees have discovered numerous weapons in children's living quarters.[132]  Children report experiencing bullying, assault, theft, minimal supervision by staff, and sexual exploitation when

---

[127] *See, e.g.*, *Benefits of Breastfeeding*, Cleveland Clinic, https://my.clevelandclinic.org/health/articles/15274-benefits-of-breastfeeding [https://perma.cc/9NZP-MKNH] (last visited May 14, 2026).

[128] *See e.g.*, *id.*

[129] *See, e.g.,* Cesar G. Victora et al., *Breastfeeding in the 21st Century: Epidemiology, Mechanisms, and Lifelong Effect*, 387 Lancet 475, 475–90 (2016) (reviewing evidence that breastfeeding is associated with lower infant infectious morbidity and mortality); World Health Organization, *Infant and Young Child Feeding* (Dec. 20, 2023), https://www.who.int/news-room/fact-sheets/detail/infant-and-young-child-feeding [https://perma.cc/4MH4-GHB5] (noting that non-breastfed infants face greater risks of infection, illness, and mortality); Kendall-Tackett, *A New Paradigm for Depression in New Mothers*, 35 J. Hum. Lactation 1–6 (2019) (discussing hormonal and psychological effects of weaning, including mood disturbance and grief-like symptoms).

[130] Children's Rights, *Are You Listening? Youth Accounts of Congregate Placements in New York State*, at 33 (Jan. 2023), https://www.childrensrights.org/wp-content/uploads/2024/07/CR-2023-AreYouListening_report.pdf [https://perma.cc/JH5Z-G2FN].

[131] Melissa Russo & Kristina Pavlovic, *NYC Moves to Protect Children at Foster Care Intake Center After I-Team Report*, News 4 I-Team (Mar. 18, 2019), https://www.nbcnewyork.com/news/local/nyc-moves-to-protect-children-after-i-team-report-asc-nicholas-scoppetta-childrens-center/1567649/ [https://perma.cc/2GSJ-WGKQ].

[132] *Id.*

held at this facility.[133]  Ms. Lorimer's daughter Zoe described the Children's Center as "like a prison."

284.    Institutional placement centers are especially challenging for children with disabilities who have certain support needs, such as Jasmine.   The centers can be noisy, overcrowded, unpredictable, and brightly lit, all of which can overstimulate children with autism, and lead to severe decompensation and distress.[134]

285.    ACS's own reports detail the terror children experience when ACS removes them and places them in foster care.  Internal ACS documents acknowledge that "sometimes [children] are frightened by the very way in which we bring them into foster care.  Many of us have experienced the toddler whose little fingers have to be pried off of her mother when she has to be removed."[135]  S.P., Ms. Trainor's newborn daughter, was crying and screaming when ACS forcibly tore her from her mother's arms.  ACS acknowledges that, "from the child's perspective," the placement process involves "driv[ing] to a strange office filled with unknown adults" where they are handed off from one set of staff to another, and then on to a new home of strangers.[136]

286.    Nor can the harms of removal to foster care be justified by ACS as necessary to prevent more catastrophic outcomes for children.  The most recent empirical research shows that foster care does not reduce rates of child maltreatment fatalities.[137]  Removing children from their homes often does not make them safer.

---

[133] Children's Rights, *supra* note 130, at 34.

[134] Sonu Darnal et al., *Sensory Processing, Emotional and Behavioural Challenges in Children with Autism Spectrum Disorder and Attention Deficit Hyperactive Disorder*, 71 Int'l J. Dev. Disabilities 703 (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC12284981/ [https://perma.cc/GLN9-T7N4].

[135] N.Y.C. Admin. for Child.'s Servs., *Child Safety Alert No. 25: Minimizing Harm to Children During the Removal and Placement Process* at 111 (Apr. 29, 2011).

[136] *See id.*

[137] Frank Edwards et al., *Foster Care and Child Maltreatment Mortality Rates in the US*, JAMA Network (Dec. 30, 2025), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2843235 [https://perma.cc/R97N-4MJU].

287.    Removals can lead to worse long-term outcomes for children, putting them at risk of a multitude of physiological and psychological impairments such as anxiety, depression, post-traumatic stress disorder, lower IQ, obesity, immune system malfunctioning, cancer, heart and lung disease, stroke, and morbidity.[138]

288.    Studies have isolated the effects of family separation from those of maltreatment and abuse and found that separation exponentially increases the chances of future criminality and delinquency.[139]

289.    Tragically, reunification does not negate the harmful effects of removal.[140]  The Archer family, for example, is still struggling to regain their sense of stability.

290.    Every year, hundreds of children suffer these harms because of ACS's unconstitutional and unnecessary family separations under its Emergency Removal Policy.

**B.    ACS's Emergency Removal Policy Causes Irreparable Harm to Parents and Families**

291.    Emergency removals interfere with a family's constitutional rights to privacy, integrity, and freedom from excessive interference.[141]

---

[138] *See* Johayra Bouza et al., *The Science is Clear: Separating Families Has Long-Term Damaging Psychological and Health Consequences for Children, Families, and Communities*, Society for Research in Child Development (June 20, 2018), https://www.srcd.org/briefs-fact-sheets/the-science-is-clear [https://perma.cc/W7A5-J37L].

[139] Erin Sugrue, Alia Innovations, *Evidence Base for Avoiding Family Separation in Child Welfare Practice* at 8-9 (July 2019), https://www.thetcj.org/wp-content/uploads/2019/10/Alia-Research-Brief-2019.pdf [https://perma.cc/K4Q2-DJ2S] (discussing Joseph J. Doyle, Jr., *Child Protection and Child Outcomes: Measuring the Effects of Foster Care*, 97 Am. Econ. Rev. 1583 (2007)); Joseph J. Doyle, Jr., *Child Protection and Adult Crime: Using Investigator Assignment to Estimate Causal Effects of Foster Care*, 116 J. Pol. Econ. 746 (2008); Joseph J. Doyle, Jr., *Causal Effects of Foster Care: An Instrumental-Variables Approach*, 35 Child & Youth Servs. Rev. 1143 (2013)).

[140] *See* Bouza et al., *supra* note 138.

[141] *See Tenenbaum*, 193 F.3d at 594, 605; *see also* U.N. International Covenant on Civil and Political Rights, Art. 23(1) (Dec. 16, 1966), https://www.ohchr.org/en/instruments-mechanisms/instruments/international-covenant-civil-and-political-rights [https://perma.cc/36S3-2WJG] ("The family is the natural and fundamental group unit of society and is entitled to protection by society and the State.").

292.    Studies show that the impact of family separation is lasting and permanently damages family units.[142]  Families that are separated even briefly and later reunified experience a lasting disruption to family dynamics, with parents and children left feeling confused, guilty, and anxious about how to repair the family unit.[143]

293.    Affected parents have given powerful voice to the severity of this trauma in studies and at public hearings.   Mothers who have been separated from their children describe the experience as a "living death."[144]  Parents have testified to chaotic scenes in which ACS seized their children in the middle of the night and denied them any opportunity to pack their children's belongings or comfort objects to bring with them.[145]  Advocates testifying on behalf of families have described how ACS uses outright deception to separate parents from their children on a purported emergency basis, including caseworkers telling parents to go down the hall to gather their child's belongings only to return and find their child already taken, or ushering parents into a separate room in a shelter while their children were taken out of the building.[146]  ACS often fails to make "every reasonable effort" to inform parents where their children are, as required by Family Court Act § 1024(b)(ii).  Parents have decried the lack of information about where their children

---

[142] Bouza et al., *supra* note 138.

[143] Soc'y for Rsch. in Childhood Dev., *The Science of Childhood Trauma and Family Separation: A Discussion of Short- and Long-Term Effects* (YouTube, June 28, 2018), https://www.youtube.com/watch?v=9-34LJoM1HY [https://perma.cc/7VQB-WWPL].

[144] Laura D. Zeman, *Etiology of Loss Among Parents Falsely Accused of Abuse or Neglect*, 10 J. Loss & Trauma 19 (2004); Kathleen S. Kenny et al., *"I Felt for a Long Time Like Everything Beautiful In Me Had Been Taken Out": Women's Suffering, Remembering, and Survival Following the Loss of Child Custody*, 26 Int'l J. Drug Pol'y 1158 (2015). *See also* Shanta Trivedi, *The Hidden Pain of Family Policing*, 49 N.Y.U. Rev. Law & Soc. Change 101, 149–50 (2025) (collecting studies showing the emotional and psychological consequences of losing a child to family policing, including experiences and symptoms of grief similar to the death of a child).

[145] *See* Emma Ketteringham, *Written Testimony of the Bronx Defenders: Hearing on Family Separation in New York City,* Bronx Defenders, at 6 (New York City Council, Justice Sys. Comm., Gen. Welfare, Nov. 27, 2018), https://www.bronxdefenders.org/wp-content/uploads/2019/04/Family-Separation-City-Council-Testimony.pdf [https://perma.cc/LQ94-UPVZ].

[146] *Id.*

were being taken, how they would be cared for, and when they would see or hear from them again.[147]

294.    Studies have also shown that mothers are directly harmed by sudden removals.  The acute stress activated by a child's removal can trigger or exacerbate mental health challenges or substance abuse, leading to cycles of decompensation and greater risk of suicide.[148]  Further, the placement of a child into foster care stigmatizes mothers,[149] creates distrust between the family and the community at large, and negatively affects parents' willingness to seek assistance when they need it.  By pushing families away from resources and support—such as primary healthcare, stable housing, and quality childcare—that would serve ACS's stated goal of reducing child maltreatment, ACS's abuse of its emergency removal power is both cruel and illogical.[150]  Ms. Trainor, for example, was terrified after giving birth to her second child that he would be removed, and Ms. Archer struggled with depression and anxiety after the emergency removals of her children.

---

[147] *Id.*

[148] *See* Soc'y for Rsch. in Childhood Dev., *supra* note 143; *see also* Angela Olivia Burton, Children's Rights et al., *Family Separation Is an Urgent Human & Civil Rights Issue*, at 15 (Sep. 2023), https://www.childrensrights.org/news-voices/family-separation-is-an-urgent-human-civil-rights-issue [https://perma.cc/T4X2-A5NV]; Elizabeth Wall-Wieler et al., *Suicide Attempts and Completions Among Mothers Whose Children Were Taken into Care by Child Protection Services: A Cohort Study Using Linkable Administrative Data*, 63 Can. J. Psych. 170 (2018).

[149] Kenny et al., *supra* note 144.

[150] *See Fast Facts: Preventing Child Abuse & Neglect*, Ctrs. for Disease Control (Apr. 6, 2022), https://redwoodcounty-mn.gov/wp-content/uploads/2024/03/Fast-Facts-Child-Abuse-Neglect.pdf [https://perma.cc/VVH2-XPVB]; Ctrs. for Disease Control, Child Abuse and Neglect Prevention: Resource for Action (2016), https://www.cdc.gov/violenceprevention/pdf/CAN-Prevention-Resource_508.pdf [https://perma.cc/E5CP-UGQW]; Ctrs. for Disease Control, *Preventing Child Abuse and Neglect* (May 2025), https://www.cdc.gov/child-abuse-neglect/prevention/index.html [https://perma.cc/8NDF-2H6P].

295.   ACS's Emergency Removal Policy's disproportionate effect on Black and Latino families harms not only the individual families involved, but their communities as well.[151]   The Emergency Removal Policy's harms are also intergenerational, affecting many Black and Latino parents who themselves spent time in foster case, including Ms. Archer and Ms. E.

296.   In sum, ACS's Emergency Removal Policy harms families and leaves children, parents, and communities with fear, resentment, and lifelong, intergenerational trauma.[152]

## VI.   ACS HAS LONG KNOWN THAT ITS EMERGENCY REMOVAL POLICY IS UNLAWFUL AND REFLECTS DISCRIMINATORY ANIMUS AGAINST BLACK AND LATINO FAMILIES

297.   For years, ACS has been on notice that its Emergency Removal Policy is unlawful and discriminatory, through its own data and reports described above, as well as through hearings, internal and external assessments, media reporting, and litigation challenging the legality of numerous removals.   Indeed, since at least 2012, the constitutional law governing emergency removals has been clearly established.[153]   Yet ACS has exhibited deliberate indifference to the widespread constitutional violations perpetuated by its Emergency Removal Policy.

298.   Because ACS reviews and publishes its own internal data, it is aware that its caseworkers exercise their emergency removal power in approximately 50% of cases in which

---

[151] *See* Hearing Before N.Y.C. Council Comm. on Gen. Welfare, Sess. 2022-2023 at 15 (Mar. 13, 2023) (statement of Jess Dannhauser, Comm'r, N.Y.C. Admin. for Child.'s Servs.), https://legistar.council.nyc.gov/View.ashx?M =F&ID=11815232&GUID=0298AA6F-E93F-4942-B928-27E68C6D3398 [https://perma.cc/9ESS-2UMK] ("[W]e understand that the impact of an investigation on a family is significant.  Investigations are often disruptive, stressful and can be traumatic and they are disproportionately impacting families of color."); Sydney Myones, *Emergency Removals: Does the Statutory Language of N.Y. Fam. Ct. Act 1024, Safeguard Vulnerable Families from Foster Care Pani*c, 25 Cardozo J. Equal Rts. & Soc. Just. 321, 337 (2019) ("The system is most aggressive in taking action against single Black mothers."); *see generally* Dorothy E. Roberts, *Shattered Bonds: The Color of Child Welfare* (2001).

[152] *See* Daniel Moritz-Rabson, '*Never Designed to Help': How New York's 'Child Welfare' System Preys on Families*, The Appeal (May 15, 2023), https://theappeal.org/acs-new-york-city-administration-for-childrens-services/ [https://perma.cc/VME9-Q4ZQ].

[153] *See Southerland*, 680 F.3d at 143-49; *see also K.W.*, 2026 WL 1391967, at *18 (explaining that Second Circuit cases dating back to 2004 clearly "established that extrajudicial removal is only justified in situations where the child's life, or physical or emotional health, is threatened so acutely that officials would not have time to seek a court order")..

they conduct removals.  ACS is also aware that in over 25% of those emergency removals, the child or children do not stay in state custody after the initial hearing, either because of a court order or because ACS consents to a release, as it did following the 2025 emergency removal of Ms. Lorimer's children.  ACS itself litigates these proceedings in which courts routinely reject ACS's purported rationales for family separation, frequently informing ACS supervisors that its emergency removals are often unlawful.

299.    ACS's Emergency Removal Policy has been scrutinized by the New York City Council.  In 2018, the City Council held a hearing to probe a 28% increase in emergency removals conducted by ACS.  During the hearing, affected parents and family advocates testified about ACS's systemic, unconstitutional use of the emergency removal process, as well as the lifelong stress and trauma caused by family separations.[154]  After the hearing, ACS did not meaningfully modify its policies or practices regarding the use of emergency removal authority, and the rate of emergency removals continued to climb.[155]

300.    Additionally, ACS has been the subject of numerous lawsuits challenging the legality of emergency removals that have either ended in settlement or resulted in a favorable

---

[154] *See* Nov. 27, 2018 Hr'g Tr., *supra* note 31, at 115:15–193:20; Ketteringham, *supra* note 145 (testimony of The Bronx Defenders at same hearing); *Rise Testimony to City Council: Nov. 27, 2018 Hr'g on Fam. Separation in Fam. Court*, Rise Mag., (Nov. 28, 2018), https://www.risemagazine.org/2018/11/rise-testimony-to-city-council-nov-27-2018-hearing-on-family-separation-in-family-court/ [https://perma.cc/3Y2E-WGE7] (testimony of Rise at same hearing).

[155] *See supra* notes 19–30.

disposition or ruling for the plaintiffs on the same constitutional grounds asserted by plaintiffs here.[156]

301.    After these lawsuits, ACS did not institute any additional supervisory review, caseworker retraining, or disciplinary protocols sufficient to prevent recurrence of the violations at issue in those cases.

302.    ACS is aware that its unconstitutional overreliance on its Emergency Removal Policy almost exclusively targets Black and Hispanic families, who comprise approximately 90% of the families subjected to ACS emergency removals.  ACS confirms the racial animus by pursuing its Emergency Removal Policy on starkly discriminatory terms year after year.

303.    The New York State Office of Child and Family Services publishes annual data on racial disparity within the child welfare system from jurisdictions across the state.  Thus, ACS is on notice that, out of dozens of child welfare service agencies in the state, it ranks worst in racial

---

[156] *See, e.g.*, *K.W.*, 2026 WL 1391967, at *7–16 (holding that plaintiffs adequately alleged violations of child's Fourth Amendment and procedural due process rights where an ACS caseworker extrajudicially removed an infant from his father's care in non-exigent circumstances and kept the infant and his father separated for nearly three years despite never charging father with abuse or neglect); *Tenenbaum*, 193 F.3d at 587  (holding that, in non-exigent circumstances, caseworkers extrajudicially removed a child from school and subjected her to a medical examination in violation of the child and the parents' procedural due process rights and the child's Fourth Amendment rights);  *Walston v. City of New York*, 2024 WL 1376905 (S.D.N.Y. Mar. 7, 2024), Settlement Order, CV 10002 (LAK) (S.D.N.Y. Apr. 1, 2024), Dkt. No. 82 (mother and City of New York reached a settlement of approximately $50,000 for the mother who alleged constitutional violations based on ACS's emergency removal of newborn where there was "a lack of any 'objectively reasonable' basis to conclude there was a risk of imminent harm" to the infant); Order of J. Pursuant to Rule 68, *Rivers v. City of New York*, No. 23 CV 4084 (JGLC) (S.D.N.Y. Aug. 30, 2023), Dkt. No. 32 (plaintiff, a Black mother, accepted an offer of judgment from the City of approximately $75,000 after alleging that ACS illegally removed her newborn baby without a court order based solely on positive marijuana tests despite the fact that New York law legalized marijuana and prevented families from being separated based on marijuana use); Infant Compromise Order, *Ferguson v. City of New York*, No. 22 CV 1000 (KPF) (S.D.N.Y. Aug. 17, 2023), Dkt. No. 57 (mother and the City settled for a total of $175,000 after the mother brought Fourth and Fourteenth Amendment claims for the emergency removal of two minor children based on an anonymous complaint); *McCoy v. Admin. for Child.'s Servs.*, 2024 WL 4379584 (E.D.N.Y. Aug. 9, 2024), Notice of Settlement, No. 23 CV 03019 (HG) (E.D.N.Y. Sep. 5, 2025), Dkt. No. 97 (plaintiff and ACS settled after plaintiffs alleged their Fourth, Sixth, and Fourteenth Amendment rights were violated in removal proceedings).

disparity between Hispanic children in foster care relative to white children and second worst for Black children in foster care relative to white children.[157]

304.    ACS is also aware of the 2020 ACS Audit—commissioned by the agency in recognition of persistent racial disparities in its treatment of families—and its striking findings. The unpublished draft report generated by the auditors found that race plays a pervasive role in ACS's interaction with and decision-making regarding families,[158] and described the agency as a "predatory system that specifically targets Black and Brown parents" and subjects them to "a different level of scrutiny[.]"[159]

305.    Confirming that the gross racial disparities created by ACS's Emergency Removal Policy are attributable to animus, the ACS Audit found that caseworkers act according to "pervasive anti-Black stereotypes about the abilities of Black and [B]rown parents to care for their children."[160]

306.    ACS caseworkers also reported that they felt "pressured [by ACS leadership] to push their way into people's homes and not tell parents their rights."[161]  Workers said that this

---

[157] State Off. of Child. & Fam. Servs., *Black Disparity Rate: Unique Children in CPS Reports CY 2024* at 5, 10 (2024), https://ocfs.ny.gov/reports/sppd/dmr/Disparity-Rate-Packet-2024-County-Comparison.pdf  [https://perma.cc/59E3-3V25].

[158] ACS employees have also commented on the racism present within their own workplace.  Employees identified a "clear racial hierarchy within ACS" where "Black and Brown staff don't have the power to inform policies and practices and voice their experiences of racism."  Wallace, et al., *supra* note 43, at 21.

[159] *Id.* at 14.

[160] James Barron, *Some Child Welfare Workers Say the System Is Racist*, N.Y. Times (Nov. 28, 2022), https://www.nytimes.com/2022/11/28/nyregion/some-child-welfare-workers-say-the-system-is-racist.html [https://perma.cc/VR8S-86TZ].

[161] Andy Newman, *Is N.Y.'s Child Welfare System Racist? Some of Its Own Workers Say Yes.*, N.Y. Times (Nov. 22, 2022), https://www.nytimes.com/2022/11/22/nyregion/nyc-acs-racism-abuse-neglect.html [https://perma.cc/TC9H-68ZG].

pressure made them "feel complicit in the harm that [ACS] can cause Black and [B]rown families" and powerless to change the system.[162]

307.    After reviewing the damning preliminary findings of the ACS Audit, ACS declined to publish its results and it was only through a Freedom of Information Law request made by The Bronx Defenders, an organization that represents parents in Article 10 proceedings in Bronx County Family Court, that these findings came to light.  The ACS Audit was intended to be paired with a pilot program to improve ACS policies and practices.  But once presented with the Audit's overwhelming evidence that racial animus pervades—and, in fact, motivates—many of ACS's policies and practices, including its Emergency Removal Policy, the agency chose not to pursue the remedial pilot program.

308.    Subsequent ACS assessment reports[163] reveal that despite the troubling findings of the ACS Audit, ACS has not implemented any significant changes to the way it trains and supervises staff to address the agency's racial bias.  ACS's assessment reports from 2021 and 2023 note that Black and Hispanic children continue to be disproportionately involved in ACS investigations and have disproportionately higher rates of foster care placement and court-ordered supervision.[164]    Despite acknowledging the persistence of these racial disparities, ACS's assessment reports did not identify adequate policy changes, supervisory reforms, or disciplinary

---

[162] *Id.*

[163] Under Local Law 174, ACS is required to conduct equity assessments to identify practices or policies to address disparate outcomes based on race, gender, income, and sexual orientation, and to create an equity action plan to implement changes.  Every two years, ACS must provide a report to the mayor detailing the efforts ACS has taken to implement their equity action plans.  *See* N.Y.C. Mayor's Office for Econ. Opportunity, *Local Law 174 – Equity Assessments*, https://www.nyc.gov/site/opportunity/reports/local-law-174-equity-assessments.page [https://perma.cc/EE4W-QMGF] (last visited May 25, 2026).

[164] N.Y.C. Admin. for Child.'s Servs., *Local Law 174 Reporting For the July 1, 2021 Report*, N.Y.C. Mayor's Off. of Operations (Dec. 01, 2021), https://a860-gpp.nyc.gov/concern/parent/0p096c53z/file_sets/js956m439 [https://perma.cc/82SR-99CK]; N.Y.C. Admin. for Child.'s Servs., *Agency Reports: Admin. for Child.'s Servs. LL 174 Work*, N.Y.C. Mayor's Off. of Operations (Aug. 12, 2024), https://a860-gpp.nyc.gov/concern/nyc_government_publications/0p096c53z [https://perma.cc/ZWT2-52F8].

measures implemented in response. ACS has thus consistently acceded and demonstrated deliberate indifference to the gross racial disparities in its practices, including in its Emergency Removal Policy.

309. A 2023 report by the New York Civil Liberties Union concluded that "Black families are treated with more suspicion and less compassion" by ACS.[165] And a recent report by The Bronx Defenders similarly states that ACS "acts on racist errors, stereotypes, and tropes when removing children and accusing Black and Latine parents of mistreatment."[166]

310. ACS's unconstitutional and discriminatory use of emergency removals has received widespread media attention, elevating the experiences of families who were wrongfully separated by ACS without judicial oversight.[167]

311. For instance, in 2019, New York City's public radio station, WNYC, reported on a Black family that ACS separated on an emergency basis after ACS caseworkers observed some trash, an empty kitchen, and the smell of marijuana in their home.[168] Once the parties appeared in family court, the judge ordered ACS to immediately return the child, an 18-month-old toddler, to her mother, finding no evidence of imminent danger.[169]

---

[165] N.Y.C.L.U., *Racism at Every Stage: Data Shows How NYC's Administration for Children's Services Discriminates Against Black and Brown Families* (June 20, 2023), https://www.nyclu.org/en/campaigns/racism-every-stage-data-shows-how-nycs-administration-childrens-services-discriminates [https://perma.cc/6HT5-FVRV].

[166] *This Wound is Still Fresh*, supra note 103, at 20.

[167] *See, e.g.*, Max, *supra* note 68; Michael Fitzgerald, *Hearings: Emergency Removals to Foster Care Have Surged In New York. Here's One Case*, The Imprint (Apr. 24, 2019), https://imprintnews.org/featured/hearings-emergency-removal-new-york-city/34685 [https://perma.cc/5T3Q-QRFX]; Yasmeen Khan, *Family Separations in Our Midst*, WNYC (Apr. 17, 2019), https://www.wnyc.org/story/child-removals-emergency-powers/ [https://perma.cc/V3U8-R392]; Abigail Kramer & Angela Butel, *Child Welfare Surge Continues: Family Court Cases, Emergency Child Removals Remain Up*, Ctr. for N.Y.C. Affs. (July 2018), https://www.centernyc.org/child-welfare-surge-continues [https://perma.cc/3MQA-9XGA]; Raphael Pope-Sussman, *Advocates Say ACS Is 'Running Scared' in the Wake of Horrifying Child Abuse Cases*, Gothamist (Dec. 6, 2016), https://gothamist.com/news/advocates-say-acs-is-running-scared-in-the-wake-of-horrifying-child-abuse-cases [https://perma.cc/7YUM-DABC].

[168] Khan, *supra* note 167.

[169] *Id.*

312.    Similarly, a 2023 Gothamist article reported that ACS had recently paid a settlement to a Black mother after it conducted an emergency removal of her newborn baby based on positive marijuana tests in August 2021, months after New York State legalized recreational marijuana use[170] and after ACS itself had publicly stated that "[a] positive toxicology result for a parent or a newborn, by itself, does not constitute reasonable suspicion of child abuse or maltreatment."[171]

313.    ACS has failed to meaningfully address its widespread and systematic unconstitutional use of emergency removals despite being on notice of the problematic practice through public hearings, the agency's own reports, and investigative media coverage.  ACS is likewise on notice of the gross racial disparities inherent in its Emergency Removal Policy.  ACS is aware of its own reporting, and that of others, on the animus reflected in the almost exclusive use of the Emergency Removal Policy against Black and Latino families.

## VII.    ACS FAILS TO ADEQUATELY TRAIN, SUPERVISE, MONITOR, AND DISCIPLINE ITS STAFF TO ENSURE EMERGENCY REMOVALS COMPLY WITH THE LAW

314.    The nature of risk assessment highlights the need for rigorous training, supervision, and oversight.

315.    Even though ACS is aware that its staff conduct, on average, well over a thousand emergency removals per year, ACS provides inadequate training and supervision regarding the

---

[170] Michelle Bocanegra, *NYC Children's Services Agency to Settle with Parent Allegedly Targeted for Marijuana, Race*, Gothamist (Sep. 7, 2023), https://gothamist.com/news/nyc-childrens-services-agency-to-settle-with-parent-allegedly-targeted-for-marijuana-race [https://perma.cc/W59W-B8E6].  (Michelle Bocanegra has no relationship to Jeannette Bocanegra, the children's next friend.)

[171] Michael Fitzgerald, *New York City Moves to Limit Drug Testing of Pregnant Women*, The Imprint (Nov. 20, 2020), https://imprintnews.org/child-welfare-2/new-york-city-limit-drug-testing-women-foster/49557 [https://perma.cc/225X-JQ6K] (quoting ACS joint memo with the New York City Department of Health and Mental Hygiene).

lawful use of emergency removal powers, predictably producing the widespread and systematic abuses—including racial discrimination—sanctioned by the Emergency Removal Policy.

316.     ACS fails to properly train its caseworkers and supervisors—both initially during onboarding and in an ongoing manner throughout employment—to initiate emergency removals only where there is immediate danger and insufficient time to seek a court order and to appropriately and meaningfully consider alternatives to emergency removals.

317.     For example, ACS's training materials—including the ACS Casework Manual, which delineates practice standards for investigating reports of child maltreatment and assessing risk—lack adequate guidance and instructions regarding (i) how to evaluate whether a risk to the child's life or health is imminent, (ii) how to assess whether seeking a court order prior to removal would compromise the child's safety, and (iii) how to determine whether changed circumstances have eliminated the need for an emergency removal.[172]

318.     ACS also fails to conduct additional or remedial training for staff who conduct emergency removals in violation of the United States Constitution.

319.     These shortcomings demonstrate ACS's deliberate indifference to its inadequate training methods, despite being on notice that caseworkers and their supervisors routinely use the agency's emergency removal power in non-exigent circumstances.

320.     Nor does ACS provide caseworkers with the necessary supervision and oversight to ensure compliance with the Fourth and Fourteenth Amendments.   Supervision of ACS caseworkers and review of their performance does not involve scrutinizing the constitutionality of their emergency removals.   Far from ensuring emergency removals comply with the law,

---

[172] *See* Casework Manual, *supra* note 13 at 94-99; *see also, e.g.*, N.Y.C. Admin. for Child.'s Servs., *Child Safety Alert No. 30*: *Conducting Emergency Removals of Children*, *supra* note 16; N.Y.C. Admin. for Child.'s Servs., *Conducting Emergency Removals* (Feb. 23, 2011).

supervisors not only sanction, but routinely encourage, the use and enforcement of ACS's Emergency Removal Policy.

321.    ACS also pressures its caseworkers to remove children, which distorts their decision-making and assessment of risk.  ACS creates incentives whereby caseworkers fear reprimand only when they undertake too little intervention.  ACS does not adequately discipline its caseworkers for providing overly invasive intervention, the wrong intervention, or intervention that exacerbates, rather than alleviates, the challenges a family is facing.

322.    Moreover, ACS does not regularly or meaningfully review the constitutionality of emergency removals conducted by its staff.  Similarly, the agency does not monitor caseworkers who repeatedly conduct wrongful emergency removals.  ACS thus fails to take appropriate disciplinary action or corrective measures against caseworkers who have engaged in unlawful emergency removals.

323.    Indeed, based on its response to a Freedom of Information Law request, ACS does not have any disciplinary policies, protocols, or procedures related to emergency removals.  As a result, a caseworker who conducts an unlawful emergency removal will not be disciplined or subject to any meaningful corrective measures.  ACS's failure to discipline staff who conduct emergency removals where there is time to seek a court order—coupled with the agency's "culture of fear [that] incentivize[s] the removal of children"[173]—has led ACS caseworkers to frequently abuse their emergency removal power.

324.    Finally, ACS has failed to take meaningful steps to reduce or eliminate the agency's disproportionate deployment of its emergency removal powers against Black and Latino families. The inadequate training, supervision, monitoring, and discipline that ACS provides caseworkers

---

[173] Wallace, et al., *supra* note 43, at 21.

with respect to families' constitutional rights during removals directly result in caseworkers consistently abusing the emergency removal power in violation of the Fourth and Fourteenth Amendments.

**CLASS ACTION ALLEGATIONS**

325. This action is properly maintained as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

326. **Children's Class**: The first class, represented by Plaintiffs Jasmine, Jeremiah, Daevon, Zoe, Yolanda, Xena, Willow, and Kayden, is defined as all children who have been, are, or will be seized by ACS without a court order, parental consent, or threat of such immediate harm to the child's health or safety that there is insufficient time to secure a court order (the "Children's Class").

327. **Children's Equal Protection Subclass**: The subclass of the Children's Class, represented by Plaintiffs Jasmine, Jeremiah, Daevon, Zoe, Yolanda, Xena, Willow, and Kayden, is defined as all members of the Children's Class who are Black or Latino (the "Children's Equal Protection Subclass").

328. **Parents' Class**: The second class, represented by Plaintiffs Ms. Archer and Ms. Lorimer, is defined as all parents whose children have been, are, or will be seized by ACS without a court order, parental consent, or threat of such immediate harm to the child's health or safety that there is insufficient time to secure a court order ("Parents' Class," and together with the Children's Class, the "Classes").

329. **Parents' Equal Protection Subclass**: The subclass of the Parents' Class, represented by Plaintiff Ms. Archer and Ms. Lorimer, is defined as all members of the Parents' Class who are Black or Latino (the "Parents' Equal Protection Subclass," and together with the Children's Equal Protection Subclass, "Plaintiffs' Equal Protection Subclasses").

79

330.    The Classes are sufficiently numerous to make joinder impracticable.  In 2025 alone, ACS removed 1,397 children from their families using its emergency removal power.[174]  As borne out by ACS's own data, internal and public reporting, and the experiences of Plaintiffs and Class members, in scores of cases, ACS executed extrajudicial removals in circumstances where the agency had sufficient time to safely seek a court order before removing the child but did not.  The vast majority (roughly 90 percent) of these removals are of Black and Hispanic children.[175]  While the exact numbers of current members of the Classes and Subclasses are unknown to Plaintiffs at this time, the Classes and Subclasses exceed several hundred members.

331.    The questions of fact and law raised by Plaintiffs' claims are common to and typical of those of each putative member of the Classes they seek to represent.  The City has complete authority and responsibility to conduct investigations of alleged child abuse or neglect and effectuate the removal of children.  The City is on notice of ACS's abuse of its emergency removal power and has failed to train, supervise, or discipline ACS employees on the proper use of the procedures, which constitutes deliberate indifference to the harm, risk of harm, and violation of rights under the United States Constitution suffered by the Plaintiffs and the Class members they represent.

332.    Questions of fact common to the Classes include:

1.  Whether the City has a policy or widespread practice or custom of removing children from their parents or guardians on an emergency basis where there is time to seek a court order.

---

[174] *Child Welfare Indicators Annual Report CY 2025*, *supra* note 21, at 17.

[175] *See Demographics of Children and Parents at Steps in the Child Welfare System, FY 2025*, N.Y.C. Admin. for Child.'s Servs. at 1-2, https://www.nyc.gov/assets/acs/pdf/data-analysis/2025/demographics-of-children-and-parents-at-steps-in-the-child-welfare-system-fy2025.pdf [https://perma.cc/LW8L-9W6R]; *Demographics of Children and Parents at Steps in the Child Welfare System, FY 2024*, N.Y.C. Admin. for Child.'s Servs. at 1-2, https://www.nyc.gov/assets/acs/pdf/data-analysis/2024/demographics-children-fy-2024.pdf [https://perma.cc/9KUC-AQJN].

2. Whether the City's policy, practice, or custom and its adverse racial effects are motivated, at least in part, by race.

3. Whether the City provides adequate training and maintains meaningful oversight to ensure employees do not violate the Classes' constitutional and statutory rights.

4. Whether the City has a policy or widespread practice or custom of discriminating against Black and Latino families when conducting emergency removals.

5. Whether the City fails to reasonably modify existing policy, practice, and custom to avoid violating the Classes' constitutional and statutory rights.

333. Questions of law common to the Classes include:

1. Whether the City's long-standing and well-documented actions or inactions violate the Children's Class's rights under the Fourth Amendment to the United States Constitution.

2. Whether the City's long-standing and well-documented actions or inactions violate the Classes' procedural rights under the Fourteenth Amendment to the United States Constitution.

3. Whether the City's long-standing and well-documented actions or inactions violate the Parents' Class's substantive rights under the Fourteenth Amendment to the United States Constitution.

4. Whether the City's long-standing and well-documented actions or inactions violate the Plaintiffs' Equal Protection Subclasses' equal protection rights under the Fourteenth Amendment to the United States Constitution.

5. Whether the City has a policy, practice, or custom of violating the Children's Class's rights under the Fourth Amendment to the United States Constitution, the Classes' procedural rights under the Fourteenth Amendment to the United States Constitution, the Parents' Class's substantive rights under the Fourteenth Amendment to the United States Constitution, or the Plaintiffs' Equal Protection Subclasses' equal protection rights under the Fourteenth Amendment to the United States Constitution.

334. The violations of law and resulting harms, or risk of harms, presented by the Plaintiffs are typical of the legal violations and harms, or risk of harms, experienced by all Plaintiffs in the Classes.

81

335.    Plaintiffs and their counsel will adequately and fairly protect the interests of all members of the Classes.  The interests of the Class representatives are consistent with those of the Class members.  In addition, counsel for Plaintiffs are experienced in class action and civil rights litigation and have expertise in the conduct of ACS emergency removals.

336.    Plaintiffs' attorneys have identified and thoroughly investigated all claims in this action and have committed sufficient resources to represent the Classes through trial and any appeals.

337.    The City has acted or failed to act on grounds generally applicable to all members of the Classes, necessitating class-wide declaratory and injunctive relief.

338.    Counsel for the Classes know of no conflicts among members of the Classes.

## CAUSES OF ACTION

## COUNT ONE

**(Pursuant to 42 U.S.C. § 1983 on Behalf of Children Plaintiffs and Children's Class)**
**(for Violations of the Fourth Amendment)**

339.    Each of the foregoing allegations is incorporated as if fully set forth herein.

340.    By taking them into government custody through an emergency removal, the City "seizes" children within the meaning of the Fourth Amendment.  Without a family court order— the equivalent of a warrant—the City's emergency removals are warrantless seizures.  Warrantless seizures of children without an objectively reasonable belief of risk to a child's life or health that is so grave and immediate that there is insufficient time to seek prior judicial authorization contravene the Fourth Amendment.

341.    Through ACS's Emergency Removal Policy, the City has implemented, enforced, encouraged, and sanctioned a municipal practice or custom of seizing children without an objectively reasonable belief that the children face risk to their life or health that is so grave and

82

immediate that there is insufficient time to seek prior judicial authorization, in violation of the Fourth Amendment. ACS's Emergency Removal Policy is so consistent and widespread as to constitute a custom or usage with the force of law.

342. Through ACS's Emergency Removal Policy, the City has implemented, enforced, encouraged, and sanctioned this practice or custom by failing to maintain appropriate training, oversight, supervision, monitoring, and discipline of ACS employees and continues to do so. The City has failed to train and/or supervise its employees despite knowing to a moral certainty that ACS employees routinely face the momentous responsibility of assessing whether grave and immediate risk to a child's life or health exists such that there is insufficient time to seek prior judicial authorization. The City has acted with deliberate indifference to the practice of ACS employees engaging in unconstitutional emergency removals.

343. Pursuant to this Policy, ACS employees have seized and continue to seize Children Plaintiffs and members of the Children's Class without an objectively reasonable belief that grave and immediate risk to these children's life or health exists such that there is insufficient time to seek prior judicial authorization and thus extrajudicial removal of these children from their parents is lawful, depriving Children Plaintiffs and the Children's Class of their rights under the Fourth Amendment.

344. Through ACS's Emergency Removal Policy, the City directly and proximately has caused and continues to cause the deprivation of the rights of Children Plaintiffs and the Children's Class under the Fourth Amendment.

345. Through ACS's Emergency Removal Policy, the City implements, enforces, encourages and sanctions the practice or custom of unconstitutional emergency removals in areas where Children Plaintiffs and members of the Children's Class reside and/or routinely visit.

Children Plaintiffs and the Children's Class face an immediate risk that their Fourth Amendment rights will be violated in the future.  Children Plaintiffs and the Children's Class have no adequate remedy at law and will suffer irreparable harm to their constitutional rights unless the City is enjoined from continuing its policy, practice, or custom of unconstitutional emergency removals.

### COUNT TWO

**(Pursuant to 42 U.S.C. § 1983 on Behalf of Plaintiffs, Parents' Class, and Children's Class)**
**(for Violations of the Fourteenth Amendment's Procedural Due Process Rights)**

346.    Each of the foregoing allegations is incorporated as if fully set forth herein.

347.    Procedural due process entitles all Plaintiffs to family court hearings prior to a child's removal from their parent(s) unless there is an objectively reasonable basis to believe that a child faces risk to life or health that is so grave and immediate that there is insufficient time for the City to seek judicial authorization.

348.    Through ACS's Emergency Removal Policy, the City has implemented, enforced, encouraged, and sanctioned a practice or custom of seizing children and removing them from their parents without procedural due process, as required by the Fourteenth Amendment.  The City's practice of unconstitutional emergency removals is so consistent and widespread as to constitute a policy, practice, or custom with the force of law.

349.    The City has implemented, enforced, encouraged, and sanctioned this policy, practice, or custom by failing to maintain appropriate training, oversight, supervision, monitoring, and discipline of ACS employees.  The City has failed to train and/or supervise its employees despite knowing to a moral certainty that ACS employees routinely face the momentous responsibility of assessing whether grave and immediate risk to a child's life or health exists such that there is insufficient time to seek prior judicial authorization and thus extrajudicial removal of

the child from their parents is lawful.  The City has acted with deliberate indifference to the policy and practice of ACS employees engaging in unconstitutional emergency removals.

350.    Pursuant to this policy, practice, or custom, ACS employees have seized and continue to seize members of the Children's Class and remove them from members of the Parents' Class without an objectively reasonable belief that grave and immediate risk to a child's life or health exists such that there is insufficient time to seek prior judicial authorization and extrajudicial removal of the child from their parents is lawful.

351.    The City's policy, practice, or custom has directly and proximately caused and continues to cause the deprivation of Plaintiffs' rights under the Fourteenth Amendment.

352.    The City implements, enforces, encourages, and sanctions the policy, practice, or custom of unconstitutional emergency removals in areas where Plaintiffs reside and/or routinely visit.  Plaintiffs face an immediate risk that their Fourteenth Amendment rights will be violated in the future.  Plaintiffs have no adequate remedy at law and will suffer irreparable harm to their constitutional rights unless the City is enjoined from continuing its policy, practice, or custom of unconstitutional emergency removals.

## COUNT THREE

**(Pursuant to 42 U.S.C. § 1983 on Behalf of Parent Plaintiffs, Parents' Class)**
**(for Violations of the Fourteenth Amendment's Substantive Due Process Rights)**

353.    Each of the foregoing allegations is incorporated as if fully set forth herein.

354.    Through ACS's Emergency Removal Policy, the City has implemented, enforced, encouraged, and sanctioned a practice or custom of removing children from their parents when there are less restrictive alternatives available.  Because the Policy circumvents judicial oversight, it results in removals in circumstances in which children could remain safely at home with court orders, including orders excluding a non-parent from the home, directing ACS to provide services

or material support, and/or requiring the parent to engage in services, submit to testing, or cooperate with ACS supervision. As a result, this Policy significantly interferes with parents' fundamental rights to family integrity, association, and childrearing guaranteed by the Fourteenth Amendment.

355. The City has implemented, enforced, encouraged, and sanctioned this policy, practice, or custom by failing to maintain appropriate training, oversight, supervision, monitoring, and discipline of ACS's employees and continues to do so. The City has failed to train and/or supervise its employees despite knowing to a moral certainty that ACS employees routinely face the momentous responsibility of assessing whether imminent risk to the child exists such that there is not sufficient time to seek judicial authorization and removal of the child from their parents is necessary. The City has acted with deliberate indifference to the practice of ACS employees engaging in unconstitutional emergency removals.

356. Pursuant to this policy, practice, or custom, ACS employees have removed and will continue to remove the children of Ms. Archer, Ms. Lorimer, and members of the Parents' Class without prior judicial authorization or a reasonable belief that their children faced an imminent risk of harm and continue to do so, depriving Ms. Archer, Ms. Lorimer, and the Parents' Class of their fundamental rights guaranteed by the Fourteenth Amendment.

357. The City's policy, practice, or custom has directly and proximately caused and continues to cause the deprivation of the fundamental rights of Ms. Archer, Ms. Lorimer, and the Parents' Class guaranteed by the Fourteenth Amendment.

358. The City implements, enforces, encourages, and sanctions the policy, practice, or custom of unconstitutional emergency removals in areas where Ms. Archer, Ms. Lorimer, and the Parents' Class reside and/or routinely visit. Ms. Archer, Ms. Lorimer, and the Parents' Class face

86

an immediate risk that their Fourteenth Amendment rights will be violated in the future. Ms. Archer, Ms. Lorimer, and the Parents' Class have no adequate remedy at law and will suffer irreparable harm to their constitutional rights unless the City is enjoined from continuing its policy, practice, or custom of unconstitutional emergency removals.

**COUNT FOUR**

**(Pursuant to 42 U.S.C. § 1983 on Behalf of Plaintiffs, Parents' Equal Protection Subclass, and Children's Equal Protection Subclass)**
**(for Violations of the Fourteenth Amendment's Equal Protection Clause)**

359. Each of the foregoing allegations is incorporated as if fully set forth herein.

360. Through ACS's Emergency Removal Policy, the City has enforced a facially neutral tool—emergency removal—with an invidious racial animus. The City has implemented and continues to execute a policy, practice, and custom of seizing children and removing them from their parents on the basis of race in violation of the Equal Protection Clause of the Fourteenth Amendment. The racial disparities reflected in the Emergency Removal Policy—which almost exclusively targets Black and Latino families—as well as an ACS internal audit and reporting on the racial targeting of emergency removals, demonstrate that race is a motivating factor in adopting and implementing the policy. In addition, ACS has consistently ignored widespread documentation from internal audits and extensive media and legislative reporting of the racial disparities in the Emergency Removal Policy, which further demonstrates the racial animus underlying the Policy.

361. The City's policy, practice, or custom of racially discriminatory emergency removals is so consistent and widespread as to constitute a custom or usage with the force of law.

362. The harms to Plaintiffs, the Parents' Equal Protection Subclass, and the Children's Equal Protection Subclass are directly and proximately caused by the invidious racial animus of ACS's policy and practice.

87

363.    The City has acted with deliberate indifference to the Fourteenth Amendment rights of the Plaintiffs and Subclasses.  As a direct and proximate result of the acts and omissions of the City, the Fourteenth Amendment rights of Plaintiffs and the Subclasses have been violated.

364.    ACS subjects Plaintiffs and the Subclasses to their racially discriminatory policy, practice, or custom of emergency removals and targets Black and Latino people in areas where Plaintiffs and the Subclasses reside and/or routinely visit.  A real or immediate threat exists that the Fourteenth Amendment rights of Plaintiffs and the Subclasses will be violated by the City in the future.

365.    Plaintiffs and the Subclasses have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless the City is enjoined from continuing its policy, practice, or custom of unconstitutional emergency removals.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

A.    Enter an order that the Plaintiffs may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Enter judgment pursuant to Rule 57 of the Federal Rules of Civil Procedure, declaring unconstitutional and unlawful:

1. The City's violation of the Children Plaintiffs' and Children's Class's right to be free of unreasonable seizures under the Fourth Amendment;

2. The City's violation of the Plaintiffs' and Classes' procedural due process rights under the Fourteenth Amendment;

3. The City's violation of Parent Plaintiffs' and the Parents' Class's substantive due process rights under the Fourteenth Amendment; and

4. The City's violation of the Plaintiffs' and the Equal Protection Subclasses' equal protection rights under the Fourteenth Amendment.

C.    Provide appropriate equitable and injunctive relief to remedy the City's unconstitutional policy, practice, and custom of abusing the emergency removal power in violation of Plaintiffs' and members of the Classes' constitutional rights;

89

D.      Award compensatory damages to Plaintiffs, in an amount to be proven;

E.      Award Plaintiffs and members of the Classes their fees and costs, including attorneys' fees, as permitted by law;

F.      Award Plaintiffs and members of the Classes prejudgment and post-judgment interest; and

G.      Award Plaintiffs and members of the Classes other and further relief as the Court deems just and equitable.

May 28, 2026

Respectfully submitted,

/s/ David Shalleck-Klein
David Shalleck-Klein
Lewis Bossing
Eliza J. McDuffie
Anna Belle Newport
Amelia Y. Goldberg*
Phoenix Rice-Johnson
Family Justice Law Center
183 Madison Avenue, #419
New York, NY 10016
Tel: (212) 223-6939
dshalleckklein@fjlc.org
lbossing@fjlc.org
emcduffie@fjlc.org
anewport@fjlc.org
agoldberg@fjlc.org
pricejohnson@fjlc.org

*Application pending

Baher Azmy
Adina Marx-Arpadi
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464
bazmy@ccrjustice.org
amarxarpadi@ccrjustice.org

Christine Gottlieb
NYU School of Law Family
   Defense Clinic/Washington
   Square Legal Services
245 Sullivan Street, 5th Floor
New York, NY 10012
Tel: (212) 998-6693
gottlieb@mercury.law.nyu.edu

Tarek Z. Ismail
Julia Hernandez*
Family Defense Clinic
Main Street Legal Services,
   CUNY School of Law
2 Court Square

Lisa Freeman
Anna Blondell
Melissa Friedman
The Legal Aid Society
49 Thomas Street, 10th Floor
New York, NY 10013
Tel: (212) 577-7982
Fax: (646) 616-4982
lafreeman@legal-aid.org
ablondell@legal-aid.org
mfriedman@legal-aid.org

Roger A. Cooper
Andrew Khanarian
Noopur Sen
Ariel Sheffey
Michael Cronin
Cleary Gottlieb Steen
   & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Tel: (212) 225-2000
racooper@cgsh.com
akhanarian@cgsh.com
nsen@cgsh.com
asheffey@cgsh.com
mcronin@cgsh.com

*Attorneys for J.W., J.A., D.A., Z.L., Y.L.,
X.L., W.L., K.L., and the Children's
Class and Children's Subclass*

90

Long Island City, NY 11101
Tel: (718) 340-4141
tarek.ismail@law.cuny.edu
julia.hernandez@law.cuny.edu

*Application pending*

Alan Schoenfeld
Thomas White
Hannah Hoffman
Michaela Olson*
Hailey Elisabeth Kruger
Kendrick Baker*
Wilmer Cutler Pickering
  Hale and Dorr LLP
7 World Trade Center
New York, NY 10007
Tel: (212) 230-8800
Fax: (212) 230-8888
alan.schoenfeld@wilmerhale.com
tom.white@wilmerhale.com
hannah.hoffman@wilmerhale.com
michaela.olson@wilmerhale.com
hailey.kruger@wilmerhale.com
kendrick.baker@wilmerhale.com

*Application pending*

Sean J. Kim
Wilmer Cutler Pickering
  Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Tel: (202) 663-6142
Fax: (202) 663-6363
sean.kim@wilmerhale.com

*Attorneys for Denise Archer, Danielle
Lorimer, and the Parents' Class and
Parents' Subclass*

91