**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DENISE ARCHER, et al., on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>     v.<br><br>CITY OF NEW YORK,<br><br>               Defendant. | Case No. 1:26-cv-4426<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................................. i

PRELIMINARY STATEMENT ..................................................................................................... 1

FACTUAL AND LEGAL BACKGROUND ................................................................................... 3

    I.      ACS's Emergency Removal Policy.................................................................................. 3

         A.     Reporting, Investigations, and Child Removals ....................................... 3

         B.     ACS's Emergency Removal Policy........................................................... 4

    II.     The Emergency Removal Policy Targets Black and Latino Families .................... 8

    III.    Plaintiffs and the Classes Have Been Harmed and Are at Risk of Further Harm from ACS's Emergency Removal Policy ......................................................... 10

LEGAL STANDARD.................................................................................................................... 13

ARGUMENT................................................................................................................................. 14

    I.      PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(a) ................... 14

         A.     The Classes and Subclasses Are So Numerous That Joinder of All Members Is Impracticable.............................................................. 14

         B.     The Classes' and Subclasses' Claims Present Common Questions of Law and Fact.................................................................................. 15

         C.     Plaintiffs' Claims Are Typical of the Classes' and Subclasses' Claims... 19

         D.     Plaintiffs and Proposed Class Counsel Will Fairly and Adequately Represent the Interests of the Classes and Subclasses............................. 20

             1.     Plaintiffs' Interests Are Not Antagonistic to the Interests of the Class Members............................................................................. 20

             2.     Class Counsel Are Qualified, Experienced, and Capable.............. 21

    II.     PLAINTIFFS MEET THE REQUIREMENTS OF RULE 23(b)(2).................... 23

CONCLUSION.............................................................................................................................. 24

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)..................................................................................................20, 23

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)..........................................................................................................14

*B.K. ex rel. Tinsley v. Snyder*,
922 F.3d 957 (9th Cir. 2019) ..........................................................................................23

*Barrows v. Becerra*,
24 F.4th 116 (2d Cir. 2022) ......................................................................................18, 19

*Basso v. N.Y. Univ.*,
363 F. Supp. 3d 413 (S.D.N.Y. 2019)..............................................................................17

*Brennan v. City of New York*,
Nos. 19-CV-02054 (NGG) (CLP), 20-CV-01716 (NGG) (CLP), 2023 WL
5672590 (E.D.N.Y. Sept. 1, 2023).......................................................................................16

*Brown v. Kelly*,
609 F.3d 467 (2d Cir. 2010)..............................................................................................16

*Caridad v. Metro N. Commuter R.R.*,
191 F.3d 283 (2d Cir. 1999)..............................................................................................14

*Consol. Rail Corp. v. Town of Hyde Park*,
47 F.3d 473 (2d Cir. 1995).................................................................................................14

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007)................................................................................................20

*Daniels v. City of New York*
198 F.R.D. 409 (S.D.N.Y. 2001) .....................................................................................16

*Elisa W. v. City of New York*,
82 F.4th 115 (2d Cir. 2023) .....................................................................13, 15, 17, 18, 19

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
62 F.4th 704 (2d Cir. 2023) .............................................................................................15

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009)................................................................................................21

*In re Foodserv. Inc. Pricing Litig.*,
   729 F.3d 108 (2d Cir. 2013)..................................................................................13

*In re Initial Pub. Offerings Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006)....................................................................................14

*Johnson v. Nextel Commc'ns Inc.*,
   780 F.3d 128 (2d Cir. 2015)..................................................................................15

*Kindle v. Dejana*,
   315 F.R.D. 7 (E.D.N.Y. 2016)..............................................................................15

*Marisol A. ex rel. Forbes v. Giuliani*,
   929 F. Supp. 662 (S.D.N.Y. 1996) .......................................................................23

*Marisol A. v. Giuliani*,
   126 F.3d 372 (2d Cir. 1997)............................................................................20, 23

*Nat'l L. Ctr. on Homelessness & Poverty v. New York*,
   224 F.R.D. 314 (E.D.N.Y. 2004) .........................................................................20

*Newman v. RCN Telecom Servs., Inc.*,
   238 F.R.D. 57 (S.D.N.Y. 2006) ...........................................................................18

*Nicholson v. Williams*,
   205 F.R.D. 92 (E.D.N.Y. 2001) ...........................................................................23

*Parker v. Time Warner Ent. Co.*,
   239 F.R.D. 318 (E.D.N.Y. 2007) .........................................................................15

*Pls. #1-21 v. County of Suffolk*,
   No. 15-CV-2431 (WFK) (LB), 2021 WL 1255011 (E.D.N.Y. Mar. 12, 2021) ...............16

*Pls. 1-3 v. City of New York*,
   814 F. Supp. 3d 331 (E.D.N.Y. 2025) ..................................................................15

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993)............................................................................14, 19

*Robinson v. N.Y.C. Transit Auth.*,
   No. 19 Civ.1404 (AT), 2020 WL 5814189 (S.D.N.Y. Sept. 30, 2020)............................16

*Stinson v. City of New York*,
   282 F.R.D. 360 (S.D.N.Y. 2012) .....................................................................16, 23

*Sykes v. Mel Harris & Assocs., LLC*,
   285 F.R.D. 279 (S.D.N.Y. 2012) .........................................................................18

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)...................................................................................13, 15, 16, 19, 23

## DOCKETED CASES

*A.M. ex rel. Mobley v. Mattingly*,
  No. 10-CV-02181 (E.D.N.Y.)...................................................................................21

*B.B. ex rel. Rosenthal v. Hochul*,
  No. 21-CV-06229 (E.D.N.Y.)...................................................................................21

*Gould v. City of New York*,
  No. 24-CV-1263 (E.D.N.Y.)....................................................................................22

## STATUTES, RULES, AND REGULATIONS

Fed. R. Civ. P.
  5.2(a) ........................................................................................................................2
  23(a) .................................................................................................2, 13, 14, 18, 24
  23(a)(4) .............................................................................................................20, 22
  23(b)(2) ................................................................................1, 2, 3, 13, 15, 23, 24
  23(c)(5) ...................................................................................................................13
  23(g)..................................................................................................................22, 24

N.Y. Fam. Ct. Act
  § 1021.......................................................................................................................4
  § 1022.......................................................................................................................4
  § 1024.......................................................................................................................4
  § 1027(a)(iii) ...........................................................................................................4

N.Y. Soc. Serv. Law
  § 372(3)-(4)..............................................................................................................2
  § 412(6)....................................................................................................................4
  § 412(7)(ii) ..............................................................................................................4
  § 422(2)(a) ...............................................................................................................3
  § 424(7)....................................................................................................................4

**PRELIMINARY STATEMENT**

Every year, New York City's Administration for Children's Services ("ACS") removes hundreds of children from their parents' custody without prior judicial review and without justification for acting unilaterally, pursuant to an unwritten "Emergency Removal Policy."  By this motion, Plaintiffs move the Court to certify classes and subclasses under Rule 23(b)(2) to vindicate rights under the United States Constitution and to obtain injunctive and declaratory relief for parents and children who have been, are, or will be subject to forcible family separation under ACS's Emergency Removal Policy.

Before ACS can remove a child from their parent following a report of abuse or neglect, the law ordinarily requires the agency to demonstrate in a court hearing that the child faces an imminent risk of harm that necessitates removal.  These court hearings can offer children and parents the opportunity to challenge ACS's allegations and fight to maintain the integrity of their families.  Under the Emergency Removal Policy, however, ACS staff routinely execute extrajudicial removals in circumstances that do not present a risk to the child's life or health so grave and immediate that there is insufficient time to seek a court order.

ACS conducts extrajudicial removals at a staggeringly high rate.  ACS's reports show that annually ACS conducts about 50% of all removals without a court order.  In 2025, ACS removed nearly 1,400 children from their families on a purported emergency basis.  In the first three months of this year, ACS used its emergency removal power in at least 59% of reported removals, separating hundreds of children from their families without a court order.

ACS's Emergency Removal Policy almost exclusively targets Black and Latino families.  Year after year, about 90% of children seized from their families on an emergency basis—over 1,100 children in 2025—are Black or Hispanic.  Hispanic families are five times more likely, and Black families ten times more likely, to have their children seized than are white families.  ACS

1

staff have described the agency as "predatory" and one "that specifically targets Black and Brown parents" and applies "a different level of scrutiny" to them.

Plaintiffs submit this Memorandum in support of their motion to certify two classes for declaratory and injunctive relief under Rule 23(b)(2).  The first class, represented by Child Plaintiffs J.W., J.A., D.A., Z.L., Y.L., X.L., W.L., and K.L., is defined as all children who have been, are, or will be seized by ACS without a court order, parental consent, or threat of such immediate harm to the child's health or safety that there is insufficient time to secure a court order (the "Children's Class").  The second class, represented by Parent Plaintiffs Denise Archer and Danielle Lorimer,[1] is defined as all parents whose children have been, are, or will be seized by ACS without a court order, parental consent, or threat of such immediate harm to the child's health or safety that there is insufficient time to secure a court order ("Parents' Class," and, together with the Children's Class, the "Classes").  Plaintiffs also seek certification of Rule 23(b)(2) subclasses. The first subclass, represented by the Child Plaintiffs, is defined as all members of the Children's Class who are Black or Latino (the "Children's Equal Protection Subclass").  The second subclass, represented by Parent Plaintiffs Archer and Lorimer, is defined as all members of the Parents' Class who are Black or Latino (the "Parents' Equal Protection Subclass," and together with the Children's Equal Protection Subclass, the "Equal Protection Subclasses").

As demonstrated below, Plaintiffs satisfy the requirements for each of the proposed Classes and Subclasses under Rule 23(a) and (b)(2).  Each Class and Subclass satisfies Rule 23(a):  (1) the

---

[1] Pseudonyms are used for the protection of Plaintiffs and their families.  *See* Fed. R. Civ. P. 5.2(a); N.Y. Soc. Serv. Law § 372(3)-(4).  In Plaintiffs' Complaint, Jasmine is a pseudonym of minor Plaintiff J.W., Jeremiah is a pseudonym of minor Plaintiff J.A., and Daevon is a pseudonym of minor Plaintiff D.A.  Jasmine, Jeremiah, and Daevon are Ms. Archer's children.  Zoe is a pseudonym of minor Plaintiff Z.L., Yolanda is a pseudonym of minor Plaintiff Y.L., Xena is a pseudonym of minor Plaintiff X.L., Willow is a pseudonym of minor Plaintiff W.L., and Kayden is a pseudonym of minor Plaintiff K.L.  Zoe, Yolanda, Xena, Willow, and Kayden are Ms. Lorimer's children.  Plaintiffs will share identifying information with the City after entering into a protective order.

2

Classes and Subclasses number in the hundreds, at least, making joinder impractical; (2) they present common questions regarding seizures of children from their parents under ACS's Emergency Removal Policy; (3) Plaintiffs' claims are typical of the Classes and Subclasses they seek to represent, arising from the same unlawful policy, practice, or custom of ACS and supported by the same legal arguments; and (4) Plaintiffs and Class Counsel will fairly and adequately represent the interests of the Classes and Subclasses.  Lastly, certification is warranted under Rule 23(b)(2), as Plaintiffs request class-wide injunctive and declaratory relief to address ACS's systemic and unconstitutional seizures of children under its Emergency Removal Policy.

For these reasons, Plaintiffs respectfully request that the Court grant this motion and certify the Classes and Subclasses.

FACTUAL AND LEGAL BACKGROUND

I.   ACS'S EMERGENCY REMOVAL[2] POLICY

A.   Reporting, Investigations, and Child Removals

A family's involvement with ACS begins with a call to the New York Statewide Central Register of Child Abuse and Maltreatment (the "SCR"), a hotline operated by the New York State Office of Children and Family Services ("OCFS") that screens calls concerning the welfare of children in New York State.[3]  Reports to the hotline pertaining to families in New York City are forwarded to ACS.[4]  Once ACS begins an investigation, it has sixty days to classify the report as "indicated," meaning ACS has determined it is more likely than not that a child was neglected or

---

[2] ACS defines a "removal" as "any interference with the parent's right to custody of the child[.]"  (Ex.1 to Declaration of Thomas White, N.Y.C. Admin. for Child.'s Servs., *Child Safety Alert No. 30*: *Conducting Emergency Removals of Children* at 123.)  (All numbered exhibits are to the Declaration of Thomas White dated May 29, 2026.)  This definition includes instances where ACS physically removes a child from their parent's care or otherwise directs the separation of child from parent; the seizure of the child may occur at the home, school, hospital or other location.  (Ex.2; N.Y.C. Admin. for Child.'s Servs., *When A Safety Plan Becomes A Removal* at 9.)

[3] N.Y. Soc. Serv. Law § 422(2)(a).

[4] *Id.*

3

abused, or "unfounded," in which case the report is closed.[5]

Where a report is indicated, ACS is not required to separate the child from the parent. (Compl. ¶ 39.) ACS may offer the family services, seek protective orders after filing a petition[6] alleging abuse or neglect, or pursue court and agency supervision over the family. (*Id.*) Should ACS believe it necessary to remove the child, it may secure authorization from the court by filing a petition and application for removal under New York Family Court Act § 1027(a)(iii) (through a "§ 1027 hearing"). Alternatively, if ACS believes there is insufficient time to file a full petition, it may file a pre-petition application, often *ex parte*, under § 1022 (through a "§ 1022 *ex parte* order").[7]

The final—and most extreme—option allows ACS to remove a child unilaterally, without pre-deprivation due process or a court order, on an emergency basis under § 1024 of the Act. Emergency removals are strictly limited to exigent circumstances where the child's life or health is in imminent danger and there is insufficient time to seek a court order, even *ex parte*. After conducting an emergency removal, ACS must file a petition in family court by the next business day to afford families notice and an opportunity to be heard at the earliest available time. (*Id.* ¶ 53.)

## B.    ACS's Emergency Removal Policy

Although its emergency power is designed to be a tool of last resort, ACS routinely removes children without prior judicial review and absent justification for acting unilaterally. ACS has adopted an unwritten "Emergency Removal Policy," whereby ACS staff routinely execute

---

[5] N.Y. Soc. Serv. Law §§ 412(6), (7)(ii), 424(7).

[6] As used in this Memorandum, "petition" refers to the accusatory instrument used to initiate an Article 10 abuse or neglect case in New York Family Court.

[7] Under the Family Court Act, ACS may also temporarily remove a child with their parent's written consent. N.Y. Fam. Ct. Act § 1021. Based on its response to a FOIL request, ACS does not appear to conduct removals with written parental consent in New York City. (Compl. ¶ 41.)

4

extrajudicial removals in circumstances that do not present a risk to the child's life or health so grave and immediate that there is insufficient time to seek a court order.  (*Id.* ¶ 57.)  Under the Policy, ACS disregards whether there is sufficient time to seek court authorization and thus regularly bypasses judicial review.  (*Id.*)  Each of the putative class members has been subject to, and/or is at heightened risk of, this unwarranted resort to emergency removals in circumstances where ACS could have otherwise sought judicial review and allowed families to be heard.

ACS's Emergency Removal Policy is reflected in the staggering rate at which ACS seizes children on a purported emergency basis.  The City's own data show that ACS consistently conducts about 50% of its removals of children, over a thousand every year, using its emergency removal power.  (*Id.* ¶¶ 60–71.)  In 2025, when removing children at the outset of a case, ACS used its emergency removal power in at least 53.7% of cases, separating hundreds of children from their families without due process or a court order.[8]  In 2024, ACS removed at least 1,428 children from their families using its emergency power;[9] in 2023, it removed at least 1,500 children under this authority.[10]  In just the first three months of 2026, ACS used its emergency removal power in at least 59.3% of cases, separating hundreds of children from their families without due process or court order.[11]

These numbers likely underrepresent how often ACS wields its emergency removal

---

[8] (Ex.3; N.Y.C. Child., *Flash Report: Monthly Indicators* at 13; Ex.4; N.Y.C. Admin. for Child.'s Servs., *Child Welfare Indicators Annual Report CY 2025*, at 17 [hereinafter *Child Welfare Indicators 2025*].)

[9] (Ex.5; N.Y.C. Child., *Flash Report: Monthly Indicators* at 13; Ex.6; N.Y.C. Admin. for Child.'s Servs., *Child Welfare Indicators Annual Report CY 2024*, at 17.)

[10] (Ex.7; N.Y.C. Child., *Flash Report: Monthly Indicators* at 13; Ex.8; N.Y.C. Admin. for Child.'s Servs., *Child Welfare Indicators Annual Report CY 2023*, at 17.)

[11] (Ex.9; N.Y.C. Child., *Flash Report: Monthly Indicators* at 13.)

power.[12]  ACS may remove and then return a child, sometimes days or weeks later, without ever filing a petition in family court.  (Compl. ¶ 74.)  As a result, ACS's public reporting fails to capture the full number of families it subjects to emergency removals.  (*Id.*; Declaration of Denise Archer ("Archer Decl.") ¶¶ 6–8; Declaration of Emma Ketteringham ("Ketteringham Decl.") ¶¶ 18–20; Declaration of Lauren Shapiro ("Shapiro Decl.") ¶¶ 13, 18.))  These secret removals are sanctioned by ACS's Emergency Removal Policy.

ACS's Emergency Removal Policy is also reflected by the high rate of cases—over 25%—that ACS brings to court after an emergency removal in which the court does not find justification for the child to remain in state custody.[13]  As a proxy for unconstitutional removals, this rate is also likely a significant undercount, including because the data on cases where the family court maintains a child in state custody include a significant number in which the court subsequently orders the child's return after parent and child have challenged the initial removal order.[14]

Further, ACS's own reports reveal how the agency incentivizes caseworkers to overuse emergency removals.  (Compl. ¶ 82.)  In 2020, ACS commissioned an internal audit on racial inequity, which included interviews with more than 50 caseworkers as well as ACS leadership (the "ACS Audit").[15]  The ACS Audit (uncovered through a FOIL request) reveals the pretext

---

[12] (Ex.10; Ctr. for N.Y.C. Fam. Affs., *Watching the Numbers 2023: Covid-19's Effects on Child Welfare System* (reporting higher numbers of total emergency removals between 2017-2022 than ACS reported); Ex.11; Ctr. for N.Y.C. Fam. Affs., *Watching the Numbers 2025* (reporting higher numbers of total emergency removals between 2018-2023 than ACS reported).)

[13] (Ex.12; The City Council of New York, *Report of the Finance Division on the Fiscal 2021 Preliminary Financial Plan, Fiscal 2021 Preliminary Capital Budget, Fiscal 2021 Preliminary Capital Commitment Plan, and the Fiscal 2020 Preliminary Mayor's Management Report for the Administration for Children's Services*, at 41.)

[14] ACS's own data show that between 2014 and 2019, nearly 26% of the approximately 18,000 hearings challenging removal orders resulted in the family court ordering a child returned to a parent.  (Ex.13; Administration for Children's Services Response to Request for Public Information Re: ACS Policies and Procedures, Tables 3a.-b. (on file with Plaintiffs' counsel).)

[15] (Ex.13; antwuan wallace, Abigail Fradkin, Marshall Buxton & Sydney Henriques-Payne, *New York City Administration for Children's Services Racial Equity Participatory Action Research & System Audit: Findings and Opportunities*, Nat'l Innovation Serv.)

undergirding the Emergency Removal Policy. The Audit concluded that "internal and external pressures drive staff to seek removal as a first course of action, to cover the reputation of staff, internally, and ACS, externally."[16] The Audit exposed ACS's "internal culture that operates on fear and intimidation" and "incentivize[s] the removal of children," pressuring caseworkers to "err on the side of safety for themselves" by seeking removal and thereby avoiding liability.[17] ACS staff reported that leadership situates caseworkers as "detectives looking for reasons to remove children, rather than as social workers aiming to support families."[18]

Advocates representing parents and children during ACS investigations and in Article 10 proceedings in family court confirm these concerns. (Ketteringham Decl. ¶¶ 16–17, 21; Declaration of Christine Waer ("Waer Decl.") ¶¶ 10–12.) Lawyers representing both children and parents have seen numerous cases in which ACS removed children from their parents on an emergency basis where there was sufficient time to safely seek a court order authorizing the removal. (Ketteringham Decl. ¶ 22; Shapiro Decl. ¶ 16; Waer Decl. ¶ 11; Declaration of Zainab Akbar ("Akbar Decl.") ¶ 17; Declaration of Brian Zimmerman ("Zimmerman Decl.") ¶ 10–11.) Across the city, the family courts are open five days a week, from 9:00 a.m. to approximately 5:00 p.m. (Waer Decl. ¶ 7; Akbar Decl. ¶ 9; Shapiro Decl. ¶ 11.) Yet lawyers observe that ACS emergency removes children on weekdays when the court is open and ACS could obtain a pre-removal order from the court within a matter of hours. (Ketteringham Decl. ¶¶ 11, 22; Zimmerman Decl. ¶ 11.) Moreover, caseworkers frequently conduct extrajudicial removals based on information they had at least 24 hours prior—and sometimes substantially longer—without having

---

[16] (*Id.* at 22.)

[17] (*Id.* at 21.)

[18] (*Id.*)

obtained any new information relevant to the safety assessment.  (Ketteringham Decl. ¶ 22; Akbar Decl. ¶ 17; Declaration of Judge Ann O'Shea ("O'Shea Decl.") ¶¶ 16–17.)

ACS's failure to adequately train and supervise its workforce contributes significantly to this problem.  ACS's training materials—including the ACS Casework Manual, which delineates standards for investigating neglect reports and assessing risk—lack adequate guidance and instructions regarding (i) how to evaluate whether a risk to the child's life or health is imminent, (ii) how to assess whether seeking a court order prior to removal would compromise the child's safety, and (iii) how to determine whether changed circumstances have eliminated the need for an emergency removal.[19]  Nor does ACS provide necessary oversight; its supervision of caseworkers does not involve scrutinizing the constitutionality of emergency removals.  (Compl. ¶ 320.)

As a result, ACS fails to take appropriate disciplinary action against caseworkers who have conducted unlawful emergency removals.  (*Id.* ¶ 322.)  Indeed, based on its response to a FOIL request, ACS does not have any disciplinary policies, protocols, or procedures related to emergency removals.  (*Id.* ¶ 323.)  Thus, a caseworker who conducts an unlawful emergency removal will not be disciplined or subject to any meaningful corrective measures.  (*Id.*)

The inadequate training, supervision, monitoring, and discipline that ACS provides to caseworkers acting under the Emergency Removal Policy directly results in violations of the rights of children and parents.  (*Id.* ¶ 324.)

## II.    THE EMERGENCY REMOVAL POLICY TARGETS BLACK AND LATINO FAMILIES

Under its Emergency Removal Policy, ACS overwhelmingly—indeed, almost

---

[19] (Ex.14; N.Y.C. Admin. for Child.'s Servs., Division of Child Protection Casework Practice Requirements Manual at 93–99; Ex.15; N.Y.C. Admin. for Child.'s Servs., *Conducting Emergency Removals*.)

*exclusively*—separates Black and Latino[20] families.  (Compl. ¶ 263.)

ACS's own data indicates that across the last several years, roughly 90% of emergency removals are executed against Black and Hispanic children, even though only approximately 56% of children in New York City are Black or Hispanic.[21]  In 2025, 88% of children subjected to ACS emergency removals—over 1,100 children—were Black or Hispanic; in 2024, the rate was over 90%.[22]  Comparatively, ACS rarely separates white families on an emergency basis:  Across 2024 and 2025, 3.4% of children subjected to emergency removals were white.[23]  Even when ACS determines a white parent abused or neglected their child, the agency is less likely to emergency remove the child.  In 2025, when ACS indicated reports against white parents, it emergency removed the children 5.2% of the time, compared to 8.7% of the time when indicating reports against Hispanic parents and 10.4% of the time when indicating reports against Black parents.[24]

ACS is aware that its Emergency Removal Policy almost exclusively targets, and reflects discriminatory animus against, Black and Latino families.  (Compl. ¶ 302.)  OCFS, which publishes annual data from jurisdictions across the state, has labeled the overrepresentation of Black and Hispanic families in ACS interactions an "extreme disparity," making ACS a statistical

---

[20] This Memorandum uses the term "Latino" to refer to people of Latin American origin or descent, except where citing statistical data or studies that specifically use the term "Hispanic," in which case the Memorandum preserves the original terminology used in the underlying source for accuracy.

[21] (Ex.16; State Off. of Child. & Fam. Servs., *Disproportionate Minority Representation (DMR) in Child Welfare Services Dashboard*.; Ex.17; State Off. of Child. & Fam. Servs., *Demographics of Children and Parents at Steps in the Child Welfare System, FY 2025*, N.Y.C. Admin. for Child's Servs. at 1-2 [hereinafter Demographics 2025].)

[22] (Ex.17; Demographics 2025; Ex.18; *Demographics of Children and Parents at Steps in the Child Welfare System, FY 2024*, N.Y.C. Admin. for Child.'s Servs. at 1-2 [hereinafter Demographics 2024].)  Family defense advocates confirm the ACS data.  (Ketteringham Decl. ¶¶ 29–30; Waer Decl. ¶ 20; Akbar Decl. ¶ 26; Shapiro Decl. ¶ 27; Zimmerman Decl. ¶ 14.)

[23] (*See supra* note 22; *see also* Ex.19; N.Y.C.L.U., *Racism at Every Stage: Data Shows How NYC's Administration for Children's Services Discriminates Against Black and Brown Families* (finding that in 2022 ACS conducted thousands of investigations leading to hundreds of children being removed from their homes in majority non-white neighborhoods; in contrast, in wealthier and whiter neighborhoods ACS did not remove any children).)

[24] (Demographics 2025, *supra* note , at 1–2.)

outlier among in-state peers.[25]  The ACS Audit found that race plays a pervasive role in ACS's investigations, and described the agency as a "predatory system that specifically targets Black and Brown parents" and subjects them to "a different level of scrutiny[.]"[26]  ACS caseworkers act according to "pervasive anti-Black stereotypes about the abilities of Black and [B]rown parents to care for their children."[27]  "Black and Brown parents are generally presumed to be a risk to their children," while "white parents are presumed to be innocent and are repeatedly given opportunities to fail and try again."[28]  Subsequent ACS reports note that Black and Hispanic children continue to be disproportionately involved in investigations and have disproportionately higher rates of removals to foster care.[29]

ACS is aware of its own reporting, and that of others,[30] on the animus reflected in the almost exclusive use of the Emergency Removal Policy against Black and Latino families, yet has not taken meaningful action to remediate these widespread harms.  (Compl. ¶ 313.)

## III.    PLAINTIFFS AND THE CLASSES HAVE BEEN HARMED AND ARE AT RISK OF FURTHER HARM FROM ACS'S EMERGENCY REMOVAL POLICY

ACS has separated the Child Plaintiffs from Plaintiffs Archer and Lorimer pursuant to its Emergency Removal Policy.  The Parent Plaintiffs and Child Plaintiffs have experienced harm from the Policy and continue to be at risk of future harm.

---

[25] (Ex.20; State Off. of Child. & Fam. Servs., *Disparity Rate Packet 2024 County Comparison*.)

[26] (wallace et al., *supra* note 15, at 14.)

[27] (Ex.21; James Barron, *Some Child Welfare Workers Say the System Is Racist*, N.Y. Times.)

[28] (wallace et al., *supra* note 15, at 15.)

[29] (Ex.22; N.Y.C. Admin. for Child.'s Servs., *Local Law 174 Reporting For the July 1, 2021 Report*); (Ex.23; N.Y.C. Admin. for Child.'s Servs., *Agency Reports: Admin. for Child.'s Servs. LL 174 Work*.)

[30] (N.Y.C.L.U., *supra* note 23, at 11 (concluding that "Black families are treated with more suspicion and less compassion" by ACS)); (Ex.24; The Bronx Defs., *"This Wound is Still Fresh": Stories of Family Survival in the Face of the Administration for Children's Services Racism* at 20 (stating that ACS "acts on racist errors, stereotypes, and tropes when removing children and accusing Black and Latine parents of mistreatment").)  (*Cf.* Waer Decl. ¶ 21 (describing biased comments of ACS caseworkers and supervisors); Akbar Decl. ¶ 27 (same); Ketteringham Decl. ¶ 30 (same).)

Denise Archer is a 36-year-old Black woman who lives in the Bronx with her three children Jasmine, Jeremiah, and Daevon. (Archer Decl. ¶¶ 2–3.) ACS removed her children from her care without prior judicial authorization twice in 2023. (*Id.* ¶ 5.) In March 2023, ACS emergency removed all three children after Ms. Archer sought medical treatment for her daughter's accidental injury. (*Id.* ¶¶ 6–7.) ACS did not file an Article 10 petition and returned the children to Ms. Archer two days later. (*Id.* ¶ 8.) On July 2, 2023, after Ms. Archer asked ACS for help caring for her children, ACS opened a new investigation. (*Id.* ¶¶ 9–12.) On July 3, 2023, a caseworker saw a burn on her younger son. (*Id.* ¶¶ 14–15.) The caseworker took him to the hospital, where doctors confirmed the burn was days old, healing, and did not require further treatment. (*Id.* ¶ 16.) Yet ACS again emergency removed all three children from Ms. Archer's care. (*Id.* ¶ 17.) Four days later, ACS filed an Article 10 petition. (*Id.* ¶ 19.) The family court placed the children in foster care. (*Id.* ¶ 20.) In 2026, the Appellate Division, First Department found that the children had not been at imminent risk of harm and the children were returned to Ms. Archer after almost three years. (*Id.* ¶¶ 21–22.) Ms. Archer and her children are traumatized and deeply fearful about being separated again. (*Id.* ¶ 25.)

Danielle Lorimer is a 37-year-old Black and Latina woman who lives in the Bronx with her five children Zoe, Yolanda, Xena, Willow, and Kayden. (Declaration of Danielle Lorimer ("Lorimer Decl.") ¶¶ 2–3.) ACS first took her children away pursuant to the Emergency Removal Policy in April 2019. (*Id.* ¶ 4.) Later, the family court returned the children to her care. (*Id.* ¶ 8.) Five and a half years later, ACS received a report from the children's school about two of the children's hygiene and tardiness. (*Id.* ¶ 9.) On October 27, 2025, thirteen days after receiving that report, ACS told Ms. Lorimer that she and her family had to enter the shelter system through the Prevention Assistance and Temporary Housing ("PATH") intake center. (*Id.* ¶ 12.) Ms. Lorimer

11

followed ACS's instructions and went to the PATH intake center, but the next day, October 28, 2025, ACS filed an Article 10 petition against her. (*Id.* ¶¶ 14–15.) ACS told the family court it was not seeking a removal order. (*Id.* ¶ 16.) That night—although the circumstances had not changed and Ms. Lorimer and her children were still at PATH—ACS emergency removed all five children. (*Id.* ¶¶ 17–19.) On October 31, 2025, after the family court began a hearing ACS agreed to return the children. (*Id.* ¶¶ 22–23.) The children have been safely in Ms. Lorimer's care ever since. (*Id.* ¶¶ 22–23, 25.) Still, she and the children are fearful and deeply anxious about being separated again. (*Id.* ¶ 27.)

ACS's Emergency Removal Policy inflicts significant harm on parents and children like Ms. Archer, Ms. Lorimer, and their families. (Archer Decl. ¶¶ 24–25; Lorimer Decl. ¶ 27; Declaration of Meredith Trainor ("Trainor Decl.") ¶ 18; Declaration of M.E. ("M.E. Decl.") ¶ 10.) Emergency removals often take place in the middle of the night. (Ketteringham Decl. ¶ 24; Shapiro Decl. ¶ 24; Zimmerman Decl. ¶ 13.) Caseworkers frequently arrive at the home accompanied by armed police officers. (Trainor Decl. ¶ 11; M.E. Decl. ¶ 9; Akbar Decl. ¶ 20; Waer Decl. ¶ 14.) The harms of these emergency removals are both well-documented and long-lasting. (Compl. ¶¶ 276–296; Archer Decl. ¶ 24; Waer Decl. ¶¶ 14–16.) Families that are even briefly separated may experience lasting disruptions to family dynamics for years to come. (Compl. ¶ 292; Lorimer Decl. ¶ 27; O'Shea Decl. ¶¶ 18, 20.)

On May 28, 2026, Plaintiffs, on behalf of themselves, two putative Classes, and two putative Subclasses, filed a complaint against the City of New York alleging that ACS's Emergency Removal Policy violated their rights under the Fourth and Fourteenth Amendments. The Children's Class includes children who have been seized by ACS under the Emergency Removal Policy, and the Parents' Class includes parents of such children. The two Subclasses

include all members of the Children's and Parents' Classes who are Black or Latino.  (Compl. ¶¶ 326–329.)

## LEGAL STANDARD

Certification is appropriate when a putative class satisfies the requirements of Rule 23(a) and meets at least one of the standards of Rule 23(b).  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011); *In re Foodserv. Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013).  A class satisfies Rule 23(a) if:  (1) the class is so numerous that joinder of all members is impracticable; (2) there is at least one question of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed R. Civ. P. 23(a).  Additionally, "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class."  Fed. R. Civ. P. 23(c)(5).  The Children's Class, Parents' Class, and Equal Protection Subclasses seek certification under Rule 23(b)(2), which permits class treatment if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Rule 23(b)(2) applies "when a single injunction or declaratory judgment would provide relief to each member of the class."  *Wal-Mart*, 564 U.S. at 360.

While plaintiffs must prove by a preponderance of the evidence that each Rule 23 element is met, *Elisa W. v. City of New York*, 82 F.4th 115, 127 (2d Cir. 2023), courts reviewing a motion for class certification accept as true the complaint's allegations concerning the case's merits.  *See Caridad v. Metro-N. Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999).  "Merits questions may be

13

considered ... only to the extent[] that they are relevant to" determining whether Rule 23 is satisfied. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).[31]

**ARGUMENT**

## I.    PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(a)

### A. The Classes and Subclasses Are So Numerous That Joinder of All Members Is Impracticable

In the Second Circuit, numerosity is presumed at forty class members. *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Plaintiffs need not demonstrate the "exact class size or identity of class members to satisfy the numerosity requirement." *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).

Here, the Classes and Subclasses easily meet the numerosity requirement. Annually, Defendant consistently seizes over a thousand children from their parents under its emergency removal power.[32] The vast majority (roughly 90%) of these removals are of Black and Hispanic children.[33] In scores of these cases, ACS executed extrajudicial removals in circumstances where the agency had sufficient time to safely seek a court order before removing the child but did not. (Compl. ¶¶ 56–80; Ketteringham Decl. ¶ 22; Waer Decl. ¶ 11; Akbar Decl. ¶ 17; Shapiro Decl;

---

[31] The facts set forth in this Memorandum are, except where noted, those alleged in the Complaint. If Defendant challenges the evidentiary basis for Plaintiffs' arguments for certification, Plaintiffs request the opportunity to conduct discovery of relevant facts. *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 40 (2d Cir. 2006) (district courts have discretion to allow discovery to address disputed issues of fact relevant to each Rule 23 requirement).

[32] (Child Welfare Indicators 2025, *supra* note 8, at 17.)

[33] (Demographics 2025, *supra* note 21, at 1–2; Demographics 2024, *supra* note 22, at 1–2.)

14

¶ 21; Zimmerman Decl. ¶¶ 10–11; O'Shea Decl. ¶¶ 16–17.)  As such, the Classes and Subclasses each easily exceed the threshold beyond which joinder of members is impracticable.[34]

### B. The Classes' and Subclasses' Claims Present Common Questions of Law and Fact

To satisfy commonality, plaintiffs must demonstrate a question of law or fact common to the class.  *Elisa W.*, 82 F.4th at 122–23.  Commonality is "a minimal burden for a party to shoulder," *Kindle v. Dejana*, 315 F.R.D. 7, 11 (E.D.N.Y. 2016) (quoting *Parker v. Time Warner Ent. Co.*, 239 F.R.D. 318, 329 (E.D.N.Y. 2007)); "even a single common question will do," *Wal-Mart*, 564 U.S. at 359 (citation modified); *see also Elisa W.*, 82 F.4th at 127 (vacating denial of certification where district court failed to analyze each proposed common question for "whether *any one of them* could generate a common answer" (emphasis added)).  As the Supreme Court has clarified, commonality turns on the action's ability to "generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (citation omitted).  Commonality exists if there is at least one question "capable of classwide resolution," such "that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

"Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Elisa W.*, 82 F.4th at 123 (quoting *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137–38 (2d Cir. 2015)).  Accordingly, courts in

---

[34] Additionally, although the implied requirement of ascertainability does not apply to Rule 23(b)(2) class actions, should it apply the proposed Classes and Subclasses meet the requirement.  The Classes are defined to include children, and parents of children, who have been, are, or will be seized by ACS without a court order, parental consent, or threat of such immediate harm to the child's health or safety that there is insufficient time to secure a court order.  The Subclasses are defined as all members of the Children's Class or Parents' Class who are Black or Latino.  Should the requirement apply here, membership in the Classes and Subclasses would be established with "definite boundaries," *Pls. 1-3 v. City of New York*, 814 F. Supp. 3d 331, 348 (E.D.N.Y. 2025) (citing *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 716 (2d Cir. 2023)), and the requirement satisfied because ACS maintains records of all potential class members, their race, whether the member was subjected to an emergency removal, and information about each removal.

15

this Circuit routinely find commonality satisfied where Plaintiffs challenge a single practice or custom—here, ACS's widespread seizure of children from their parents under its Emergency Removal Policy—that applies to all class members. *See, e.g.*, *Brennan v. City of New York*, Nos. 19-CV-02054 (NGG) (CLP), 20-CV-01716 (NGG) (CLP), 2023 WL 5672590, at *4 (E.D.N.Y. Sept. 1, 2023) (commonality satisfied where "class members' injuries derive from a unitary course of conduct by a single system." (citation modified)); *Robinson v. N.Y.C. Transit Auth.*, No. 19 Civ. 1404 (AT) (BCM), 2020 WL 5814189, at *5 (S.D.N.Y. Sept. 30, 2020) (same); *Pls. #1-21 v. Cnty. of Suffolk*, No. 15-CV-2431 (WFK) (LB), 2021 WL 1255011, at *13 (E.D.N.Y. Mar. 12, 2021) (where "there is 'strong commonality of the violation and the harm,' this 'is precisely the type of situation for which the class action device is suited'" (quoting *Brown v. Kelly*, 609 F.3d 467, 468 (2d Cir. 2010))); *Stinson v. City of New York*, 282 F.R.D. 360, 369 (S.D.N.Y. 2012) ("[T]hat the claims of the proposed class stem from the same alleged unconstitutional conduct of the defendants proves the existence of common questions" (quoting *Daniels v. City of New York*, 198 F.R.D. 409, 417 (S.D.N.Y. 2001))).

Plaintiffs challenge Defendant's Emergency Removal Policy, through which Defendant has violated the rights of Plaintiffs and other similarly situated individuals by removing children from their parents in circumstances that do not present a risk to the child's life or safety so grave and immediate that there is insufficient time to seek a court order. This unlawful policy raises common questions of fact and law that are central to the case. The resolution of these questions will "generate common answers" to an issue central to the validity of each Class and/or Subclass member's claim, allowing for resolution of all claims in a single stroke. *Wal-Mart*, 564 U.S. at 350 (emphasis, citations, and quotation marks omitted).

The following questions of fact and law are common to the Classes and Subclasses:

16

Common Questions of Fact:

- Whether Defendant has a policy or widespread practice or custom of removing children from their parents or guardians on an emergency basis where there is sufficient time to seek a court order.

- Whether Defendant's policy, practice, or custom and its adverse racial effects are motivated, at least in part, by race.

- Whether Defendant provides adequate training or maintains meaningful oversight to ensure employees do not violate the Classes' and Subclasses' constitutional rights.

- Whether Defendant has a policy or widespread practice or custom of discriminating against Black and Latino families when conducting emergency removals.

- Whether Defendant fails to reasonably modify existing policy, practices, and customs to avoid violating the Classes' and Subclasses' constitutional and statutory rights.

Common Questions of Law:

- Whether Defendant's long-standing and well-documented actions or inactions violate the Children's Class's rights under the Fourth Amendment to the United States Constitution.

- Whether Defendant's long-standing and well-documented actions or inactions violate the Classes' procedural rights under the Fourteenth Amendment to the United States Constitution.

- Whether Defendant's long-standing and well-documented actions or inactions violate the Parents' Class's substantive rights under the Fourteenth Amendment to the United States Constitution.

- Whether Defendant's long-standing and well-documented actions or inactions violate the Plaintiffs' Equal Protection Subclasses' equal protection rights under the Fourteenth Amendment to the United States Constitution.

- Whether Defendant has a policy, practice, or custom of violating the Children's Class's rights under the Fourth Amendment to the United States Constitution, the Classes' procedural rights under the Fourteenth Amendment to the United States Constitution, the Parents' Class's substantive rights under the Fourteenth Amendment to the United States Constitution, or the Plaintiffs' Equal Protection Subclasses' equal protection rights under the Fourteenth Amendment to the United States Constitution.

Answering these questions "does not involve the circumstances of any individual [class member]," *Elisa W.*, 82 F.4th at 125, because they each "stand[] to be answered class-wide with a single yes or no," *Basso v. N.Y. Univ.*, 363 F. Supp. 3d 413, 422 (S.D.N.Y. 2019). For example,

17

whether ACS has a policy or widespread practice or custom of removing children from their parents on an emergency basis where there is sufficient time to seek a court order may be answered yes or no for the entire class. The same is true with respect to ACS training and oversight: Either ACS provides adequate training and meaningful oversight to its employees, or it does not. *Cf. Elisa W.*, 82 F.4th at 125 ("[P]laintiffs assert[] that ACS does not impose 'robust' training requirements and that ACS does not maintain oversight over [foster care agencies] ... . If ACS's training requirements are so pervasively deficient as to be unlawful, there would not appear to be any impediment to addressing that unlawful practice in one stroke."). For the Equal Protection Subclasses, either ACS has a widespread policy, practice, or custom of discriminating against Black and Latino families when seizing children from their parents under its Emergency Removal Policy, or it does not.

"[F]actual differences in the claims of the class do not preclude a finding of commonality." *Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 287 (S.D.N.Y. 2012), *aff'd*, 780 F.3d 70 (2d Cir. 2015) (quoting *Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 73 (S.D.N.Y. 2006)). Regardless of how the Emergency Removal Policy was executed in each instance, Plaintiffs and other members of the Classes and Subclasses were all subjected to and harmed by Defendant's unconstitutional policy, practice, or custom. "That the injury arising from the [challenged conduct] may manifest itself differently depending on a [class member's] situation does not defeat the commonality of the class's injury." *Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2022).

The questions of fact and law common to the Classes and Subclasses, when answered, will in one stroke drive resolution of the asserted classwide constitutional claims. Accordingly, the commonality requirement of Rule 23(a) is satisfied.

18

### C. Plaintiffs' Claims Are Typical of the Classes' and Subclasses' Claims

"[W]here the claims of a class stem from a single course of conduct, 'the commonality and typicality requirements of Rule 23(a) tend to merge.'" *Elisa W.*, 82 F.4th at 128 (quoting *Wal-Mart*, 564 U.S. at 349 n.5). "Typicality requires that claims of [would-be] class representatives be typical of those of the class, and is satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Id.* (quoting *Barrows*, 24 F.4th at 131). Where "the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 936–37.

Here, Parent Plaintiffs and each of the eight Child Plaintiffs seek to represent Class members who have suffered harms under ACS's policy, practice, or custom of conducting emergency removals in the absence of such grave and immediate danger to a child's health or safety that there is insufficient time to safely seek a court order. Parent and Child Plaintiffs, who are Black and/or Latino, also seek to represent the Equal Protection Subclasses, alleging that ACS's custom or practice disproportionately and unconstitutionally targets Black and Latino families. (Archer Decl. ¶¶ 2–3; Lorimer Decl. ¶¶ 2–3.)

Plaintiffs allege they were harmed by the same unconstitutional conduct—ACS's seizure of children from their parents under its Emergency Removal Policy—that harmed the putative members of both Classes, making Plaintiffs' claims typical of those of class members. (Compl. ¶¶ 56–59, 85–253; Archer Decl. ¶¶ 10–17; Lorimer Decl. ¶¶ 12–18; Trainor Decl. ¶¶ 4–11; M.E. Decl. ¶¶ 7–10; Ketteringham Decl. ¶¶ 12–25; Akbar Decl. ¶¶ 19–25.) Plaintiffs proposing to represent the Equal Protection Subclasses allege that they were harmed because ACS's child

19

seizures under the Policy disproportionately and unconstitutionally target Black and Latino families, who make up the putative Subclasses. (Compl. ¶¶ 85–253, 260–275; Archer Decl. ¶¶ 2–3; Lorimer Decl. ¶¶ 2–3.) Accordingly, the claims of Plaintiffs are typical of the claims of the class members Plaintiffs seek to represent.

### D.    Plaintiffs and Proposed Class Counsel Will Fairly and Adequately Represent the Interests of the Classes and Subclasses

Plaintiffs and proposed counsel for the Classes must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "Determination of adequacy typically entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (quotation marks and citation omitted).

### 1.    Plaintiffs' Interests Are Not Antagonistic to the Interests of the Class Members.

The interests of Plaintiffs moving to represent the Children's Class, Parents' Class, and Equal Protection Subclasses are not antagonistic to the interests of other class members. The adequacy requirement is met where plaintiffs "seek broad based relief ... [and] the interests of the class members are identical despite the individualized problems of each plaintiff." *Nat'l L. Ctr. on Homelessness & Poverty v. New York*, 224 F.R.D. 314, 325 (E.D.N.Y. 2004). Here, the interests of Plaintiffs and those of the class members are aligned because Plaintiffs seek structural reforms that would benefit all members. The interests of the class members are identical irrespective of the individualized claims of each plaintiff. *See Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997) (Rule 23(a)(4) satisfied where plaintiffs sought "broad based relief which would require the

child welfare system to dramatically improve the quality of all of its services"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (only "fundamental" conflicts prevent certification of a class).

### 2. Class Counsel Are Qualified, Experienced, and Capable.

Class Counsel will represent the Classes and Subclasses fairly and adequately. Plaintiffs' attorneys have identified and thoroughly investigated all claims in this action and have committed significant resources to represent the Classes and Subclasses through trial and any appeals.

The Children's Class Plaintiffs are represented by attorneys who are competent and experienced in class action litigation, child welfare litigation, and complex civil litigation. (Declaration of Lisa Freeman ("Freeman Decl.") ¶¶ 8–9; Declaration of Roger Cooper ("Cooper Decl.") ¶¶ 6–7.) The Legal Aid Society's Special Litigation and Law Reform Unit of its Juvenile Rights Practice is uniquely knowledgeable in handling complex federal civil rights class action litigation on behalf of children alleged to be victims of abuse and neglect in New York City. *See, e.g.*, *B.B. ex rel. Rosenthal v. Hochul*, No. 21-CV-06229 (E.D.N.Y.); *A.M. ex rel. Mobley v. Mattingly*, No. 10-CV-02181 (E.D.N.Y.). (Freeman Decl. ¶¶ 8–9.) Cleary Gottlieb Steen & Hamilton LLP also possesses significant experience in federal class action litigation and public interest litigation throughout the United States. (Cooper Decl. ¶ 6.) Each Plaintiff moving to represent the Children's Class and Children's Equal Protection Subclass appears by their next friend pursuant to Rule 17(c)(1)(A). The next friend for Child Plaintiffs Jasmine, Jeremiah, and Daevon is Jahlia Hernandez, who is sufficiently familiar with the facts of each child's situation and dedicated to each child's best interests, and will fairly and adequately represent each child's best interests. (Compl. ¶ 23.) The next friend for Child Plaintiffs Zoe, Yolanda, Xena, Willow, and Kayden is Jeannette Bocanegra, who is also sufficiently familiar with the facts of each child's

21

situation and dedicated to their best interests, and will fairly and adequately represent each child's best interests. (*Id.* ¶ 24.)

The Parents' Class Plaintiffs are likewise represented by attorneys who are competent and experienced in class action litigation, child welfare litigation, and complex civil litigation. The Family Justice Law Center, a non-profit legal advocacy organization focused on the child welfare system, has experience in the conduct of ACS and federal class action litigation. *See, e.g.*, *Gould v. City of New York*, No. 24-CV-1263 (E.D.N.Y.). (Declaration of David Shalleck-Klein ¶¶ 5–9.) The NYU Family Defense Clinic, which supervises law students in advocacy on behalf of parents in New York family courts, also litigates class actions to protect the rights of families. (Declaration of Christine Gottlieb ¶¶ 5–7, 9–10.) The Center for Constitutional Rights is a national legal, educational, and advocacy organization that has litigated numerous landmark civil rights class actions challenging discrimination by public entities. (Declaration of Baher Azmy ¶¶ 5–7.) The Family Defense Clinic at Main Street Legal Services, CUNY School of Law, has experience litigating civil rights class actions and cases implicating families' constitutional rights during ACS investigations. (Declaration of Tarek Ismail ¶ 5; Declaration of Julia Hernandez ¶ 5.) Wilmer Cutler Pickering Hale and Dorr LLP has significant experience in complex litigation and federal class action litigation throughout the United States. (Declaration of Alan Schoenfeld ¶¶ 5–9.)

Accordingly, Plaintiffs and proposed counsel for the Classes and Subclasses satisfy the requirements of Rule 23(a)(4).[35]

---

[35] For the reasons discussed above, Plaintiffs separately request that this Court appoint Plaintiffs' counsel as class counsel under Rule 23(g).

## II.    PLAINTIFFS MEET THE REQUIREMENTS OF RULE 23(b)(2)

Where, as here, a defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," Rule 23(b)(2) provides for class treatment.  Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(2) "is most commonly relied upon by litigants seeking institutional reform" through class-wide declaratory or injunctive relief.  *Stinson*, 282 F.R.D. at 379 (quotations marks and citation omitted).  "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of Rule 23(b)(2) actions.  *Amchem*, 521 U.S. at 614.  Central to a Rule 23(b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Wal-Mart*, 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

Rule 23(b)(2) certification is appropriate in this case because Plaintiffs seek class-wide injunctive and declaratory relief to address Defendant's unconstitutional policy, practice, or custom of conducting emergency removals in circumstances in which there is not such grave and immediate danger that there is insufficient time to safely seek a court order.  (Compl. ¶ 337.)  Because Plaintiffs seek a uniform remedy to enjoin Defendant's unlawful conduct, this case fits squarely within the scope of Rule 23(b)(2).  *See Nicholson v. Williams*, 205 F.R.D. 92, 99 (E.D.N.Y. 2001) ("Several courts in the Second Circuit have found Rule 23(b)(2) satisfied when the nature of the relief sought by plaintiffs is injunctive and would benefit all class members."); *Marisol A. ex rel. Forbes v. Giuliani*, 929 F. Supp. 662, 692 (S.D.N.Y. 1996), *aff'd*, 126 F.3d 372 (2d Cir. 1997); *cf. B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 971 (9th Cir. 2019) (Rule 23(b)(2) is "unquestionably satisfied when members of a putative class seek uniform injunctive or

23

declaratory relief from policies or practices that are generally applicable to the class as a whole" (citation omitted)). Accordingly, plaintiffs have met the requirements to certify the Classes and Subclasses under Rule 23(b)(2).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court certify a Children's Class, a Parents' Class, and two Equal Protection Subclasses, as set forth above, pursuant to Rules 23(a) and (b)(2), and appoint Plaintiffs' current counsel as Class Counsel under Rule 23(g).

May 29, 2026

Lisa Freeman
Anna Blondell
Melissa Friedman
The Legal Aid Society
49 Thomas Street, 10th Floor
New York, NY 10013
Tel: (212) 577-7982
Fax: (646) 616-4982
lafreeman@legal-aid.org
ablondell@legal-aid.org
mfriedman@legal-aid.org

Roger A. Cooper
Andrew Khanarian
Noopur Sen
Ariel Sheffey
Michael Cronin
Cleary Gottlieb Steen
   & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Tel: (212) 225-2000
racooper@cgsh.com
akhanarian@cgsh.com
nsen@cgsh.com
asheffey@cgsh.com
mcronin@cgsh.com
*Attorneys for J.W., J.A., D.A., Z.L., Y.L.,
X.L., W.L., K.L., and the Children's Class
and Children's Subclass*

Respectfully submitted,

*/s/ David Shalleck-Klein*
David Shalleck-Klein
Lewis Bossing
Eliza J. McDuffie
Anna Belle Newport
Amelia Y. Goldberg*
Phoenix Rice-Johnson
Family Justice Law Center
183 Madison Avenue, Suite 419
New York, NY 10016
Tel: (212) 223-6939
dshalleckklein@fjlc.org
lbossing@fjlc.org
emcduffie@fjlc.org
anewport@fjlc.org
agoldberg@fjlc.org
pricejohnson@fjlc.org

*Application pending

Baher Azmy
Adina Marx-Arpadi
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464
bazmy@ccrjustice.org
amarxarpadi@ccrjustice.org

Christine Gottlieb
NYU School of Law Family
   Defense Clinic/Washington
   Square Legal Services
245 Sullivan Street, 5th Floor
New York, NY 10012
Tel: (212) 998-6693
gottlieb@mercury.law.nyu.edu

Tarek Z. Ismail
Julia Hernandez*
Family Defense Clinic
Main Street Legal Services,
   CUNY School of Law

25

2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4141
Tarek.Ismail@law.cuny.edu
Julia.Hernandez@law.cuny.edu

*Application pending*

Alan E. Schoenfeld
Thomas White
Hannah Hoffman
Michaela Olson*
Hailey Elisabeth Kruger
Kendrick Baker*
Wilmer Cutler Pickering
   Hale and Dorr LLP
7 World Trade Center
New York, NY 10007
Tel: (212) 230-8800
Fax: (212) 230-8888
Alan.Schoenfeld@wilmerhale.com
Tom.White@wilmerhale.com
Hannah.Hoffman@wilmerhale.com
Michaela.Olson@wilmerhale.com
Hailey.Kruger@wilmerhale.com
Kendrick.Baker@wilmerhale.com

*Application pending*

Sean J. Kim
Wilmer Cutler Pickering
   Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Tel: (202) 663-6142
Fax: (202) 663-6363
Sean.Kim@wilmerhale.com
*Attorneys for Denise Archer, Danielle
Lorimer, and the Parents' Class and Parents'
Subclass*

## CERTIFICATE OF COMPLIANCE

I, David Shalleck-Klein, hereby certify pursuant to Local Civil Rule 7.1(c) that the foregoing Memorandum of Law in Support of Plaintiffs' Motion for Class Certification was prepared using Microsoft Word and complies with Local Civil Rule 7.1(c), because it is 7,940 words long.

/s/ David Shalleck-Klein
David Shalleck-Klein